Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUE K. and ROBERT K., individually and on behalf of G.K. a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED BEHAVIORAL HEALTH, and the EMC CORPORATION HEALTH PLAN,<br><br>Defendants. | COMPLAINT<br><br>Civil No. |

Plaintiffs Sue K. ("Sue") and Robert K. ("Robert"), individually and on behalf of G. K. ("G.") a minor, through their undersigned counsel, complain and allege against Defendants United Behavioral Health ("UBH") and the EMC Corporation Health Plan ("The Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Sue and Robert are natural persons residing in Boulder County, Colorado. Sue and Robert are G.'s parents.

1

2. UBH, a subsidiary of United Healthcare Insurance Company, which sometimes operates under the brand name Optum, was responsible to provide mental health coverage and third party administrative services for Plan participants. UBH required that Plan participants also be enrolled in an EMC corporation medical plan for any mental health coverage to be valid. Sue and G. met this requirement during the treatment at issue.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Sue was a participant in the Plan and G. was a beneficiary of the Plan at all relevant times.

4. G. received medical care and treatment at Solacium Sunrise residential treatment center ("Sunrise", a licensed residential treatment facility in Utah, which provides sub-acute treatment to adolescent girls with mental health, behavioral, or substance abuse problems.

5. UBH, denied claims for payment of G.'s medical expenses in connection with her treatment at Sunrise. This lawsuit is brought to obtain the Court's order requiring UBH to pay G.'s unpaid expenses incurred during treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because UBH directed the Plaintiffs to submit the appeal of denied claims through its claim processing center in Utah, and the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### G.'s Developmental History and Medical Background

9. In the seventh grade, G. began to isolate herself away from her friends. She stopped going to after school activities and spent more time by herself in her bedroom, either online or playing video games.

10. During this time, Sue discovered that G. had been going to anorexia websites and that she had been purging and restricting her food intake. In addition, Sue found out that G. had been self-harming by cutting herself. G. attempted to hide her self-harm by wearing bracelets and long sleeved shirts; after this discovery, Sue enrolled G. in therapy.

11. G. suffered from severe anxiety and would be consumed by worry over seemingly inconsequential things like remembering how to open her locker, or getting to class on time. One day in her high school Spanish class, G. was so anxious that she was unable to respond to a question posed by the teacher and she ran out of the class crying. During another incident, G. was ordering fast food, but was so overcome with anxiety that she was unable to relay her order to the restaurant worker.

12. G. told Sue that she was a lesbian. G. joined the gay straight alliance at her school, but was unable to establish a relationship with anyone there. In early January of 2016, G. attempted suicide by overdosing and slashing her wrists. G. was taken by ambulance to

the emergency room, and stayed at the hospital for ten days. While she was there she told hospital staff that she continued to feel suicidal.

13. Sue searched G.'s room and found razor blades and a suicide note. On January 28, 2016, G. was transported to a psychiatric hospital. While the typical length of stay at that hospital was only three days, G. stayed there for over a month because of her ongoing risk of suicide, and her extremely elevated levels of depression and anxiety. G. told her psychiatrist that she wanted to jump off a bridge after she was released, and confessed that she had a large cache of pills stashed in her room.

14. Hospital staff and an educational consultant recommended that G. be transferred to a facility called Northwest Passage after her release from the psychiatric hospital. G. had to be taken there by secure transport due to her ongoing active risk of suicide. G. stayed at Northwest Passage for 30 days and was given a thorough neuropsychological assessment which recommended that she be placed in a residential treatment center.

**Sunrise**

15. After G. completed her acute hospitalization, and on the advice of the medical professionals that treated G., she began her subacute treatment at Sunrise on April 7, 2016.

16. In an Explanation of Benefits statement dated July 19, 2016, UBH denied payment for G.'s treatment at Sunrise "due to No Authorization." Sue contacted an Optum employee named Gloria through a representative and was told that once claims were denied for a lack of authorization, Sue should submit a copy of G.'s medical records and request a retrospective review. Sue did so on October 13, 2016.

17. On October 28, 2016, UBH processed Sue's retrospective review request as if it had been a level one member appeal. The reviewer gave the following justification for maintaining the denial:

> …Your child was admitted for treatment of depression and anxiety. After reviewing the medical records, your child had made good progress and no longer needed the type of care provided in this setting. While your child continued to face challenges as she worked on his [sic] issues, your child had progressed to the point that she was not in immediate danger of hurting herself. Your child may have required staff support for these issues, however, she did not require the kind of structure, monitoring and clinical support found in this setting. …

18. G. was discharged from Sunrise on December 20, 2016.

19. On December 22, 2016, Sue submitted a level two appeal of the denial of G.'s treatment at Sunrise. Sue wrote that on October 13, 2016, she had provided UBH with a copy of G.'s medical records and requested that it perform a retrospective review of the denial.

