Brian S. King, #4610
Brent J. Newton, #6950
BRIAN S. KING PC
420 E. South Temple, Suite 420
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUE K. and ROBERT K., individually and on behalf of G.K., a minor, | **MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | Civil No. 2:18-cv-00880-RJS-DBP |
| v. | Chief District Judge Robert J. Shelby |
| UNITED BEHAVIORAL HEALTH and the EMC CORPORATION HEALTH PLAN | Chief Magistrate Judge Dustin B. Pead |
| Defendants. | |

Plaintiffs Sue K. and Robert K., individually and on behalf of G.K., a minor, hereby move the Court to award them summary judgment against Defendants United Behavioral Health ("United") and the EMC Corporation Health Plan (the "Plan") (collectively, "Defendants").

### OVERVIEW

The question posed by this case is somewhat novel in the ERISA context: how should an insurance claims administrator evaluate a patient whose suicidal depression, anxiety disorders, and avoidant personality traits manifest themselves most strongly in constant attempts to mask

those symptoms so as to avoid potentially difficult interactions? More to the point, how should

an ERISA claims administrator evaluate a patient when, after successfully keeping her

worsening mental health a secret from both her parents and her therapists for three years, the

patient attempts suicide and the professionals treating that patient begin to consistently and

ardently warn that her seeming recovery is a mask and that – if released from 24/7 care too early

– she will not be able to keep herself safe?

Defendants' answer to that question was simple: deny that G.K. needed any care beyond

a brief hospitalization (to stabilize her after her suicide attempt) and a monthlong period of

psychological evaluation at Northwest Passage. To reach that conclusion, Defendants ignored the

recommendations of G.K.'s treatment team at Northwest Passage, which advised that G.K.

needed further treatment to teach her to process her mental health disorders rather than hiding

them to the point that she posed a danger to herself again. Defendants also ignored consistent

warnings from G.K.'s treatment team at Solacium Sunrise ("Sunrise"), the residential treatment

facility where G.K. received care after Northwest Passage, those clinicians at Sunrise (and, in her

moments of openness and clarity, G.K. herself) believed that she would not be safe if she did not

receive further residential treatment. Rather than heed the warnings from these professionals or

even engage with their reasoning at all, Defendants elected to take the position that G.K. did not

need even a single day of treatment at Sunrise because she denied suicidal ideation – the very

denial that her treating professionals consistently warned was a mask that should not be trusted.

The Court need not replicate Defendants' mistakes. Instead, on reviewing the medical

records compiled in this brief, the Court should determine that G.K.'s treating professionals at

both Northwest Passage and Sunrise were correct and that it was medically necessary for G.K. to

//

be admitted at Sunrise. Then, the Court should overturn Defendants' wrongful denial of benefits for G.K.'s treatment.

Further, the Court should also find that Defendants violated the Mental Health Parity and Addiction Equity Act ("MHPAEA") by imposing limitations on mental health benefits that are more stringent than the limitations Defendants impose on analogous medical/surgical benefits such as treatment received at skilled nursing, inpatient rehabilitation, and inpatient hospice facilities.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. At all relevant times, Sue K. was a participant and G.K. was a beneficiary in the Plan. G.K. is Sue K.'s daughter.[1]

2. United was the claims administrator for claims for mental health benefits under Plan.[2]

### G.K.'s Struggles With Mental Health Disorders

3. G.K. was born in mid-May, 2001.[3]

4. The prelitigation appeal record contains very little information about G.K.'s medical condition until her seventh grade school year.[4]

5. Beginning in seventh grade (around the year 2013), G.K. began pulling away from friends, dropping out of her school activities, and spending hours online.[5]

6. G.K. would later report that she began to struggle with depression and anxiety in 2013.[6]

//

---

[1] *See* Rec. 0269-70, 1116.
[2] *See id*.
[3] Rec. 2387.
[4] *See generally* Rec. 0001-2392.
[5] Rec. 2387.
[6] *See* Rec. 2333.

7.  During the fall of 2014, it was discovered that G.K. was "going on anorexia websites and posting comments about wanting to disappear."[7]

8.  At some point between 2013 and 2016, G.K. began cutting, but concealed it.[8]

9.  At some point between 2013 and 2016, G.K. also began both purging and restricting her intake of food, but she was again able to conceal it.[9]

10. Beginning in March 2015, G.K. began seeing a therapist every week.[10]

11. By the fall of 2015, G.K. began telling her therapist that she was anxious about going to high school and began avoiding going "out to socialize."[11]

12. However, G.K. was still concealing her cutting, purging, and food restriction from her parents and therapist at this time.[12]

13. Also in the fall of 2015, G.K. came out as a lesbian and joined her school's gay straight alliance, but "did not connect with anyone in this group."[13]

14. By December of 2015, G.K. "began to show signs of anxiety, including not being able to answer her Spanish teacher, walking out of class crying, and not being able to order in a fast food restaurant."[14]

15. During the 2013-2016 time period, G.K. believed she was "able to keep her symptoms pretty much hidden from her parents" and from therapists she had at the time.[15]

---

[7] Rec. 2387.
[8] *See id*.
[9] *See id*.
[10] *See id*.
[11] *Id*.
[12] *See id*.; *see also* Rec. 2333.
[13] *See* Rec. 2387.
[14] *Id*.
[15] Rec. 2333.

16. However, in 2016 G.K. would eventually indicate that:

> [She had] struggled with depression for the past three years. She is often overwhelmed with anxiety especially in social situations. … She reports a marked lack of joy, major social isolation from peers, tends also to isolate more from her family as well. She would rarely interact with her peers, often looking for excuses to stay quite isolated form others. Her school performance was okay but she rarely participated in any class discussion or raise her hand to answer questions or approach her teachers if she needed any help.[16]

17. G.K. began having suicidal thoughts sometime in or about 2014, and continued to have them for the following two years.[17]

18. G.K. would later report that her depression and anxiety worsened in the fall of 2015.[18]

19. By December and January of 2016, G.K. reported that she was having suicidal thoughts "on a daily basis."[19]

20. G.K. would later report:

> These thoughts would include, "I have no reason to live"; no one really cares about me"; etc. Prior to this, [G.K.] struggled in social situations and school. She had a hard time finding motivation for schoolwork and her grades were lower. She reports being anxious about being around people and was very isolated.[20]

21. On January 18, 2016, G.K. attempted suicide by waiting until everyone else in her home had gone to bed, then taking "16 Tylenol and 16 Advil" and making "severe cuts" on her arm.[21]

22. "At 4:00 a.m. [G.K.] texted 911 and was hospitalized … for 10 days."[22]

*//*

---

[16] *Id.*
[17] Rec. 2331.
[18] Rec. 2333.
[19] Rec. 2331.
[20] *Id.*
[21] Rec. 2387; *see also* Rec. 1238.
[22] Rec. 2387.

23. While hospitalized, G.K. "told staff that she was suicidal" and "suicide notes were found in her room and on her phone."[23]

24. Razor blades that G.K. "was using to cut herself" were also found.[24]

25. Following this, G.K. was transferred to Centennial Peaks Psychiatric Hospital ("Centennial") from January 28, 2016 to February 29, 2016.[25]

26. While the "typical stay" at Centennial is "three to five days[,]" G.K. was "there for almost a month because of her acute suicidal ideation[.]"[26]

27. While at Centennial, G.K. "voiced a desire to jump off of a local bridge" and "stated that she had stashed a bag of Advil, Tylenol[,] and Nyquil in her room" to assist her in committing suicide.[27]

28. She would also later report that she had previously considered committing suicide by planning to "jump off a bridge near her house."[28]

29. Centennial referred G.K. to a "30 day assessment program," Northwest Passage.[29]

30. G.K. "required transport" to Northwest Passage "by a professional transport company" due to "her continuing suicidal state."[30]

31. While G.K. was at Northwest Passage from February 29, 2016 to April 5, 2016, she "underwent assessment" and also received "medication to stabilize her depression and anxiety."[31]

---

[23] *Id.*
[24] *Id.*
[25] *See id.*
[26] *Id.*
[27] *Id.*
[28] Rec. 2331.
[29] Rec. 2387.
[30] Rec. 2387-88.
[31] Rec. 2388.