20. Sue stated that UBH had mistakenly processed her retrospective review request as a full level one appeal. Sue expressed concern that as Optum had not processed her appeal thoroughly enough to determine that it was not a proper level one appeal, it may not have properly reviewed G.'s medical records either.

21. Sue argued that by miscategorizing her retrospective review request, UBH had effectively deprived her of her right to submit a level one appeal and that she had not been given a full, fair, or thorough review. In addition, she contended that due to UBH's error, she did not have time to prepare an appropriately thorough appeal in the short timeframe allowed.

22. Sue included an updated copy of G.'s medical records with the appeal, and argued that G. not only met UBH's admission and continued stay guidelines for residential care, but G. also required the type of care that could only be provided to her in an intermediate residential treatment setting.

5

23. On January 4, 2017, UBH sent Sue and Robert a letter upholding the denial of G.'s treatment at Sunrise. The reviewer gave the following justification for the denial:

    …Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24 hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered. …

    The letter did not provide the proper appeal information for the external review organization utilized by the Plan. On July 18, 2017, a revised letter with the corrected appeal information was sent to Sue and Robert.

24. On June 28, 2017, Sue requested that the denial of G.'s treatment at Sunrise be evaluated by an external review agency. Because the previous denial letter gave incorrect appeal information, Sue submitted this appeal to the improper agency. Sue stated that Optum had erroneously classified Sunrise as a boarding school, when it was in fact, an accredited and "licensed multidisciplinary residential treatment center that does not offer custodial care."

25. Sue disputed the reviewer's assertion that G. was suffering from an acute behavioral health condition. She argued that while G. suffered from a variety of severe behavioral health conditions, none of them were severe enough to require acute hospitalization during the time that G. was at Sunrise. Sue wrote that the sub-acute intermediate level

residential care G. was receiving at Sunrise was the appropriate level of care for G.'s condition, especially given that lower levels of care had been attempted without success.

26. Sue also argued that UBH's classification of residential treatment as acute care conflicted with Optum's definition of a residential treatment center as a sub-acute facility in its Level of Care Guidelines.

27. Sue wrote that G. was enrolled in residential treatment due to serious psychiatric symptoms that interfered with her ability to function. She asserted that residential treatment was clinically appropriate as it was medically necessary, and was the first level of care where G. had made any progress.

28. She argued that the care G. was receiving was not custodial and was given in accordance with generally accepted standards of medical practice, such as those set forth by the American Academy of Child and Adolescent Psychiatry. Sue wrote that G.'s treatment was appropriate for her diagnoses of severe Major Depressive Disorder, Generalized Anxiety Disorder, and Social Anxiety Disorder.

29. Sue included several letters of medical necessity with the appeal from medical professionals who had worked closely with G. Briana Bielmeier, case manager at Northwest Passage wrote in a letter dated May 12, 2016:

> …[G.] continues to present a high level of risk given her struggles to utilize skills. At the time of discharge, it was still important for [G.] to be restricted from various means of harm to herself. It was recommended and medically necessary that [G.] receive intensive therapeutic services in a residential treatment facility to address her mental health needs. …

Pediatric neuropsychologist Dr. Robert T. Law wrote in a May 12, 2016, letter:

> …[G.'s] continued struggles with anxiety and depression have severely impacted her safety and functioning in her daily life. There is significant concern that without interventions, these patterns of emotional distress will continue. Therefore the assessment team strongly recommended that [G.] receive support

and guidance in a residential treatment center to learn and generalize therapeutic skills. …

Ke'ala Cabulagan, LCSW, one of G.'s therapists at Sunrise wrote in part in a June 13, 2017, letter:

> …Having admitted with a significant history of self-harming behaviors and a recent suicide attempt in January 2016, a return to home was not a viable option. Socially, [G.] continued to struggle; suffering from anxiety, she had no desire to form relationships, further preventing any success in returning to home or receiving lower levels of care during the time period of the treatment with Sunrise.
>
> Mr. & Mrs [K.] had no other options for their daughter. [G.] was hospitalized and transferred to a 30 day assessment program, Northwest Passage, in which they received confirmation of her diagnosis of anxiety and depression. Noting significantly high anxiety, the [K.]'s and her program could not consider outpatient treatment as a viable resource to prevent their daughter from acting on her continued suicidal thoughts. …
>
> Of significant concern, is that prior to her attempted suicide it is reported that [G.] spent more time in her room, her leg would bounce, she would wring her hands and itch them, withdrew from friends and refused to participate in activities. Had she been home, there is no question, [G.] would have returned to these behaviors and quickly escalated into another suicidal [sic] attempt. Absolutely, her treatment at Sunrise prevented the worse [sic] from happening, further supporting ongoing medical necessity. …
>
> Had [G.] been treated outside of an RTC [Residential Treatment Center], she would have been unable to maintain the gains in a non-therapeutically staffed environment while at home. …

30. Sue also included a copy of G.'s medical records with the appeal. These records showed that G. continued to struggle with depression and anxiety, and continued to isolate and distance herself from her peers. Sue argued that G. coped with stress by cutting or starving herself, and that G. met all of the Plan's requirements for admission and treatment at Sunrise

31. On March 13, 2018, Sue filed a complaint with UBH's grievances and appeals department. She wrote how UBH had misprocessed her retrospective appeal as a level

8

one appeal request, and had given her incorrect appeal information for the external review process. As a consequence, although Sue submitted her external review request on June 28, 2017, the timeframe for processing the appeal was tolled, and UBH did not send the file out to be processed until March 9, 2018.