32. Despite this medication, G.K.'s "anxiety continued" and, in fact, "appeared to be exacerbated by the other patients."[32]

**G.K.'s Inpatient Hospitalization, Treatment at Northwest Passage, and Treatment at Solacium Sunrise**

33. After assessing her, the treatment team at Northwest Passage recommended that G.K. receive further residential treatment, indicating that "[G.K.'s] problems with social interaction and her social anxiety contributed to her depression and suicidal ideation[,]" that she "also had a difficult time expressing her emotions[,]" and that she "continued to present a high level of risk, including that it was necessary for her to be restricted from various means to harm herself."[33]

34. Accordingly, G.K. was admitted into Solacium Sunrise ("Sunrise"), a residential treatment center,[34] on April 7, 2016.[35]

35. Upon her admission into Sunrise, G.K. was diagnosed with the following DSM-V Axis I disorders:

   a.  Major Depressive Disorder, recurrent, severe

   b.  Generalized Anxiety Disorder

   c.  Social Anxiety Disorder

   d.  Emerging Avoidant Personality Traits.[36]

36. At Sunrise, G.K. initially struck her treatment team and staff as pleasant, calm, and kind, denying suicidal ideation.[37] However, staff would record observations that G.K.

---

[32] *Id.*
[33] *Id.*
[34] *See* Rec. 1212.
[35] Rec. 2332.
[36] *See id.*
[37] *See, e.g.,* Rec. 0980-1041 (treatment notes from this period of time).

"seemed to be shy when asking for her basic needs to be met"[38] and "[G.K.] seemed

to overall have a positive day *because she kept her emotions at face value*."[39]

37. Shortly after her admission into Sunrise, G.K.'s treatment team noted that G.K.

"struggle[d] with anxiety and depression[,]" but that she would "need to be

challenged to be genuine and honest with where she's at emotionally" because "[s]he

puts on a front of being very sweet and calm."[40] Her treatment team warned staff:

> [B]e very aware of her relationships to make sure they are safe and
> appropriate. Point out inconsistencies between her behavior and her
> mood (if she is saying she's depressed but isn't showing it). Staff can
> model how to share emotions and show her it's ok to let these things
> out.[41]

38. These concerns, along with her treatment team's extra call for staff to be conscious

and observant when interacting with G.K., were reflected in the following notes from

staff or her treatment team indicating that G.K. was manifesting symptoms of

ongoing depression, avoidance, and anxiety:

a. May 1, 2016 – "G.K. seems to be depressed and withdrawn from her
community. Writer has observed her that she [sic] seems to observe
others and tends to shy away when reaching out. [G.K.] seems to
isolate to herself most of the time. She was respectful towards staff
as well as peers with very little interaction."[42]

b. May 2, 2016 – "[G.K.] seemed to have a high level of stress and
anxiety today. She appears to have tried multiple tactics to get her
one team to be mutually respectful, with no solid results. [G.K.]
expressed to staff that she doesn't feel like she is able to grow in her
current situation. … Staff tried to reach out to [G.K.] to make her feel
safe and supported. Staff encouraged her to reach out when she felt
like she was struggling with her peers or her feelings."[43]

---

[38] Rec. 1041.
[39] Rec. 1014 (emphasis added).
[40] Rec. 2334.
[41] *Id*.
[42] Rec. 2336.
[43] Rec. 2337.

    c.   May 4, 2016 – "[G.K.] seemed to struggle a lot emotionally today. After getting her feedback from treatment team she seemed upset and talked with writer about not understanding what they were asking her. [G.K.] said she feels like she's being herself and that she doesn't feel the need to work on relationships with her peers. [G.K.] said she's never had a lot of relationships and that thats [sic] fine with her. [G.K.] seemed to get very emotional while talking with writer about this and even teared up a little. Throughout the night [G.K.] was respectful and did what was expected of her but she seemed to be upset and depressed."[44]

    d.   May 5, 2016 – "[G.K.] appeared to be very closed off. She was compliant with the one team and was respectful to writer. She seemed to keep her conversations surface level and seemed to keep the relationship with writer at arms [sic] length. [G.K.] appeared to be willing and positive towards the community and staff. Writer observed [G.K.] to become deep in her feelings when she felt no one was looking…"[45]

    e.   May 6, 2016 – "[G.K.] seemed aloof, introspective, and quiet today. She seemed to isolate and read a lot throughout the shift and seemed to shift and not respond when asked to check in emotionally. She seemed a bit more frustrated at her peers on the one team today and seemed more agitated than usual…"[46]

    f.   May 7, 2016 – "[G.K.] struggles with self-advocacy. She has a hard time asking for help from teachers. She struggles in social settings."[47]

    g.   May 7, 2016 – "[G.K.] is really good at disguising her anxiety and emotions … [G.K.] has opportunities to open up to her peers and staff, but doesn't seem to be taking the chance to do so. [G.K.] has high social anxiety, so what she needs and wants (to be heard, etc), is also the scariest thing for her. Staff will work on challenging [G.K.] to explore her emotions…

…

[G.K.] still hasn't opened up in class, and continues to remain quiet."[48]

---

[44] Rec. 2338.

[45] Rec. 2339.

[46] Rec. 2340.

[47] Rec. 2341.

[48] Rec. 2343.

h.  May 20, 2016 – "[G.K.] did not seem to open up to peers or staff today. She was agreeable to the point that it was suspicious. She seemed to lay in her bed and isolate after she was done with her morning responsibilities. Overall she seemed to have a less than average day on the AM shift today."[49]

i.  May 23, 2016 – "*[G.K.] is reporting that her depression has not improved and that she thinks it may be worse and the anxiety is still a problem*. She still finds little joy in her life…

…

[G.K.'s] mood is quite depressed, seems quite sad, *nothing to look forward to, feels safe here at Sunrise but would not* be safe at home. She is feeling somewhat hopeless and helpless…"[50]

j.  May 25, 2016 – "… [G.K.] struggles to assert her needs assertively and seems to give up easily. When asked why she doesn't push for her needs, she expresses that she feels it doesn't matter. [G.K.] seems to be struggling to find the value in boundaries as well as her personal needs."[51]

k.  June 4, 2016 – "[G.K.] seems to avoid talking about anything beneath the surface level with staff and peers but continues to do well following basic house expectations."[52]

l.  July 9, 2016 – "[G.K.] told staff she was feeling very anxious today. She said she feels anxious all the time, and if she wasn't anxious, she would be bored all the time.