32. On March 22, 2018, the external review organization upheld the denial of G.'s treatment at Sunrise. The reviewer gave the following justification for the denial:

> …In this case, the patient is hospitalized after a suicide attempt in January 2016. She has three psychiatric hospital placements from that hospitalization, prior to her entering the Residential Treatment Center during the dates in question. At the time of placement, she is not suicidal. She has improved significantly from the time of her initial hospitalization, though she remains requiring intensive treatment and is vulnerable to relapse. It is her vulnerability to relapse that is stressed as the basis of her requiring RTC level of care, along with her need for continuous in the moment counseling during this time period. However, she goes on several day trips and extended home passes with the family during this time period as well as a camping trip, which is not continuous for her need for continuous in the moment counseling. There is a time that she regresses in May 2016 and has an increase in depression and worry that were she home she would experience suicidal ideation. There are multiple alternative placements in which her need for continued intensive treatment and monitoring could be achieved, less intensive than the RTC. It is general standard [sic] of care to treat an individual at the least restrictive setting in which she/he can be safely and effectively treated. It is not established in the records that this is an RTC environment. She goes on passes and trips, so the treatment that she receives in reality is more consistent with a group home treatment, with access to family and to community. A group home environment, through state department of mental health services (which the records do not indicate were sought in this case) would provide significant structure, continuous and in the moment counseling and support and a safe environment in which to build around additional services. A therapeutic school, for instance, along with outpatient individual, group, medication management and family treatment services. The lack of actual 24/7 care and the lack of accessing community educational and therapeutic services including group living services indicates she was not being treated in the least intensive environment in which safe and appropriate treatment could be provided, which is a requirement for medical necessity determination.

33. On April 9, 2018, Sue wrote a letter in response to the corrected July 18, 2017, denial. She stated that she had discovered new information that was pertinent to Optum's

medical necessity determination, and that she was submitting this letter to UBH to include it.

34. Sue wrote that she had discovered that the Plan was subject to MHPAEA, and that the denials she had received were not MHPAEA compliant. She wrote that UBH had imposed a "non-quantitative treatment limitation" in violation of MHPAEA by requiring acute impairments in order to receive sub-acute care in a residential treatment center.

35. In addition, Sue argued that UBH held residential treatment to a stricter standard than was allowed by MHPAEA. She contended that in order to satisfy the parity requirement, UBH's treatment of residential treatment centers could not be stricter than comparable intermediate medical facilities covered by the Plan such as skilled nursing or rehabilitation facilities.

36. Sue requested that UBH consider the MHPAEA information she had provided even though she had not included it with her previous appeals because, "If the medical necessity criteria in question are not truly in compliance with the MHPAEA, then it would have greatly affected the outcome of previous benefit determinations."

37. The Plaintiffs exhausted their pre-litigation appeal obligations under ERISA and the terms of the Plan.

38. The denial of benefits for G.'s treatments was a breach of contract and caused Sue and Robert to incur medical expenses that should have been paid by the Plan in an amount totaling over $111,000.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

39. ERISA imposes higher-than-marketplace quality standards on insurers and plan

administrators. It sets forth a special standard of care upon plan fiduciaries such as UBH, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

40. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process.  29 U.S.C. §1133(2).

41. UBH and the Plan breached their fiduciary duties to G. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in G.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of G.'s claims.

42. The actions of UBH and the Plan in failing to provide coverage for G.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

43. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

44. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

45. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the

predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

46. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(H).

47. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for G.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does UBH exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner UBH excluded coverage of treatment for G. at Sunrise.

48. The actions of UBH and the Plan requiring that G. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

49. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and UBH, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for

mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

50. The actions of UBH and the Plan, as outlined above, have caused damage to Sue and Robert in the form of denial of payment in an amount totaling over $111,000 for medical services provided to G.

51. The violations of MHPAEA by UBH and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to: surcharge, estoppel, restitution, disgorgement, injunction, accounting, constructive trust, equitable lien, declaratory relief, unjust enrichment, and specific performance, together with prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for G.'s medically necessary treatment at Sunrise under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of MHPAEA;

//
//
//
//

4. For such further relief as the Court deems just and proper.

DATED this 8th day of November, 2018

By    s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Boulder County, Colorado