…

[G.K.] seemed very isolated today. She appeared to try to smooth things over with her roommates and staff today, rather than find a solution to the conflict. [G.K.] seemed very anxious, and was exercising to cope with the anxiety. At lunch she told staff that she feels anxious all the time. She said it is her normal feeling, and if she didn't feel constantly anxious, that she would be bored, as if [nothing] exists about her personality outside her anxiety. Staff asked

---

[49] Rec. 2344.
[50] Rec. 2347 (second emphasis in original).
[51] Rec. 2348.
[52] Rec. 2349.

her what she thought she could accomplish if she was not anxious all the time. She said she didn't know."[53]

39. Over time, G.K. began successfully confronting her anxiety, avoidant behaviors, and depression, and the treatment team and staff at Sunrise began to express optimism and confidence in her outlook. This improvement may be reflected in at least the following notes:

a. September 19, 2016 – "[G.K.] indicates that she is doing quite well and feels good about her progress. She does appear to fewer [sic] complaints than she has had in the past, attitude does appear to be more positive.

…

She looks good today, engages well in the conversation, mood seems to be quite stable, affect is bright, denies self-harm thoughts, much less critical of others and herself, less blaming, appetite is better and her weight is stable."[54]

b. September 28, 2016 – "[G.K.] did not appear to be anxious tonight. She seemed to be calm and content. [G.K.] seemed to start conversations throughout the night with staff as well as peers. She did not appear to hesitate to start any. [G.K.] did appear to be anxious when getting behind in the house schedule and seemed to manage her anxiety well.

…

[G.K.] did not appear depressed. She seemed happy and excited that her parents sent her origami stuff. She appeared to do that most of the night when not doing what was expected of her at that time."[55]

c. October 17, 2016 - "[G.K.] is doing quite well, happy with her present combination of meds. She indicates that she had a good visit with parents over parent weekend. She would like to continue the present medications.

…

---

[53] Rec. 2350.
[54] Rec. 2353.
[55] Rec. 2354.

She looks super today, pleasant, engages well in the conversation, mood is stable, much less of the depression, affect is bright, denies self-harm thoughts, appears to have no side effects to the present medications. She is expecting to be on level four shortly."[56]

d.  December 5, 2016 – "[G.K.] is doing very well, had a super home visit and visited some schools where she plans to enroll after finishing at Sunrise later this month. She is excited about the new changes for her. She would like to stay on her present medications when discharged.

…

[G.K.] looks super today, engages well in the conversation, seems to enjoy my dog and excited told me about the two new puppies they have at home. Her mood is stable, affect is bright and [attitude] is quite positive. We discussed her meds and plan to stay with the present regimen. I left a message for mom that we will have prescriptions for [G.K.] at discharge with refill. [G.K.] did indicate that she has a therapist and a psychiatrist for follow-up when she returns home."[57]

40. G.K. was successfully discharged from Sunrise on December 20, 2016.[58]

**Defendants' Denials of G.K.'s Claims for Benefits and Plaintiffs' Appeals**

41. In an Explanation of Benefits statement dated July 19, 2016, UBH denied payment for all of G.K.'s treatment at Sunrise "due to No Authorization."[59]

42. Sue contacted an Optum employee named Gloria through a representative and was told that once claims were denied for a lack of authorization, Sue should submit a copy of G.K.'s medical records and request a retrospective review.[60]

43. Sue requested the retrospective review on October 13, 2016, indicating:

I am in receipt of an Explanation of Benefits from United Behavioral Health dated July 19, 2016. This Explanation of

---

[56] Rec. 2355.
[57] Rec. 2356.
[58] *See* Rec. 2381-82.
[59] *See* Rec. 0269.
[60] *See* Rec. 0269-70.

Benefit is denying the claims that have been submitted for the
treatment my daughter, [G.K.] has received and continues to
receive at Solacium Sunrise for dates of service April 7, 2016
through today, as no discharge date has been determined yet.

…

At this time, I am exercising our right to request that you please
complete that Retrospective Review and provide authorization for
[G.K.'s] continued stay at the aforementioned facility.

I strongly believe that [G.K.'s] continued intermediate residential
mental health treatment is medically necessary and in accordance
with generally accepted standards of medical practice.

I am enclosing the Sunrise medical records to support our claim that
my daughter's residential treatment is medically necessary…[61]

44. On October 28, 2016, Defendants responded to Sue's request for a retrospective

review and upheld their denial of G.K.'s claims for benefits.[62] Defendants' rationale

for this denial was:

Your child was admitted for treatment of depression and anxiety.
After reviewing the medical records, your child had made good
progress and no longer needed the type of care provided in this
setting. While your child continued to face challenges as she worked
on her issues, your child had progressed to the point that she was not
in immediate danger of hurting herself. Your child may have
required staff support for these issues, however, she did not require
the kind of structure, monitoring and clinical support found in this
setting.[63]

45. Sue appealed a second time, arguing that G.K.'s treatment was medically necessary

and enclosing her medical records and letters from various professionals who had

treated G.K. supporting the contention that her treatment was medically necessary.[64]

//

---

[61] Rec. 0269-70.
[62] *See* Rec. 1102-03.
[63] Rec. 1102.
[64] *See* Rec. 2368-70.

46. Sue attached several letters from professionals who had treated G.K. to her second-

    level appeal, all opining that G.K.'s admission into Sunrise was medically

    necessary.[65]

47. In one of these letters Briana Bielmeier, G.K.'s case manager at Northwest Passage,

    wrote:

> [G.K.] received a comprehensive mental health assessment at
> [Northwest Passage]. … It should be noted that while in this program,
> [G.K.] remained on strict suicide precautions from date of intake until
> March 3, 2016 when she was reduced to minimal suicide precautions.
> Previous history supported that [G.K.] did not verbalize to others of her
> suicidal ideation, though had gone to a great extent to apparently plan
> her suicide (saving pills). As a result, it was important for those
> working with [G.K.] to get to know her well. On March 18, 2016,
> [G.K.] was removed from minimal suicide precautions, given the
> environment allowed for line of sight supervision, structure, support,
> and overnight sleep checks. This environment also restricted [G.K.]
> from accessing items to potentially harm herself. Given [G.K.'s]
> tendency to avoid interactions and severe depression, it was important
> to monitor her closely. While residing in this program, [G.K.] engaged
> in structured programming including group work, educational
> programming, structure free time, and active recreation both indoor and
> outdoor. [G.K.] was willing to engage, though continued to struggle
> with social interactions. While this, in and of itself, was not
> problematic, the pattern of social anxiety and challenges with peer
> interactions has contributed to [G.K.'s] depression and suicidal
> ideation. She also had a difficult time expressing her emotions and
> relied on others to notice the symptoms and initiate the conversations.
> As a result, [G.K.'s] ability to maintain in the community or in lower
> levels of care continue to put her at risk of suicidal ideation and further
> isolative/avoidant behaviors.
>
> At completion of [G.K.'s] assessment, the clinical team recommended
> that [G.K.] continue to receive a high level of care to monitor her affect
> and maintain her safety. [G.K.] continues to present a high level of risk
> given her struggles to utilize skills. At the time of discharge, it was still
> important for [G.K.] to be restricted from various means of harm to
> herself. It was recommended and medically necessary that [G.K.]
> receive intensive therapeutic services in a residential treatment facility
> to address her mental health needs. It was recommended that the
> residential environment be structured and supportive while [G.K.]

---

[65] *See* Rec. 1237-42, Rec. 2380-83.

learns more appropriate skills to manage her suicidal ideation, self-harming behaviors[,] and emotion dysregulation. This pattern appeared to be surrounded by anxiety, depression, and emotion dysregulation.[66]

48. In another letter, Dr. Robert T. Law, a pediatric neuropsychologist who had also provided care for G.K. at Northwest Passage, wrote, in pertinent part:

> In addition to recommendations for continued medication management by a psychiatrist, our clinical team recommended that [G.K.] receive intensive treatment services to assist in developing more effective skills to manage her emotions and behaviors. Her continued struggles with anxiety and depression have severely impacted her safety and functioning in her daily life. There is significant concern that without interventions, these patterns of emotional distress will continue. Therefore, the assessment team strongly recommended that [G.K.] receive support and guidance in a residential treatment center to learn and generalize therapeutic skills. … This level of care will provide [G.K.] with a coordinated and therapeutically-trained team of professionals who can maintain her safety, while supporting her progress to gain new skills by proactively assisting her in the moment and approaching her treatment with a common set of therapeutic goals, in partnership with her parents.[67]

49. A third letter from Ke'ala Cabulagan, G.K.'s treating therapist at Sunrise, indicated:

> This request is medically necessary during the dates of service 04/07/2016-12/21/2016 for the following reasons: Having admitted with a significant history of self-harming behaviors and a recent suicide attempt in January 2016, a return to home was not a viable option. Socially, [G.K.] continued to struggle; suffering from anxiety, she had no desire to form relationships, further preventing any success in returning to home or receiving lower levels of care during the time period of treatment with Sunrise.
>
> [Sue and Robert] had no other options for their daughter. [G.K.] was hospitalized and transferred to a 30 day assessment program, Northwest Passage[.] … Noting significantly high anxiety, the [Plaintiffs] and [G.K.'s] program could not consider outpatient treatment as a viable resource to prevent their daughter from acting on her continued suicidal thoughts.
>
> Daily living shows that [G.K.] struggled with anxiety and depression, putting on a front of being sweet and calm. With the symptoms of high

---

[66] Rec. 1238-39.
[67] Rec. 1241-42.

anxiety, asking for what she needed and wanted was also the scariest thing for her. One of her core beliefs was that she does not matter, contributing to one of the main factors behind her anxiety. [G.K.] also created a hierarchy of things that cause her anxiety and worked on having to [expose] herself to basic daily tasks. Well into treatment, [G.K.] cycled between improvements[ ] and "everything sucks", tending to give up. Effective treatment could only be realized[ ] with in-the-moment coaching opportunities such as an RTC, where highly trained support staff could consistently apply and coach [G.K.] with the development of healthy coping skills.

Furthermore, [G.K.] denied any desire to work on relationships and that they were draining for her. Work needed to be done to identify family roles and how they impact the dynamics at home. [G.K.] viewed her world in black-and-white with regard to relationships. She found it easier to push away from relationships when she felt overwhelmed. Of significant concern[ ] is that prior to her attempted suicide it is reported that [G.K.] spent more time in her room, her leg would bounce, she would wring her hands and itch them, withdrew from friends and refused to participate in activities. Had she been home, there is no question[ ] [G.K.] would have returned to these behaviors and quickly escalated into another suicidal [sic] attempt. Absolutely, her treatment at Sunrise prevented the worse [sic] from happening, further supporting ongoing medical necessity.

While [G.K.] had some improvement at Sunrise, her symptoms of rigid relationships, struggles to recognize her own role, and mood irritability in the context of depression and anxiety displayed and continued throughout her stay at Sunrise. Had [G.K.] been treated outside of an RTC, she would have been unable to maintain the gains in a non-therapeutically staffed environment while at home. That is, if [G.K.] is to be treated in a less intensive setting, such as an out-patient facility, she likely will not have had the same success or continue to maintain the success she had here. …

Based on this evidence of her continued symptoms and behaviors during treatment, it is strongly felt that treatment in an RTC such as Sunrise was the most effective for of treatment for [G.K.'s] behavioral health treatment.[68]

50. On January 4, 2017, Defendants responded and again upheld their denial of G.K.'s claims for benefits at Sunrise.[69] Defendants' rationale was:

---

[68] Rec. 2381-82.
[69] *See* Rec. 1116-17.

Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24 hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety, mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered.[70]

51. Following this, Defendants arranged for an external review organization to evaluate their denial of G.K.'s claims.[71]

52. The external review organization upheld Defendants' denial, reasoning that the care G.K. received at Sunrise was not medically necessary because:

In this case, the patient is hospitalized after a suicide attempt in January 2016. She has three psychiatric hospital placements from that hospitalization, prior to her entering the Residential Treatment Center during the dates in question. At the time of placement, she is not suicidal.

She has improved significantly from the time of her initial hospitalization, though she remains requiring intensive treatment and is vulnerable to relapse. It is her vulnerability to relapse that is stressed as the basis of her requiring RTC level of care, along with her need for continuous in the moment counseling during this time period. However, she goes on several day trips and extended home passes with the family during this time period as well as a camping trip, which is not continuous for her need for continuous in the moment counseling. There is a time that she regresses in May 2016 and has an increase in depression and worry that were she home she would experience suicidal ideation. There are multiple alternative placements in which her need for continued intensive treatment and monitoring could be achieved, less intensive than the RTC. It is general standard of care [sic] to treat an individual at the least

---

[70] Rec. 1116.
[71] *See, e.g.,* Rec. 2386.

restrictive setting in which she/he can be safely and effectively treated. It is not established in the records that this is an RTC environment. She goes on passes and trips, so the treatment that she receives in reality is more consistent with a group home environment, with access to family and to community. A group home environment, through state department of mental health services (which the records do not indicate were sought in this case) would provide significant structure, continuous and in the moment counseling and support and a safe environment in which to build around additional services. A therapeutic school, for instance, along with outpatient individual, group, medication management and family treatment services. The lack of actual 24/7 care and the lack of accessing community educational and therapeutic services including group living services indicates she was not being treated in the least intensive environment in which safe and appropriate treatment could be provided, which is a requirement for medical necessity determination.[72]

### Relevant Plan and Internal Criteria Language

53. To evaluate whether mental health treatment received at a residential treatment facility (such as Sunrise) was medically necessary, Defendants utilized the Optum by United Behavioral Health Level of Care Guidelines for 2016 ("Optum Guidelines").[73]

54. The Optum Guidelines define "Residential Treatment Center" as:

A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient.

The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.[74]

*//*

---

[72] Rec. 2386-87.
[73] Rec. 0148.
[74] *Id.*

55. The Optum Guidelines further provide that admission into a residential treatment

center is warranted when:

- The member is eligible for benefits.
AND
- The member's condition and proposed services are covered by the benefit plan.
AND
- Services are within the scope of the provider's professional training and licensure.
AND
- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission).
  - Failure of treatment in a less intensive level of care is not a prerequisite for authorizing coverage.
AND
- The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care.
AND
- Co-occurring behavioral health and medical conditions can be safely managed.
AND
- Services are the following:
  - Consistent with generally accepted standards of clinical practice;
  - Consistent with services backed by credible research soundly demonstrating that the services will have a measurable and beneficial health outcome, and are therefore not considered experimental;
  - Consistent with Optum's best practice guidelines;
  - Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.
AND
- There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.

- o Improvement of the member's condition is indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care.
- o Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery, resiliency and wellbeing.

AND

- Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care.

AND

- The member is not in imminent or current risk of harm to self, others, and/or property.

AND

- The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include the following:
  - o Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
  - o Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[75]

56. During the same time period, Defendants also used the InterQual Criteria, specialized medical/surgical criteria, to determine whether treatment received at a skilled nursing facility was medically necessary.[76]

57. The InterQual Criteria provide that admission into a skilled nursing facility is medically necessary when both ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ criteria are met.[77]

---

[75] Rec. 0147-48, 0151-52 (bullets and numbering revised slightly for clarity).
[76] *See* Rec. 2637-65.
[77] *See* Rec. 2637.

58. The "███████████" criteria require all of the following criteria to be met:



//

---

[78] Rec. 2637-41 (edited to omit voluminous references to specific medical conditions).

59. Defendants imposed substantial similar guidelines, also created by InterQual, to claims for admission into subacute inpatient rehabilitation facilities.[79]

## STANDARD OF REVIEW

The standard of review differs somewhat between Plaintiffs' causes of action. For both claims, the Court should grant summary judgment if Plaintiffs show that "there is no genuine dispute as to any material fact" and that Plaintiffs are "entitled to judgment as a matter of law."[80] However, when both parties to a cause of action involving wrongful denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B) move for summary judgment, thereby effectively "stipulat[ing] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[81]

By contrast, Plaintiffs' second (MHPAEA) cause of action has the contours of a more typical motion for summary judgment with the non-moving party entitled to the usual inferences in its favor. The MHPAEA cause of action requires *de novo* review because it involves the question of whether the Defendants have violated a federal statute.[82]

//

//

---

[79] *See* Rec. 2616-36.
[80] Fed. R. Civ. P. 56(a).
[81] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (citation and internal quotation marks omitted).
[82] *See Beckstead v. EG&G Tech. Servs. Emple. Benefit Plan*, 2006 U.S. Dist. LEXIS 86158, at *8 (D. Utah 2006) (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) for the proposition that "the determination of a Plan Administrator's compliance with ERISA's statutes and regulations is one of statutory interpretation in which the Court owes the Plan Administrator no deference."); *see also Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir. 1993) *Munnelly v. Fordham University Faculty & Administration HMO Ins. Plan*, 216 F.Supp.3d 714, 727 (S.D.N.Y. 2018).

<u>**ARGUMENT**</u>

I.     **THE COURT SHOULD IMPOSE THE *DE NOVO* STANDARD OF REVIEW.**

The Supreme Court has determined that, in general, "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard" unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[83] If the plan in question does vest discretionary authority, courts instead apply a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[84]

However, even if a plan vests discretionary authority in an administrator, a defendant forfeits access to the deferential "arbitrary and capricious" or "abuse of discretion" standard of review if it fails to comply with ERISA's procedural requirements.[85] In 2002, the Department of Labor established procedural regulations (the "2002 regulations") to "set[ ] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries."[86]

In pertinent part the 2002 regulations require that a plan administrator initially denying a claim for benefits must provide the claimant with information including: (1) "[t]he specific reason or reasons for the adverse determination;" (2) "[r]eference to the specific plan provisions on which the determination is based;" (3) "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such

---

[83] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).
[84] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted).
[85] *See, e.g., Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316-17 (10th Cir. 2009) (reviewing an ERISA claim *de novo* because the defendant insurance company violated the procedural requirements of ERISA).
[86] 29 C.F.R. § 2560.503-1(a).

material or information is necessary;" and (4) for denials based on lack of medical necessity, "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[87]  ERISA's claims procedure regulations also provide that ERISA's guarantee of a "full and fair review" of a plan administrator's denial of benefits requires that the administrator must, at minimum: "take[ ] into account all comments, documents, records, and other information submitted by the claimant related to the claim[;]" and (2) provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits[.]"[88]

In sum, these procedures require that the appeals process must represent "a meaningful dialogue between ERISA plan administrators and their beneficiaries"[89] or else the claim denial is "deemed denied on review without the exercise of discretion by an appropriate fiduciary."[90]

Under the now obsolete pre-2002 version of the ERISA regulations, the Tenth Circuit held that, for purposes of retaining deferential judicial review, some failures to comply with the procedural requirements of ERISA could be overlooked so long as the defendant "substantially complied" with those requirements.[91] The ACA revisions to the claims procedure regulations override this precedent. But even if the Court is inclined to apply *Gilbertson*, Defendants have not shown that they substantially complied with the claims procedure regulations. As the claims administrator and a fiduciary under the plan, Defendants were required to comply with the regulations. They comprehensively failed to do so for at least two reasons.

//

---

[87] *Id*. § 2560.503-1(g)(i),(ii),(iii) and (v).
[88] 29 C.F.R § 2560.503-1(h)(2)(iii)-(iv), *Id*. § 2560.503-1(h)(3)(iii).
[89] *Gilbertson v. Allied Signal*, 328 F.3d 625, 635 (10th Cir. 2003) (citation omitted).
[90] *Id*.
[91] *Gilbertson*, 328 F.3d at 634.

First and foremost, Defendants did not demonstrate that they had taken the opinions of G.K.'s treating professionals into account, nor did they make any attempt to engage with the opinions of the mental health professionals who had treated G.K. Indeed, Defendants' second denial letter states that their review "included an examination of the following information: case notes and medical records."[92] It gives no indication that Defendants even read the letters submitted by Briana Bielmeier, Dr. Robert T. Law, or Ke'ala Cabulagan, and it emphatically does not explain why (assuming Defendants were aware of their opinions) Defendants disagreed with their opinions.

Having litigated against United on many cases, Plaintiffs can attest that Defendants' abject failure to consider or engage with the opinions of G.K.'s treating professionals is not particularly uncommon. United, in particular, does this a lot. However, Defendants' failure is especially galling under these particular circumstances because all three of the letters explained, at some length, that all of the mental health professionals who had treated G.K. uniformly formed the impression that her seemingly good behavior and proclamations that she was no longer suicidal or suffering from anxiety or depression were a "front" or a "mask," designed to avoid confronting the issue because G.K. believed she did not matter and was afraid to assert her actual needs.[93]

Accordingly, G.K.'s treating professionals consistently warned that the fact that G.K. outwardly presented like she had rapidly gone from a suicide attempt and more than a month of intense suicide restrictions to a cheery and sweet young woman was a sign that things had not improved, not a sign that things were getting better.[94] Defendants' warnings were later seemingly

---

[92] Rec. 1116.
[93] *See generally* Rec. 1237-42, Rec. 2380-83.
[94] *See generally id.*

proven right when, on May 23, 2016, G.K. finally opened up and informed staff at Sunrise that her depression had not improved but worsened, and that her anxiety was also still a problem.[95] Defendants either ignored all of this information or refused to engage with it anywhere in their final denial letter.[96] Given the facts of this case, that was a serious procedural irregularity warranting *de novo* review.

Second, Defendants also made no attempt to engage in a "meaningful dialogue" with Plaintiffs concerning Defendants' denials – their rationales for denying G.K.'s claims are conclusory, threadbare, and don't even engage with her own May 23, 2016 representation as to her own mental health status.

Per the 2002 regulations, fulfilling each of the above requirements was the bare minimum necessary to provide Plaintiffs with a full and fair review of G.K.'s claims.[97] Defendants were not entitled to arbitrarily choose not to comply with ERISA's procedural requirements. Ensuring a claimant understands the reasons for a denial required Defendants to explain how they came to their conclusions in light of the terms of the plan *and* in light of the information in the medical records *as applied to those plan terms*.[98] Defendants' denial letters simply do not reflect a reasoned application of the Plan's language to the information Defendants had about G.K.'s medical history.

//

---

[95] *See* Rec. 2347.

[96] *See* Rec. 1116-17.

[97] *See* 29 CFR § 2560.503-1(g)-(h).

[98] 29 C.F.R. §2560.503-1(g)(1)(i), (ii), (iii), and (v) (emphases added); *see also Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004) (providing that "[f]iduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no more evidence in the record to refute that theory.")

Because Defendants extensively and repeatedly failed to comply with ERISA's minimum procedural requirements, the Court should review Defendants' denials of G.K.'s claims *de novo*.

## II.  G.K.'s CARE WAS MEDICALLY NECESSARY UNDER THE OPTUM GUIDELINES.

Whether the Court elects to apply deferential or *de novo* review, Defendants wrongly denied G.K.'s claims first and foremost because the record demonstrates it was medically necessary for G.K. to be admitted into Sunrise on April 7, 2016.

| Optum Criteria | Discussion |
|---|---|
| The member is eligible for benefits. | Because Defendants do not dispute this criterion in their final denial letter, the Court should consider it to be established for purposes of its analysis. |
| The member's condition and proposed services are covered by the benefit plan. | Because Defendants do not dispute this criterion in their final denial letter, the Court should consider it to be established for purposes of its analysis. |
| Services are within the scope of the provider's professional training and licensure. | Read generously, Defendants may have disputed this in their final denial letter when they referred to Sunrise as a "boarding school."[99] To the extent that they did so, Defendants are mistaken. Sunrise is a licensed residential treatment center.[100] |
| The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission).<br><br>Failure of treatment in a less intensive level of care is not a prerequisite for | Defendants' final denial letter disputes that this is criterion is met. Defendants are incorrect.<br><br>Indeed, the record demonstrates that as late as May 23, 2016, G.K. reported that her depression had worsened, not gotten better, and that her anxiety had remained an issue since her enrollment in Sunrise.[101] She also expressed that she had "nothing to look forward to," that she "found little joy in her life," and that she "would |

---

[99] Rec. 1116.
[100] *See* Rec. 1212.
[101] *See* Rec. 2347.

| | |
|---|---|
| authorizing coverage. | not be safe at home."[102]<br><br>This matches with observations from Defendants' own external reviewer, who observed that G.K.'s anxiety had not improved (but had instead worsened) during her time at Northwest Passage.[103]<br><br>These observations align with the opinions of G.K.'s mental health professionals, three of whom warned that G.K. would not be safe to go home and that her seeming improvement should be taken with a grain of salt given her depressive, anxious, and avoidant personality traits.[104]<br><br>Taken as a whole, this evidence from the record demonstrates that – at least on April 7, 2016 when Defendants insist G.K. did not need even a day of residential treatment following Northwest passage – G.K. required at least some amount of residential treatment to address her conditions.<br><br>Accordingly, the Court should find that this criterion has been established in Plaintiffs' favor. |
| The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care. | Defendants likely intended their final letter to dispute that G.K.'s symptoms required the intensity of services provided by residential treatment, but for reasons stated in response to the prior factor, *supra*, Defendants are mistaken.<br><br>Accordingly, the Court should find that this criterion has been established in Plaintiffs' favor. |
| Co-occurring behavioral health and medical conditions can be safely managed. | Because Defendants do not dispute this criterion in their final denial letter, the Court should consider it to be established for purposes of its analysis. |

---

[102] *Id*. (emphases omitted).
[103] *See* Rec. 2388.
[104] *See* Rec. 1237-42, Rec. 2380-83.

| | |
|---|---|
| Services are the following:<br><br>Consistent with generally accepted standards of clinical practice;<br><br>Consistent with services backed by credible research soundly demonstrating that the services will have a measurable and beneficial health outcome, and are therefore not considered experimental;<br><br>Consistent with Optum's best practice guidelines;<br><br>Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks. | Because Defendants do not dispute this criterion in their final denial letter, the Court should consider it to be established for purposes of its analysis. |
| There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.<br><br>Improvement of the member's condition is indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care.<br><br>Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery, resiliency and wellbeing. | Because Defendants do not dispute this criterion in their final denial letter, the Court should consider it to be established for purposes of its analysis. |
| Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care. | Read generously, Defendants may have disputed that this criterion was met by mentioning "long term custodial care" in their final denial letter.[105]<br><br>Regardless, Plaintiffs do not anticipate Defendants will seriously argue that the care |

---

[105] Rec. 1116.

| | G.K. received at Sunrise was "custodial," given her ongoing symptoms and the regular mental health treatment she was receiving.[106] |
|---|---|
| The member is not in imminent or current risk of harm to self, others, and/or property. | Defendants do not dispute this criterion in their final denial letter. |
| The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include the following:<br><br>Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.<br><br>Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care. | Defendants likely intended their final letter to dispute that G.K.'s symptoms required the intensity of services provided by residential treatment, but for reasons stated in response to prior factors, *supra*, Defendants are mistaken.<br><br>G.K. herself, as well as all of her treating professionals who opined in the records, believed that G.K.'s psychosocial problems were likely to threaten her safety in a less intensive level of care.[107] Defendants' final denial letter does not articulate a reasonable and principled response to those representations.<br><br>Accordingly, the Court should find that this criterion has been established in Plaintiffs' favor. |

As the Court can observe, the record contains ample evidence demonstrating that it was medically necessary for G.K. to receive care at a residential treatment center. She still exhibited the same withdrawal, masking, depression, and anxiety that had precipitated her last suicide attempt – most notably by continuing to "[put] on a front of being sweet and calm," as her treating therapist at Sunrise noted.[108] Ironically, the very symptoms which Defendants insisted meant G.K. never needed residential treatment are the same symptoms that her medical history, her own representations in May that she had not shown any improvement, and the mental health

---

[106] *See also* Rec. 0104 for the Plan's definition of "Custodial Care."
[107] *See* Rec. 1237-42, Rec. 2347, Rec. 2380-83.
[108] Rec. 1241.

professionals who actually knew her and provided treatment before, during, and after her care at Sunrise insist were indicators that she had not actually gotten better. Defendants' final denial letter never articulated any principled reason why their interpretation of G.K.'s symptoms was congruent with her medical history, much less why that interpretation should trump her treating professionals' and her own statements about her wellbeing.

Accordingly, the Court should either find that Defendants' denial of G.K.'s claims for admission and treatment at Sunrise were arbitrary and capricious or, on a *de novo* review, should find that it was medically necessary for G.K. to be admitted into Sunrise.

### III.   DEFENDANTS' DENIALS WERE ARBITRARY AND CAPRICIOUS BECAUSE THEY DID NOT ENGAGE WITH THE OPINIONS OF G.K.'s TREATING PROFESSIONALS AND ONLY ENGAGED WITH G.K.'s SELF-REPORTING AND MEDICAL RECORDS WHEN THEY FAVORED THE CONCLUSION DEFENDANTS' WANTED TO DRAW.

Defendants needed to follow a curious path in order to draw the conclusion, reflected in their final denial letter, that G.K. "did not need to be in a 24 hour mental health residential rehabilitation setting" upon her admittance into Sunrise on April 7, 2016. Defendants asserted residential treatment was not medically necessary G.K. "was not suffering from an acute behavioral health condition at this point" and "was in control of her emotions and not acting on any negative feelings."[109]

To draw those conclusions, Defendants needed to: (1) accept G.K.'s April 2016 representations that she was no longer experiencing suicidal thoughts, crippling depression, or serious social anxiety at face value and place their full faith and confidence in G.K. at that point; but then (2) reject the opinions of G.K.'s treatment teams at Northwest Passage and Sunrise that G.K. was putting up a front and masking ongoing suicidal ideation, crippling depression, and

---

[109] Rec. 1116.

serious social anxiety; and then also (3) reject G.K.'s May 2016 representation that she had

never, at any point, experienced relief in her depression and anxiety and that she had indeed been

putting up a front before that point to mask unabated mental health symptoms. In other words,

Defendants had to assume that G.K.'s May 2016 representations were not accurate, determine

those representations reflected a "relapse" instead of the confidence-inspiring honesty that

G.K.'s April 2016 representations had been, and accordingly withdraw the faith and confidence

they placed in G.K.'s April representations and place no faith or confidence in her

representations in May.

Defendants' final denial letter did not articulate a reasonable or principled basis for

adopting this convoluted logic. Indeed, believing a patient only when what she says supports

denying her claim for benefits and choosing not to believe her any other time, while

simultaneously ignoring her doctor's warnings that she is likely to mask the severity of her

symptoms reeks of the sort of pernicious cherry-picking that has been expressly forbidden by the

Tenth Circuit Court of Appeals.

As the Tenth Circuit has emphasized, the abuse of discretion standard of review is "not

without meaning."[110] Claims administrators are not permitted to "shut their eyes to readily

available information when the evidence in the record suggests that the information might

confirm the beneficiary's theory of entitlement and when they have little or no more evidence in

the record to refute that theory."[111] Defendants did precisely that here – taking G.K.'s initial

representations that she was doing just fine as the end-all be-all of her mental state while at

Sunrise and shutting their eyes both to what she said later *and* to her treating professionals'

---

[110] *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018).
[111] *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004).

warnings that she was likely to – at least initially – paint a rosier picture than was warranted on that front.

Worse for Defendants, the Tenth Circuit has also found that where a claim administrator's decision is not supported by substantial evidence "based upon the record as a whole," with the court taking into account "whatever in the record fairly detracts from its weight," the court should determine that the administrator's decision was arbitrary and capricious.[112] Additionally, the Court's abuse of discretion review should account for the fact that the claim administrator, acting as a fiduciary "must discharge its duties with respect to discretionary claims decisions solely in the interests of the participants and beneficiaries of the plan . . . and consistent with this standard of care must provide a full and fair review of claim denials."[113]

Sister courts in the District of Utah have also ruled that "an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion."[114] Further, another sister court has also ruled that when a claim administrator's denial letters "contain neither citations to the medical record nor references to the reports by [a defendant's] doctors" concerning a claimant's condition but are instead composed of "conclusory statements without factual support," the denial is arbitrary and capricious.[115]

[112] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted).
[113] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1266 (D.Utah 2020) (brackets, citations, and internal quotation marks omitted) (holding that a similarly situated claim administrator acted arbitrarily and capriciously in denying benefits for mental health and substance use disorders).
[114] *James F. ex rel. C.F. v. Cigna Behavioral Health, Inc.*, 2010 U.S. Dist. LEXIS 136134 *17 (D. Utah 2010) (Kimball, J.).
[115] *Raymond M.*, 463 F. Supp. 3d at 1282.

33

Here, Defendants ignored evidence in the record that detracted from their decision to deny G.K.'s claims, in violation of their fiduciary duties, and relied solely on conclusory statements without factual support. Accordingly, the Court should find that Defendants' denials were arbitrary and capricious.

## IV.    DEFENDANTS VIOLATED MHPAEA.

To establish that Defendants violated MHPAEA, Plaintiffs must demonstrate that: (1) the Plan "is subject to [MHPAEA]"; (2) the Plan "provides benefits for both mental health/substance abuse and medical/surgical treatments"; (3) Defendants placed "differing limitations on benefits for mental health care" as compared to analogous "medical/surgical care"; and (4) the limitations on mental health care are more restrictive than the predominant limitations based on the medical/surgical analogues.[116] Plaintiffs contend that the first and second element of this test are not in dispute.

In analyzing MHPAEA, courts have recognized that three types of inpatient facilities are medical/surgical analogues to the residential mental health treatment that G.K. received in this case: skilled nursing facilities,[117] inpatient rehabilitation facilities,[118] and inpatient hospice facilities.[119]

---

[116] *See, e.g., D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 8888 at *9 (D. Utah January 17, 2020) (citations and internal quotation marks omitted).

[117] *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1159 (9th Cir. 2018) (noting that under the Final Rules promulgated by the Department of Labor to elaborate on MHPAEA, "skilled nursing facilities" as well as inpatient "rehabilitation hospitals" are analogous to "residential treatment facilities for mental health or substance user disorders.")

[118] *See id.* (noting that under the Final Rules promulgated by the Department of Labor to elaborate on MHPAEA, inpatient "rehabilitation hospitals" as well as "skilled nursing facilities" are analogous to "residential treatment facilities for mental health or substance user disorders.")

[119] *See D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 130545 at *7-8 (D. Utah 2020) (finding that because "the appropriate comparison for identifying analogous levels of care between mental health/substance use disorders and medical/surgical treatment is not the type of care, but rather whether the care involved inpatient versus outpatient benefits" and "any care falling in the intermediate range between inpatient and outpatient should be compared regardless

As the record demonstrates, Defendants apply internal criteria in addition to the terms of the Plan itself to determine whether treatment received at skilled nursing and subacute treatment is medically necessary.[120] Defendants also apply internal criteria beyond the terms of the Plan to determine whether residential mental health treatment is medically necessary.[121] So all Plaintiffs need to prove that Defendants violate MHPAEA is to demonstrate that Defendants place limitations on the mental health disorder treatment G.K. received that are more stringent than the limitations they place on analogous medical/surgical treatment.

Treatment limitations can be either quantitative or nonquantitative.[122] Nonquantitative treatment limitations include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness."[123] Courts in the District of Utah have further held that MHPAEA violations can be found either on the face of plan documents or they can occur in the manner in which otherwise neutral plan terms are applied in a disparate fashion.[124] In this case, Defendants committed "as applied" MHPAEA violations because their utilization of acute criteria to determine the medical necessity of sub-acute mental health care resulted in a disparate operation of the Plan. This had the effect of limiting the availability of benefits for mental health treatment the Plan purports to provide in a more restrictive way than the Plan provides benefits for skilled nursing, inpatient rehabilitation, and inpatient hospice care.

//

---

of the type of care," inpatient hospice care was analogous to care received at a residential treatment center).

[120] *See, e.g.*, Rec. 2616-41.

[121] *See, e.g.,* Rec. 0147-48, Rec. 0151-52.

[122] 29 C.F.R. § 2590.712(a).

[123] 29 C.F.R. § 2590.712 (c)(4)(ii)(F), See also *Christine S. v. Blue Cross Blue Shield of N.M.*, , 2021 U.S. Dist. LEXIS 199330, at *23-24

[124] *Id* at *32-34.

Defendants also committed a second "as applied" MHPAEA violation by applying two sets of criteria to claims for residential mental health treatment but only applying one set of criteria to claims for a medical/surgical analogue – inpatient hospice treatment.

Plaintiffs will address all of these types of violations in turn, *infra*.

### A. Defendants Violated MHPAEA When They Denied Coverage on the Basis that G.K. Did Not Present with Acute Symptoms.

Residential treatment centers are properly compared to skilled nursing, inpatient rehabilitation and inpatient hospice facilities for purposes of evaluating a MHPAEA violation.[125] A sister court in the District of Utah has also found that a neutral plan term like medical necessity can lead to a MHPAEA violation if the administrator does not apply the term in parity between mental health and substance use coverage decisions and its medical/surgical analogue coverage decisions.[126]

In this case, we know the different reasons that Defendants used to deny benefits for G.K., because they stated them in their denial letters. On October 28, 2016, Defendants denied G.K.'s claims for benefits in part because G.K. had "progressed to the point that she was not in immediate danger of hurting herself."[127] Then on January 4, 2017, Defendants' final denial letter and indicated G.K. did not need residential treatment because she "was not suffering from an *acute* behavioral health condition" as evidenced by her ability to not *act* "on any negative feelings."[128]

In order for those denial rationales to pass a parity analysis, Defendants would have to if a patient presented with an absence of acute symptoms in analogous medical/surgical settings.

---

[125] *Johnathan Z.* at *57.
[126] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174-76 (D. Utah 2019).
[127] Rec. 1102.
[128] Rec. 1116 (emphasis added).

deny benefits. The InterQual Guidelines produced by Defendants do not provide any evidence that Defendants do so.[129]

Even worse, Defendants only cover claims for residential mental health treatment if the patient in question has suffered "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the 'why now' factors leading to admission)."[130] By direct contrast, Defendants require that a patient must demonstrate "[c]linical stability" before they may receive analogous medical/surgical care in a skilled nursing or inpatient rehabilitation facility, including by demonstrating that their condition has been "improving or unchanged" for the 24 hours preceding admission.[131]

A sister court in the District of Utah has already held that an insurance claims administrator violates MHPAEA if it attempts to impose the presence of acute symptoms as a requirement for coverage for residential treatment when it specifically excludes the same when evaluating analogous medical/surgical treatment.[132] In this case, the comparison shows that for subacute medical/surgical claims Defendants require the absence of acute changes in a patient's condition and the absence of acute symptoms to obtain coverage for subacute care, but they then used the absence of acute changes and symptoms for G.K.'s mental health and substance use disorder treatment to deny coverage. The disparity is a MHPAEA violation for which Plaintiffs are entitled to equitable relief.[133]

---

[129] *See, e.g.*, Rec. 2616-41.
[130] Rec. 0147.
[131] Rec. 2639.
[132] *See Jonathan Z. v. Oxford Health Plans*, 2022 U.S. Dist. LEXIS 121033, *59-63 (D. Utah July 7, 2022) (finding that a claims administrator "improperly required [a patient] to exhibit acute symptoms to qualify for RTC care" while not requiring "similarly acute symptoms for comparable medical-surgical treatment").
[133] *M. S. v. Premera Blue Cross,* No. 2:19-cv-00199-RJS-CMR, 2021 U.S. Dist. LEXIS 151055, at *53-54 (D. Utah Aug. 10, 2021).

### B. Defendants Also Violate MHPAEA Because They Place Limitations on Coverage for Residential Treatment Beyond the Terms of the Plan but do Not Do So for Inpatient Hospice Care.

For the purposes of MHPAEA, courts have recognized that inpatient hospice facilities are medical/surgical analogues to the residential mental health treatment that G.K. received in this case.[134] As the record demonstrates, Defendants apply additional criteria beyond the terms of the Plan – the Optum Guidelines – to claims for mental health treatment at a residential treatment facility.[135] However, Defendants do not apply any separately developed criteria to claims for medical/surgical treatment at inpatient hospice facilities.[136] Accordingly, Defendants apply treatment limitations to residential treatment that are more stringent than the limitations they apply to an analogous level of medical/surgical care. This violates MHPAEA.

## V.   THE COURT SHOULD REVERSE DEFENDANTS' DENIALS OF G.K.'s CLAIMS.

Because Plaintiffs have demonstrated that the care G.K. received at Sunrise was medically necessary, the Court should reverse Defendants' denials of G.K.'s claims and award summary judgment to Plaintiffs.

The Tenth Circuit has noted that when a claims administrator "had its chance to exercise its discretion and [ ] failed to do so in accordance with the clear guidelines of the Plan and

//

//

---

[134] *See D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 130545 at *7-8 (D. Utah 2020) (finding that inpatient hospice care was analogous to care received at a residential treatment center); *see also M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1031 ("Confining itself to the arguments presented by Defendants, the court disagrees with Defendants that on the specific record before it the only analogous medical/surgical benefits for residential treatment centers are skilled nursing and inpatient rehabilitation facilities.")

[135] *See generally* Rec. 0001-7962.

[136] There is no evidence in the record that United imposes criteria beyond the terms of the Plan to inpatient hospice facilities.

ERISA[,]" remand back to the claims administrator is not an appropriate remedy and plaintiffs are entitled to a district court's judgment on the merits of their claims.[137]

Once they received Plaintiffs' appeal, Defendants had every opportunity to exercise their discretion in compliance with both ERISA and the terms of the Plan by conducting a proper review of G.K.'s claims. Instead, they relied on cursory and conclusory information that does not engage with the whole of G.K.'s medical records or the opinions of her treating professionals. If the Court follows *Rasenack*, this militates against remanding the claim back to Defendants.

Furthermore, while ERISA treats more scrupulous claims administrators as somewhat analogous to administrative agencies during a claimant's prelitigation appeals, the text of ERISA itself "does not contain any provisions governing remands to plan administrators once those actions have been initiated, nor does it explain how judicial review of determinations made on remand is to occur."[138] This runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system should the Court remand under these circumstances.[139]

Further, as a pragmatic matter, the treatment at issue in this case began more than 6 years ago.[140] Remanding the case when it is so clear that G.K.'s treatment was medically necessary as of April 7, 2016 forces Plaintiffs to re-appeal Defendants' denials using outdated information which, in many cases, is no longer extant. It also imposes an unreasonable delay on an already slow process for which Plaintiffs have so far borne essentially all of the cost and burden. The

---

[137] *See Rasenack*, 585 F.3d at 1327 (10th Cir. 2009) (*citing with approval to Vanderklok v. Provident Life & Accidental Ins. Co.*, 956 F.2d 610, 617 (6th Cir. 1992) (holding that a claims administrator that fails to provide timely notice of its denial of benefits is "not entitled to the protections concerning administrative review")).

[138] *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014).

[139] *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted).

[140] Rec. 2332.

interests of justice will be best served if the Court reverses, rather than remands, Defendants' denials.

However, if the Court does remand G.K.'s claims for reconsideration by Defendants, it should limit Defendants' possible bases for denying G.K.'s claims to the ones it has already articulated in its denial letters. To do otherwise would violates Tenth Circuit precedent, which provides that, in the ERISA context, "remand is not appropriate to provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record."[141] In reaching this conclusion, the Tenth Circuit cited to *Spradley v. Owens-Illinois Hourly Emples. Welfare Benefit Plan* in which they noted that, under ERISA, plan administrators are not permitted "to sandbag" plaintiffs with "after-the-fact interpretation[s]" for denying insurance benefits and that courts should not even consider "post hoc interpretation[s]" of insurance plan provisions, much less encourage claims administrators to come up with new ones on remand.[142]

## VI.   THE PLAINTIFFS ARE ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS, AND TO ADDITIONAL BRIEFING ON EQUITABLE REMEDIES.

In the event that the Court grants Plaintiffs' Motion for Summary Judgment, Plaintiffs request the opportunity to present in a future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate based on 29 U.S.C. § 1132(g). Further, in the event that the Court finds that Defendants violated MHPAEA, Plaintiffs

//

//

//

---

[141] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021).
[142] 686 F.3d 1135, 1141 (10th Cir. 2012) (citation and internal quotation marks omitted).

request the opportunity to submit further briefing identifying which equitable remedies might be most appropriately tailored to whatever MHPAEA violation the Court articulates.

DATED this 28th day of July, 2022.

/s/ Brian S. King
Brian S. King

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document has been sent to all parties registered to receive court notices via the Court's CM/ECF system.

DATED this 28th day of July, 2022.

/s/ Brian S. King
Attorney for Plaintiffs