Scott M. Petersen, #7599
Clint R. Hansen, #12108
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, Utah 84151
Telephone: (801) 531-8900
spetersen@fabianvancott.com
chansen@fabianvancott.com

Michael H. Bernstein, #17491
ROBINSON & COLE LLP
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
mbernstein@rc.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SUE K. and ROBERT K., individually and on behalf of G.K. a minor,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH, and the EMC CORPORATION HEALTH PLAN,<br><br>Defendants. | Civil No. 2:18-cv-00880-(RJS)(DBP)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>District Judge Robert J. Shelby<br>Magistrate Judge Dustin B. Pead<br><br>**ORAL ARGUMENT REQUESTED** |

i

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Rule 56-1 of the Rules of Practice for the United States District Court for the District of Utah ("DUCivR"), Defendants United Behavioral Health ("UBH") and the EMC Corporation Health Plan ("Plan") (hereinafter, collectively, "Defendants"), hereby respectfully move this Court for summary judgment dismissing Plaintiffs' Sue K. and Robert K.[1], individually and on behalf of G.K, a minor (collectively, "Plaintiffs") claims for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and for violation of the Mental Health Parity and Addiction Equity Act ("MHPAEA" or "Parity Act") pursuant to 29 U.S.C. § 1132(a)(3), as alleged in their Complaint [DE 2].

## I.      INTRODUCTION AND RELIEF SOUGHT

Plaintiffs brought this action against Defendants pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq.*, as amended ("ERISA") for the wrongful denial of Plan benefits regarding mental health services G.K. received at Solacium Sunrise ("Sunrise") from April 7, 2016 – December 20, 2016 at the residential treatment center ("RTC") level of care. Plaintiffs' Complaint alleges two Causes of Action: First Cause of Action for recovery of benefits under 29 U.S.C. §1132(a)(1)(B) and Second Cause of Action for violation of the Parity Act under 29 U.S.C. §1132(a)(3).

At all relevant times, Plaintiff Sue K. was enrolled in the EMC Corporation Health Plan, which is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq., as amended ("ERISA"). Plaintiff G.K., was at all relevant times, a beneficiary under the Plan as a dependent of Plaintiff Sue K. Benefits under the Plan are self-funded by the Plan Sponsor, EMC, and United Behavioral Health ("UBH") provides certain behavioral health claim administration services under the Plan. The Plan,

---

[1] The individual claims of Robert K. were dismissed by Order of the Court dated December 18, 2019, and he maintains an appearance in this action on behalf of his minor daughter Plaintiff G.K. [DE 43, at p.2].

however, vests final discretionary authority to review and render determinations of claims for mental health benefits with an independent external review agency, MCMC. Notably, UBH does not fund benefits nor do the Plan documents vest UBH with discretionary authority to render a final appeal determination for any non-urgent claim for mental health care and/or substance use coverage under the Plan, including Plaintiffs' claim at issue here.

Summary judgment should be granted to Defendants on Plaintiffs' First Cause of Action for recover of benefits under 29 U.S.C. §1132(a)(1)(B). Because the governing Plan documents vested final discretionary authority with the external review agency MCMC, MCMC's final appeal determination on Plaintiffs' benefit claim must be reviewed under the arbitrary and capricious standard of review. Under this standard, the court "will uphold an administrator's decision so long as it is predicated on a reasonable basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). Here, MCMC upheld UBH's initial adverse benefit determination concerning G.K.'s claim for coverage of her treatment at Sunrise. MCMC's appeal determination was reasonably based on substantial evidence in the Record and the terms of the Plan. In fact, Plaintiffs' claim underwent review by multiple licensed physician reviewers, each of whom performed a thorough review of G.K.'s medical records and determined that treatment at the RTC level of care was not medically necessary.

Summary judgment should also be granted to Defendants on Plaintiffs' Second Cause of Action for violation of the Parity Act under 29 U.S.C. §1132(a)(3). The Parity Act provides that the treatment limitations placed on mental health and substance use disorder conditions should be no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical conditions in the same classification. Here, there is no evidence to support Plaintiffs' conclusory allegations that Defendants excluded or restricted coverage for treatment "based on geographic location, facility type,

provider specialty or other criteria" or that Defendants used "processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standard or other factors used to limit coverage for medical/surgical treatment in the same classification." (Compl., ¶¶46, 49.) Indeed, there is simply no evidence to support Plaintiffs' bald allegation that Defendants "require[ed] that [G.K.] satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment" (Compl., ¶48), which is the only specific allegation in the Complaint identifying the Defendants' purported violation of the Parity Act. Most importantly, Plaintiffs are not entitled to any equitable relief under ERISA §502(a)(3) because they have not alleged and cannot show that the alleged Parity Act violation proximately caused them any injury – particularly where, as here, the final adverse appeal determination on their benefit claim was made by MCMC, not UBH, and MCMC did not refer to or rely on the allegedly improper UBH guidelines in rendering that final appeal determination. Accordingly, Plaintiffs' Second Cause of Action fails as a matter of law and fact.

In addition, summary judgment should be granted dismissing this action against UBH on the separate ground that it is not a proper party defendant in this ERISA-governed matter. The Record shows that while UBH provides certain claim administration services under the Plan, including administration of non-final appeals brought under the Plan, UBH does not have final discretionary authority to render determinations concerning approval of benefit payments under the Plan. Consequently, UBH is not an ERISA fiduciary as a matter of law (it is neither the Plan nor the Plan Administrator with respect to the claim determination at issue), and therefore, cannot have breached any ERISA fiduciary duties to Plaintiffs and is not a proper defendant under claim for recovery of benefits under 29 U.S.C. §1132(a)(1)(B) or a claim for violation of

the Parity Act.[2]

Based on the foregoing, and as will be discussed in more detail below, this Court should enter an order granting summary judgment to Defendants, because (1) UBH is not a Plan fiduciary, and consequently, is not a proper party defendant as a matter of law; (2) the Plan's final adverse appeal determination, which was issued by independent review organization MCMC, was reasonably based on the terms of the Plan and substantial evidence in the Administrative Record ("AR" or "Record"), was not arbitrary and capricious as a matter of law, and should not be disturbed; and (3) there is no evidence to support Plaintiffs' allegations that the Plan's denial of benefits constituted a violation of the Parity Act or that it improperly used acute in-patient hospitalization criteria to determine the medical necessity of G.K.'s sub-acute residential treatment center level of care. Accordingly, this Court should grant Defendants summary judgment and dismiss Plaintiffs' Complaint in its entirety and with prejudice.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants produced the documents that constitute the Record, *i.e.*, the Plan documents, relevant medical records, correspondence, and any other documents before UBH during its claim and appeal review process. The AR has been filed under seal pursuant to the Court's order, and Defendants produced documents Bates stamped Sue K. AR 000001 – Sue K. AR 002615 and Sue K. AR 002883 – Sue K. AR 2890, which are referred to herein as "AR 1" to "AR 2890."

### 1.    Plan Terms For Coverage

1. The EMC Corporation established and maintained a group medical plan for its employees (*i.e.*, the Plan). (AR 1-139, 2393-2519.)

---

[2] Counsel for Defendants sought to meet and confer with counsel for Plaintiffs on the issue of voluntarily discontinuing the action as against UBH on the grounds that UBH was not an ERISA fiduciary. Plaintiffs' counsel did not agree to voluntarily discontinue claims against UBH.

13446389.1

2.   Plaintiff Sue K. was a member/participant in the Plan. (AR 10, 2422, 2504-2505.)

3.   Plaintiff G.K. was a beneficiary under the Plan as a dependent of Sue K. (AR 10, 2422, 2505.)

4.   Benefits under the Plan are self-funded by EMC Corporation, the Plan Sponsor and Plan Administrator. (AR 110, 114-15, 2410, 2415, 2503.)

5.   The Plan provides that "[t]he Plan Administrator has complete discretionary authority with regard to the operation, administration and interpretation of the Plan, and any determination by the Plan Administrator relating to the Plan shall be final, binding and conclusive in the absence of clear and convincing evidence that the Plan Administrator acted arbitrarily and capriciously." (AR 2502, *see also* AR 2508, 2510.)

6.   The Plan also provides that "[t]he Plan Administrator may also delegate any of its responsibilities under the Plan to any other person or entity." (AR 2502.)

7.   The Plan provides for administration of claims by "medical vendors … [that] provide claims payment and other administrative services under an administrative services contract with EMC." (AR 2503.)

8.   The Plan also provides that these medical vendors "do not assume any financial risk or obligation with respect to claims or the plan." (AR 2503.)

9.   Plaintiffs' medical/surgical claims for benefits are administered by Blue Cross Blue Shield of Massachusetts. (AR 2393-2500, 2503.)

10.  UBH provides certain behavioral health claims administration services under the Plan. (AR 122-39, 2503.)

11.  The Plan expressly provides that "[o]nly medically necessary care will be approved and paid by the plan. All care is subject to review based upon plan's relevant clinical criteria (available upon request),

and all providers and facilities must meet Optum Behavioral Solutions credentialing and licensing criteria." (AR 127.)

12. In addition, the Plan provides that the behavioral health service must be a Covered Service, which is defined as "[t]hose services and supplies provided for the purpose of preventing, diagnosing or treating a behavioral disorder, psychological injury or substance abuse addiction and which are described in the section titled 'What This Plan Pays,' and not excluded under the section titled 'Not Covered-Exclusions.'" (AR 128.)

13. The Plan expressly provides coverage for Medically Necessary mental health and substance use disorder and chemical dependency services at inpatient and outpatient levels of care, including residential treatment. (AR 125, 127.)

14. The Plan further provides that services that are not medically necessary are excluded from coverage. Specifically, the Plan excludes:

> Services or supplies for MHSA [mental health and substance abuse] Treatment that, in the reasonable judgment of Optum are any of the following:
>
> - not consistent with the symptoms and signs of diagnosis and treatment of the behavioral disorder, psychological injury or substance abuse;
>
> - not consistent with prevailing national standards of clinical practice for the treatment of such conditions;
>
> - not consistent with prevailing professional research demonstrating that the service or supplies will have a measurable and beneficial health outcome;
>
> - typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective; or
>
> - not consistent with Optum's Level of Care Guidelines or best

practice as modified from time to time (available upon request).

Optum may consult with professional clinical consultants, peer review committees or other appropriate sources for recommendations and information.

*      *      *

Custodial care except for the acute stabilization and return back to your baseline level of individual functioning. Care is determined to be custodial when:

- it provides a protected, controlled environment for the primary purpose of protective detention and/or providing services necessary to assure competent functioning in activities of daily living; or

- it is not expected that the care provided or psychiatric treatment alone will reduce this disorder, injury or impairment to the extent necessary to function outside a structured environment. This applies when there is little expectation of improvement in spite of all treatment attempts.

(AR 132.)

15. Notably, the foregoing exclusions apply "regardless of whether the services, supplies or treatment described in this section are recommended or prescribed by your provider and/or are the only available treatment options for your condition." (*Id.*)

## 2. Plan Terms For Claim Administration And Appeals

16. The Plan provides that UBH will conduct review and approval of pre-service, concurrent, post-service and urgent (*i.e.*, emergency) claims for Behavioral Health Services. (AR 137-38.)

17. The Plan also provides that UBH will conduct appeals for mental health and substance use treatment. (AR 137-38.)

18. The Plan further provides that UBH will conduct first level pre-service and post-service claim appeals – and states that UBH's "decision is based only on whether or not benefits are available for the proposed treatment or procedure." (AR 138.)

7

19. In the event of a Second-Level appeal, the Plan provides that "[t]he second level appeal request must be submitted to MCMC, a third-party appeals organization retained by EMC, within 60 days from receipt of the first level appeal decision." (AR 138.)

20. Only in the event of an urgent claim appeal does the Plan delegate "to Optum [i.e. UBH] the discretionary authority to interpret and administer the provisions of the Plan." (AR 138.)

### 3. 2016 UBH Guidelines

#### a. Level of Care Guidelines – Residential Treatment Center.

21. The 2016 UBH Level of Care Guidelines define a "Residential Treatment Center for Mental Health Conditions" as:

> A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient.
>
> The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.

(AR 1199.)

22. The admissions criteria for "Residential Treatment Center for Mental Health Conditions," includes in pertinent part that there is a showing of the following:

- Common Criteria for all Levels of Care are satisfied (AR 1199); and
- The member is not in imminent or current risk of harm to self, others, and/or property (AR 1199); and

- The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include:

  o Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered (AR 1199);

o Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care. (AR 1200)

23. Criteria for continued service at RTC level of care include:

- Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following:
  o Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating)
  o Health-related services that are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence.
  o Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

(AR 1200.)

**b. Level of Care Guidelines – Common Criteria.**

24. The 2016 Common Criteria and Clinical Best Practices for All Levels provides, in relevant part, that admission requires a showing of all of the following:

- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission). (AR 1203.)

  o Failure of treatment in a less intensive level of care is not a prerequisite for authorizing coverage. (AR 1203) AND

- The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and treatment of acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) (AR 1203), AND

- Co-occurring behavioral health and medical conditions can be safely managed. (AR 1204) AND

- Services are the following:

  o Consistent with generally accepted standard of clinical practice;

- o Consistent with services backed by credible research soundly demonstrating that the services will have a measurable and beneficial health outcome, and are therefore not considered experimental;
- o Consistent with Optum's best practice guidelines;
- o Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks. (AR 1204) AND

- There is a reasonable expectation that service will improve the member's presenting problems within a reasonable period of time (AR 1204) AND

- Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care. (AR 1204.)

### 4. Plaintiff G.K.'s Claim For Plan Benefits at Sunrise

#### a. Plaintiff G.K.'s admission to Sunrise and Plaintiffs' claim for benefits covering her treatment at Sunrise is administratively denied.

25.     UBH case notes document that UBH spoke with G.K.'s mother on April 7, 2016, to discuss G.K.'s condition, at which time UBH learned that Plaintiffs were "attempting to have Mem [G.K.] transferred to LT [long-term] Residential facility, 'Sunrise Residential' in Utah for continued Tx [treatment] services" (AR 233-34).

26. Another UBH case note also dated April 7, 2016 states that UBH care advocate, Ivy Rhymes, LSW, contacted "Member Rep" and the "Rep was not willing to accept alt [alternate] txment [treatment] facilities" (AR 234-35).

27. UBH case note dated April 8, 2016 states that a caller from Sunrise, an out-of-network ("OON") provider called UBH seeking information "re: Benefits for RTC," and was "[q]uoted OON benefit for RTC MH [mental health]," and notably, UBH case note dated April 8, 2016 provides that G.K. was not currently at Solacium. (AR 234.)

28. UBH case note dated April 20, 2016 documents that a Sunrise representative identified as "Heather" "inquired if auth or request for auth is on file for RESI MH loc [residential mental health level

of care]," and UBH informed "Heather" "that there is no documentation of request to precert for RESI MH loc from Solacium [Sunrise]." (AR 237.)

29. UBH case note dated April 20, 2016 also documents that contrary to information previously provided, G.K. was "admitted to MH RESI on 4/7/16 and is still there," and moreover, that during that call, Sunrise representative "Heather" declined UBH's offer to initiate a retrospective review and "take clinical and apply mnc [medical necessity criteria] from f2f [face-to-face] eval from today forward." (AR 237.)

30. UBH case note dated May 2, 2016 documents that Plaintiff Sue K. called "to get auth[orization] because [Sunrise] bill OP [outpatient] therapy separately" from residential treatment rendered at Sunrise, and was advised that "routine OP therapy does not require auth but if a service does require auth, the facility needs to call themselves for auth," and *further, that "no auth is in place for RTC and that facility was advised to send in info for retro review.* Mother will contact facility to provide them this information to call in for any necessary auths." (AR 242-43 (emphasis added).)

31. Plaintiff G.K.'s claim for coverage for residential treatment rendered at Sunrise was administratively denied by Explanation of Benefits ("EOB") for lack of authorization. (*See* AR 186-225.)

   **b. Plaintiffs' request for retrospective review is denied for lack of medical necessity.**

32. By letter dated October 20, 2016, Plaintiffs submitted a request for retrospective review of Plaintiffs' claim for coverage of G.K.'s treatment at Sunrise from April 7, 2016 forward. (AR 268-1101.)

33. Specifically, Plaintiff Sue K. states that she is in receipt of an EOB "denying the claims that have been submitted for the treatment my daughter [G.K.] has received and continues to receive" at Sunrise. (AR 269.)

34. Plaintiff Sue K. requests UBH "complete that Retrospective Review and provide authorization for

[G.K.'s] continued stay at [Sunrise]" in support of Plaintiffs' claim that G.K.'s treatment at Sunrise was medically necessary. (AR 269.)

35. By letter dated October 28, 2016, UBH Associate Medical Director, Gary Rosenberg, M.D., denied Plaintiffs' claim on retrospective review based on his determination that G.K.'s RTC level of care treatment at Sunrise was not medical necessary. (AR 1102-1105, *see also* AR 1106-1110.)

36. Dr. Rosenberg reviewed the member's retrospective review submission, UBH case notes, and G.K. medical records and noted that G.K. "was admitted for treatment of depression and anxiety" but that "[a]fter reviewing the medical records, [G.K.] had made good progress and no longer needed the type of care provided in this [residential treatment] setting." (AR 1102.)

37. Dr. Rosenberg also noted that "[w]hile [G.K.] continued to face challenges as she worked on his issues, [G.K.] had progressed to the point that she was not in immediate danger of hurting herself. [G.K.] may have required staff support for these issue, however, she did not require the kind of structure, monitoring and clinical support found in this [residential treatment] setting." (AR 1102.)

38. Dr. Rosenberg concluded that "no authorization can be provided from 04/07/2016. Care could have continued in a mental health partial hospitalization." (AR 1102.)

39. UBH case note dated October 28, 2016 documents the adverse determination reached by UBH Associate Medical Director Gary Rosenberg, M.D. (AR 248-50.)

40. The October 28, 2016 case note documents that Dr. Rosenberg conducted a live telephone interview with one of Plaintiff G.K.'s treating providers at Sunrise concerning G.K.'s treatment during which she was described as "initially guarded, depressed and anxious when she entered the program…. As treatment progressed she became more assertive and more comfortable in social interactions. She has not self-harmed and has not been endorsing suicidal ideation. Her parents have been actively engaged in

the treatment process." (AR 248-49; *see also* 252-56.)

### c. Plaintiffs' Level One member appeal is denied for lack of medical necessity.

41. By letter dated December 22, 2016, Plaintiffs submitted a Level One member appeal (incorrectly titled "Level Two Member Appeal") for G.K.'s treatment rendered at Sunrise from April 7, 2016 through her discharge on December 20, 2016. (AR 1111-15.)

42. By letter dated January 4, 2017, UBH Associate Medical Director Melinda Privette, M.D., upheld UBH's initial adverse benefit determination on Plaintiffs' claim. (AR 1116-19.)

43. Specifically, Dr. Privette notes the following:

> Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24-hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety, mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered.

(AR 1116.)

44. By letter dated June 28, 2017, Plaintiffs submitted to UBH a request for final appeal review by an independent external review organization. (AR 1125-49.)

45. By letter dated July 19, 2017, UBH responded to Plaintiffs' request for final appeal review by an independent, external review organization. (AR 1150-59.)

46. Specifically, UBH Senior Clinical Appeals Reviewer Gwendolyn Norfleet explained that "[b]ased on this [UBH's] preliminary review we have determined that UBH is not delegate[d] to process your second level appeal. MCMC has been designated by EMC to conduct non-urgent Second-Level appeal[s]. Please refer to the enclosed form for information about your available options to appeal or dispute this

13

determination" (AR 1151) and attaching "Important Information About Your Right to Request a Second-Level Review by MCMC of a Non-Coverage Determination." (AR 1153-54.)

47. The January 4, 2017 letter was revised on July 18, 2017, to provide corrected information concerning Plaintiffs' right to a Second-Level Appeal Review by external review organization, MCMC. (AR 1120-24; *see also* AR 257-59.)

48. UBH's appeal note dated December 31, 2017 also documents that "UBH does not conduct the 2nd lvl appeal and no external appeal is available until a determination is made by MCMC. Checked SPD and no exceptions to send external while 2nd lvl is being conducted." (AR 260-63.)

### d. Plaintiffs' Level Two member appeal is denied for lack of medical necessity.

49. Plaintiffs submitted their Level Two appeal directly to MCMC by letter dated October 4, 2017, resubmitting their appeal dated June 28, 2017. (AR1160-2383.)

50. MCMC upheld the adverse benefit determination by letter dated March 22, 2018. (AR 2384-

51. Specifically, MCMC stated that "[a]fter a review by an independent Board Certified physician of the Plan language and clinical records relating to the requested coverage of the Residential Treatment Center (RTC) services at Solacium Sunrise with dates of service 04/07/2016-12/20/2016 (The Services), MCMC has determined and advised the third-party administrator, Optum, that The Services are not covered. The Services have been denied." (AR 2386.)

52. MCMC further stated that "[p]er the Plan language, MCMC denied the appeal regarding Optum's denial of coverage of the Residential Treatment Center (RTC) services at Solacium Sunrise …. The independent Board Certified Physician determined that the dates of serviced (sic) being appealed are not medically necessary and upheld the denial." (AR 2386.)

53. The independent MCMC reviewer noted Plaintiff G.K.'s treatment history prior to her admission

14

to Sunrise, and also noted that "[a]t the time of placement [at Sunrise], she is not suicidal... It is her vulnerability to relapse that is stressed as the basis of her requiring RTC level of care, along with her need for continuous in the moment counseling during this time period. However, she goes on several day trips and extended home passes with the family during this time period as well as a camping trip, which is not continuous for her need for continuous in the moment counseling." (AR 2386.)

54. The independent MCMC reviewer noted that the standard of care is "to treat an individual at the least restrictive setting in which she/he can be safely and effectively treated" but that "[i]t is not established in the records that this is an RTC environment. She goes on passes and trips, so the treatment that she receives in reality is more consistent with a group home treatment, with access to family and to community." (AR 2387.)

55. The independent MCMC reviewer concluded that "[t]he lack of actual 24/7 care and the lack of accessing community educational and therapeutic services including group living services indicates that she was not being treated in the least intensive environment in which safe and appropriate treatment could be provided, which is a requirement for medical necessity determination." (AR 2387.)

56. The March 22, 2018 MCMC determination noted that "[t]his determination by MCMC constitutes the final and binding review of The Services under the terms of The Plan." (AR 2392.)

57. The independent MCMC reviewer cited nine (9) References in reaching the final adverse Second Level appeal determination[3], but notably, the UBH medical necessity guidelines for RTC are not listed as

---

[3] Specifically, the MCMC reviewer cited the following sources: 1. Charlemagne J., et al. Post-Discharge Services and Psychiatric Rehospitalization Among Children and Youth, *Administration and Policy in Mental Health and Mental Health Services Research*; 2. *American Academy of Child and Adolescent Psychiatry Facts for Families No. 97, Residential Treatment Programs*, April 2011; 3. Bettman J.E. and Jasperson R.A., Adolescents in Residential and Inpatient Treatment: A Review of the Outcome Literature, *Child Youth Care Forum*; 4. American Psychiatric Association (2013), *Diagnostic and Statistical Manual of Mental Health Disorders (5th ed.)*; 5. R. Eric Lewandowski PhD, MSc., Evidence for the Management

materials relied on by the MCMC external appeal reviewer. (AR 2391-92.)

### 5. Plaintiffs' Extra Record Parity Act Discovery

58. In response to Plaintiffs' Requests for Production of documents relative to their Second Cause of Action alleging a violation of the Parity Act, Defendants produced documents Bates stamped Sue K. 002616 – Sue K. 002882. It is undisputed that documents Bates stamped Sue K. 002616 – Sue K. 002882 are *not* a part of the Record for this matter and that they should not be considered by the Court in ruling on parties' cross-motions for summary judgment on Plaintiffs' First Cause of Action for Plan benefits under ERISA §502(a)(1)(B); 29 U.S.C. §1132(a)(1)(B).

## III. ARGUMENT

### A. MCMC's Final Adverse Appeal Determination Was Reasonable, Based On Substantial Evidence, Not Arbitrary And Capricious, And *De Novo* Correct.

#### 1. The Arbitrary And Capricious Standard Of Review Applies To The Court's Review Of Plaintiffs' Claim

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Metropolitan Life Ins. Co. v. Glenn* ("*Glenn*"), 554 U.S. 105, 110 (2008); *Foster*, 693 F.3d at 1231 (10th Cir. 2012). Under this standard, the court "will uphold an administrator's decision so long as it is predicated on a reasoned basis." *Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F.

---

of Adolescent Depression, *Podiatrics*; 6. Principles of Care for Treatment of Children and Adolescents with Mental Illness in Residential Treatment Centers, *American Academy of Child and Adolescent Psychiatry*; 7. Thapar A., et al., Depression on Adolescence, *Lancet*; 8. V. Robin Weersing, et al., Evidence Base Update of Psychosocial Treatments for Child and Adolescent Depression, *J. Clin. Child & Adolescent Psychology*; 9. Southam-Gerow M. and Prinstein M., Evidence Base Updates: The Evolution of the Eval. Of Psychological Treatments for Children and Adolescents, *J. Clinical Child Psych & Adolescent Psychology*.

App'x 738, 748 (10th Cir. 2010) (quoting *Adamson v. Unum Life ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).

Here, the Plan provides that UBH shall review and approve pre-service, concurrent, post-service, and urgent claims for Behavioral Health Services, and that UBH will conduct first level pre-service and post-service claim appeals for Behavioral Health Services (providing that UBH's "decision is based only on whether or not benefits are available for the proposed treatment or procedure"). (AR 137-38.) The Plan further provides that a "second level appeal request must be submitted to MCMC, a third-party appeals organization retained by EMC, within 60 days from receipt of the first level appeal decision." (AR 138.) The Plan also provides that "[o]nly medically necessary care will be approved and paid by the plan. All care is subject to review based upon the plan's relevant clinical criteria." (AR 127.) Care that is not medically necessary is excluded from coverage. (AR 132.)

The Tenth Circuit has held that materially similar plan language sufficiently granted a claim administrator discretionary authority to make benefit determinations. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996) (finding sufficient discretionary language in plan excluding coverage of certain medical procedures considered experimental "in the judgment of [the administrator]"); *see also Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1266 (10th Cir. 2002); *McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998). Accordingly, the Court should find that the Plan properly vested MCMC with discretionary authority to render final benefit determinations under the Plan on Second Level appeal review. This Court should further find that based on the foregoing, its review of Plaintiffs' claim must be performed pursuant to the highly deferential arbitrary and capricious review standard.

Under the arbitrary and capricious review standard, MCMC's final adverse second level appeal

determination regarding G.K.'s admission to a residential treatment center ("RTC") program at Sunrise from April 7, 2016 through December 20, 2016, must be upheld because MCMC reasonably determined that treatment at this level of care was not Medically Necessary as defined by the Plan. Pursuant to Tenth Circuit precedent, the Plan's final adverse appeal determination must be afforded deference and may not be set aside if its determinations were "reasonable and made in good faith." *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1134-35 (10th Cir. 2011) (quoting *Phelan v. Wyo Assoc. Builders*, 574 F.3d 1250, 1256 (10th Cir. 2009)); *Averhart v. U.S. W. Mgmt. Pension Plan*, 46 F.3d 1480, 1485 (10th Cir. 1994). A plan interpretation or decision having "any reasonable basis will be upheld; it need not be the only logical or even the best decision." *Rademacher v. Colo, Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 11 F.3d 1567, 1570 (10th Cir. 1993); *see also Woolsey v. Marion Labs, Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991) (administrator's decision "need only be sufficiently supported by the facts within [its] knowledge to counter a claim that it was arbitrary and capricious" and the court "will not substitute [its] judgment for the judgment of the [administrator] unless the actions of the [administrator] are not grounded on any reasonable basis" (emphasis omitted)).

2. **MCMC's Final Appeal Determination Must Be Upheld As Reasonable, Not Arbitrary And Capricious, And Based On Substantial Record Evidence, and *De Novo* Correct.**

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Metropolitan Life Ins. Co. v. Glenn* ("*Glenn*"), 554 U.S. 105, 110 (2008); *Foster*, 693 F.3d at 1231 (10th Cir. 2012). Under this highly deferential standard, the court "will uphold an administrator's decision so long as it is predicated on a reasoned basis." *Rizzi v. v. Hartford Life &*

*Accident Ins. Co.*, 383 F. App'x 738, 748 (10th Cir. 2010) (quoting *Adamson,* 455 F.3d at 1212).

Furthermore, a claim decision is not arbitrary and capricious where it is supported by substantial evidence.

*Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

> Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. Substantial evidence means more than a scintilla, of course, yet less than a preponderance. The substantiality of the evidence is evaluated against the backdrop of administrative record as a whole.

*Adamson*, 455 F.3d at 1212 (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002); *Sandoval*, 967 F.2d at 382); *see also Mark M. v. United Behavioral Health*, 2020 WL 559345, *7-*8 (D. Utah Sept. 3, 2020) (slip op.); *William B. v Horizon Blue Cross Blue Shield of New Jersey*, 2020 WL 1915906 (D. Utah April 20, 2020 (slip op.); *Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1314 (D. Utah 2018) (granting summary judgment and finding that alleged "procedural irregularities" in defendant's claim handling of plaintiff's mental health treatment were based on assumptions, that defendant's compliance with production of documents "would be unlikely to provide relevant information" and that substantial evidence supported the insurer's denial of benefits); *Scandel v. Siebert*, 175 F. Supp. 3d 1238, 1245 (D. Colo. 2016).

Here, MCMC's final and binding Level Two appeal determination, which upheld UBH's initial adverse benefit determination, is amply supported by substantial evidence in the Record, is not arbitrary and capricious, and is also *de novo* correct. *See Tracy O. v. Anthem Blue Cross Life and Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020) (affirming summary judgment in favor of defendant and noting "[b]ecause the plan gives [defendant] discretion to deny health benefits if the claimed services are not 'medically necessary,' that decision must be upheld so long as it was not arbitrary and capricious") (citing *Firestone Tire & Rubber Co.*, 489 US at 114-15). Moreover, where multiple internal reviewers, including three separate licensed physicians, have independently determined that a claim for benefits is not

medically necessary, as occurred in connection with Plaintiff G.K.'s nearly year-long treatment at Sunrise, those determinations are supported by substantial evidence under either a *de novo* or arbitrary and capricious standard of review. *See Alexandra H. v. Oxford Health Ins. Inc.*, No. 18-11105, 2019 WL 1092625, *1 (11th Cir. Mar. 8, 2019) (affirming summary judgment where two internal appeal reviewers and an external review agent determined that treatment at a partial hospitalization level of care was not medically necessary: "The parties stake out different positions on the proper standard of review [of the reviewers' determinations]. But that's a thicket we need not enter, as the record supports Oxford's decision under either standard"); *see also Tracy O.*, 807 F. App'x at 855 (finding that defendant's reliance on internal physician reviewers' determinations that treatment was not medically necessary did not lack "*any* reasonable basis" and accordingly, "the denial of coverage was not arbitrary and capricious" and must be upheld); *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580 (10th Cir. 2019); *Mark M.*, 2020 WL 5259345 at *12 (granting summary judgment to defendants where multiple physicians and external review agency agreed that RTC treatment was not medically necessary and that a less intensive level of care (*i.e.*, outpatient treatment) was appropriate); *Robert O. v. Harvard Pilgrim Health Care, Inc.*, 2019 WL 3358706 (D. Utah July 25, 2019) (granting summary judgment in favor of defendant and crediting opinions of independent review agents who concluded that mental health treatment was not medically necessary) (slip op.); *Stacy S. v. Boeing Co. Employee Health Benefit Plan (Plan 626)*, 344 F. Supp. 3d 1324 (D. Utah 2018) (granting summary judgment to defendant and noting that "criteria for admission to RTC services and continued stay are highly subjective," and internal physician reviewers appropriately determined that treatment at the RTC level of care was not medically necessary); *Jo H. v. Cigna Behavioral Health*, 2018 WL 4082275 (D. Utah Aug. 27, 2018) (slip op.).

Plaintiffs' claims for treatment rendered to Plaintiff G.K. at Sunrise from April 7, 2016 through

December 20, 2016, were properly denied because (1) Plaintiff G.K. did not require treatment at the RTC level of care; and (2) the records from Sunrise show that Plaintiff G.K. was not even receiving treatment there at the RTC level of care, but rather the treatment was described as being "more consistent with a group home treatment" and did not provide the "actual 24/7 care" of an RTC environment. (*See* AR 2387). Moreover, the Plan expressly provides that "[o]nly medically necessary care will be approved and paid by the plan." (AR 127.)

   a. **UBH's initial administrative denial of Plaintiffs' claim for treatment at Sunrise was well-supported and correct.**

Here, UBH initially denied Plaintiffs' claims for treatment at Sunrise for lack of authorization. (AR 186-225.) There is no Record evidence to suggest that Plaintiffs (or Sunrise) sought prior authorization from UBH for G.K.'s treatment at the RTC level of care at Sunrise. Indeed, the Record evidence demonstrates precisely the opposite. UBH case notes document that on April 7, 2016, Plaintiff Sue K. told UBH that Plaintiffs were "attempting" to have G.K. transferred to a long-term residential facility (AR 233-34), and that it was not until April 20, 2016 that UBH was informed that G.K. was admitted to Sunrise on April 7, 2016 at the RTC level of care. (AR 237.) In addition, UBH advised a Sunrise representative on April 20, 2016 that it did not have any documentation of a request to precertify RTC level of care treatment at Sunrise. (AR 237.)

Moreover, as documented in UBH case note dated May 2, 2016, Plaintiff Sue K. called "to get auth[orization] because [Sunrise] bill OP [outpatient] therapy separately" from residential treatment rendered at Sunrise, and Plaintiff Sue K. was advised that "routine OP therapy does not require auth[orization] but if a service does require auth[orization], the facility needs to call themselves for auth[orization]." (AR 242-43.) During this May 2, 2016 call, UBH further advised Plaintiff Sue K. that "no auth[orization] is in place for RTC and that facility was advised *to send in info for retro review*. Mother

will contact facility to provide them this information to call in for any necessary auth[orizations]." (AR 242-43 (emphasis added.)

### b. UBH's initial denial of Plaintiffs' benefit claim on retrospective claim review was well-supported and correct.

By letter dated October 20, 2016, Plaintiffs submitted their claim for coverage of G.K.'s RTC level of care at Sunrise for retrospective review arguing that G.K.'s RTC treatment at Sunrise was and remained medically necessary. (AR 268-1101.) By letter dated October 28, 2016, UBH Associate Medical Director, Gary Rosenberg reviewed Plaintiffs' request, UBH case notes, and G.K.'s medical records and determined that treatment at the RTC level of care was not medically necessary: G.K. "continued to face challenges …. However, she did not require the kind of structure, monitoring and clinical support found in this [RTC] setting." (AR 1102.) UBH case note dated October 28, 2016, also documents that Dr. Rosenberg conducted a live telephone interview with a Sunrise representative identified as "AP's designee" concerning G.K.'s condition and treatment at Sunrise. (AR 248-49.) Following a review of Plaintiffs' and Sunrises's submissions, including the opinions of her treating doctors, medical records, and G.K.'s medical records, as well as a telephone interview with the provider, Dr. Rosenberg concluded that "no authorization can be provided from 04/07/2016. Care could have continued in a mental health partial hospitalization." (AR 1102.)

### c. UBH's decision to uphold on First Level appeal its initial adverse benefit determination on Plaintiffs' claim for coverage of G.K.'s RTC treatment at Sunrise was well-supported and correct.

By letter dated December 22, 2016, Plaintiffs submitted to UBH a Level One member appeal, seeking review of UBH's initial adverse benefit determination for authorization of treatment rendered to G.K. at Sunrise from April 7, 2016 through December 20, 2016. (AR 1111-15.) Plaintiffs argue that UBH "mistakenly processed [Plaintiffs'] retro review as a level one appeal, failing to thoroughly review the

medical records from Sunrise," and further argued that G.K.'s "long-term residential treatment [G.K.] received at Sunrise" was medically necessary. (AR 1114.)

By letter dated January 4, 2017, UBH Associate Medical Director Melinda Privette, M.D., upheld the initial adverse benefit determination, finding that G.K.'s treatment at the RTC level of care was not Medically Necessary. (AR 1116-19.)

> Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24-hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety, mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered.

(AR 1116.)

> ### d. MCMC's final and binding determination, upholding on Second Level review, UBH's denial of Plaintiffs' claim for coverage of G.K.'s RTC care at Sunrise was not arbitrary and capricious because it is reasonable and well-supported by substantial evidence in the administrative record; MCMC's final determination was also *de novo* correct.

By letter dated June 28, 2017, more than six (6) months following UBH's January 4, 2017 Level One adverse appeal determination, Plaintiffs submitted a request for a Second Level appeal review by an independent review organization. (AR 1125-49.) By letter dated July 19, 2017, UBH responded to Plaintiffs' request, explaining that "UBH is not delegate[d] to process your second level appeal. MCMC has been designated by EMC to conduct non-urgent Second-Level appeal. Please refer to the enclosed form for information about your available options to appeal or dispute this determination" (AR 1151) and attaching "Important Information About Your Right to Request a Second-Level Review by MCMC of a

Non-Coverage Determination." (AR 1153-54.)

On October 4, 2017, Plaintiffs resubmitted their June 28, 2017 Second Level appeal directly to MCMC. (AR 1160-2383.) By letter dated March 22, 2018, MCMC advised Plaintiffs and UBH of MCMC's decision to uphold UBH's initial adverse benefit determination. (AR 2384-92.) Specifically, MCMC advised Plaintiffs that "[a]fter a review by an independent Board Certified physician of the Plan language and clinical records relating to the requested coverage of the Residential Treatment Center (RTC) services at Solacium Sunrise with dates of service 04/07/2016-12/20/2016 (The Services), MCMC has determined and advised the third-party administrator, Optum, that The Services are not covered. The Services have been denied." (AR 2386.) MCMC also noted that "[p]er the Plan language, MCMC denied the appeal regarding Optum's denial of coverage of the Residential Treatment Center (RTC) services at Solacium Sunrise .... The independent Board Certified Physician determined that the dates of serviced (sic) being appealed are not medically necessary and upheld the denial." (AR 2386.)

MCMC reiterated that the standard of care applicable to treatment of patients with G.K.'s signs, symptoms, and diagnoses is to "to treat [the] individual at the least restrictive setting in which she/he can be safely and effectively treated." (AR 2387.) MCMC determined that review of G.K.'s medical records did not establish that she was even receiving treatment in an RTC environment, noting that: "She goes on passes and trips, so the treatment that she receives in reality is more consistent with a group home treatment, with access to family and to community." (AR 2387.) In sum, MCMC concluded that Sunrise's records document that G.K. "appropriately engages in activities with no behavioral issues" (AR 2388), and that there were "multiple alternative placements in which her need for continued intensive treatment and monitoring could be achieved, less intensive than the RTC," which level of care she was not even receiving in any event (AR 2387).

13446389.1

Notably, the determination by the external review agent "constitutes the final and binding review of The Services under the terms of The Plan" (AR 2392.) The external review agent cites nine (9) References in reaching the final adverse appeal determination, and notably, the UBH level of care guidelines were not included in that list. (AR 2391-92.) As discussed, *supra*, UBH did not err in its administration of Plaintiffs' claim, but importantly, UBH did not issue the final adverse appeal determination at issue – MCMC did, in accordance with the terms of the Plan. That determination is reasonable, based on substantial evidence in the Record, and is not arbitrary and capricious. It is also *de novo* correct. Based on the foregoing, this Court should not disturb MCMC's final adverse appeal determination of Plaintiffs' claim for treatment at Sunrise and should enter summary judgment in Defendants' favor on Plaintiffs' first cause of action.

**B.  Summary Judgment Should Be Granted In Defendants' Favor On Plaintiffs' Second Cause Of Action For Alleged Violation Of The Parity Act.**

The applicable federal regulations specify that, in order to be compliant with the Parity Act, "[a] group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. §2590.712(c)(4)(i).

Courts in this district have held that in order to establish a viable Parity Act claim, a plaintiff must "(1) identify a specific treatment limitation on mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health/substance

25

abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *See David P. v .United Healthcare Ins. Co.*, 2020 WL 607620, *15 (D. Utah Feb. 7, 2020). Here, Plaintiffs cannot prevail on their Parity Act claim because there is no evidence in the record, or elsewhere, to support any of the elements of this cause of action. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (noting that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses").

### 1. There Is No Evidence Of A Specific Plan Limitation On Residential Treatment.

Plaintiffs' cause of action for violation of the Parity Act fails because they have failed to adduce proof of a specific limitation in the Plan, either facial or as applied, that is applicable to residential treatment. Specifically, Plaintiffs allege (1) "[f]or none of these types of [analogous medical/surgical] treatment does UBH exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner UBH excluded coverage of treatment for [G.K.] at Sunrise" (Compl., ¶47); and (2) Defendants required G.K. "satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment [which] violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits" (Compl., ¶48). These conclusory allegations merely indicate Plaintiffs' disagreement with MCMC's final adverse appeal determination and are not supported by any factual proof evidencing a lack of compliance with the Parity Act.

Indeed, there is also no evidence in the Record, or elsewhere, showing how the adverse benefit determination at issue are inconsistent with a benefit determination for medical/surgical treatment in the same classification. Instead, Plaintiffs' Parity Act claim rests entirely on conclusory and speculative

allegations that remain unsupported by any factual evidence:

> For none of these types of treatment [sub-acute inpatient treatment at settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities] does UBH exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner UBH excluded coverage of treatment for G. at Sunrise.

(Compl. ¶47.) Plaintiffs also broadly allege:

> Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and UBH, as written or in operation, use processes, strategies, standards or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

(Compl. ¶49.)

Moreover, Plaintiffs ignore applicable Federal Regulations which expressly recognize that there is no violation of the Parity Act even if the Plan's medical necessity criteria *results in different coverage/benefits* for medical/surgical claims as compared to analogous mental health/substance use claims:

> the plan complies with the rules of [29 C.F.R. §2590.712(c)(4)] because the processes for developing the evidentiary standards used to determine medical appropriateness and the application of these standards to mental health and substance use disorder benefits are comparable to and are applied no more stringently than for medical/surgical benefits. This is the result even if the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions or substance use disorders as it does for any particular medical/surgical condition.

29 C.F.R. §2590.712(c)(4)(ii) Example 4. Thus, as the Federal Regulations make clear, where, as here, the criteria for medical necessity are "based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved," there is no violation of the Parity Act even if, as one might fully expect, the criteria for determining medical necessity for mental health/substance use

services are different than those applicable to allegedly analogous medical/surgical services.[4] *Id.*

Here, it is undisputed that the Plan explicitly provides coverage for *all medically necessary* treatment at *all levels of care* without regard to whether a claim concerns medical/surgical or mental health/substance use treatment. (*See* AR 127, 2396, 2422.) Thus, while Plaintiffs baldly claim (without alleging facts describing any specific examples) that Defendants excluded or restricted coverage for G.K.'s treatment based on "geographic location, facility type, provider specialty, or other criteria" (Compl., ¶47), there is no evidence in the record, or elsewhere, to show that claims for analogous medical/surgical benefits are treated differently than claims for behavioral health services. Because Plaintiffs have not articulated any cognizable claim and cannot cite to any factual or legal support for their bald allegation that G.K.'s mental health/substance use treatment under the Plan constituted a "specific treatment limitation on mental health benefits" in violation of the Parity Act, Plaintiffs' Parity Act claim should be dismissed.

### 2. There Is No Evidence Of A Covered Medical Or Surgical Service That Is Analogous To Residential Treatment And That The Plan Treats Differently.

Plaintiffs' Parity Act claim is also subject to dismissal because there is a complete lack of any evidence in the record, or elsewhere, that either the Plan or UBH applies any coverage limitations to mental health residential treatment claims that are greater than the coverage limitations applied to their medical/surgical analogues. Indeed, the Plan explicitly requires that any claim for coverage of a medical/surgical or mental health/substance abuse must be Medically Necessary. (AR 127, 2396, 2422.) Accordingly, summary judgment dismissing Plaintiffs' Parity Act claim should be granted to the Defendant. *See Michael P. v.*

---

[4] The Plan provides that Covered Services must be Medically Necessary, which includes showing that the service is "in accordance with generally accepted standards of medical practice (as recognized by the relevant medical community" and "[c]onsistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by your medical condition" (AR 2422.)

*Aetna Life Ins. Co.,* 2017 WL 4011153, **6-7 (D. Utah Sept. 11, 2017) (denying plaintiffs' motion for summary judgment on their Parity Act claim where plaintiffs "point[ed] to no evidence of record which persuad[ed] the Court" that there was disparate treatment in the way Aetna handled plaintiffs' claim for residential treatment compared to the way Aetna handled claims for treatment at rehabilitation facilities or skilled nursing facilities).

> **3.** **There Is No Evidence Of A Disparity In The Limitation Criteria Applicable To Mental Health Residential Treatment And Any Allegedly Analogous Medical Or Surgical Service.**

In addition to the foregoing, Defendants' motion for summary judgment should be granted because Plaintiffs have failed to adduce proof showing how any supposed limitation on residential treatment is "flawed" *in comparison to* the analogous medical/surgical services. *See Anne M. v. United Behavioral Health*, 2019 WL 1989644, *3 (D. Utah May 6, 2019) (granting motion to dismiss Parity Act claim where, as here, plaintiffs baldly alleged that defendants applied "medical necessity criteria … as written or in operation … in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification"); *Kerry W. v. Anthem Blue Cross and Blue Shield*, 2019 WL 2393802, *3 (D. Utah June 6, 2019) (same); *J.L. v. Anthem Blue Cross*, 2019 WL 4393318, *3 (D. Utah Sept. 13, 2019) (same); *Mike G. v. BlueCross BlueShield of Texas,* 2019 WL 2357380, *16 (D. Utah June 4, 2019) (same); *Jeff N. v. United Healthcare Ins. Co.*, 2019 WL 4736920, *4 (D. Utah Sept. 27, 2019) (same). The lack of evidence in the Record, or elsewhere, of any such comparisons is fatal to Plaintiffs' Parity Act claim.

Even if Plaintiffs seek to rely on extra-record discovery including medical necessity guidelines for treatment rendered at either an inpatient rehabilitation ("INR") or skilled nursing facility ("SNF") (*see* AR 2616-2882), summary judgment to Defendants is still appropriate because this extra record material does

not provide any support for Plaintiffs' speculative and conclusory allegations of Defendants' purported Parity Act violations. There is simply no evidence to show that the medical necessity guidelines for mental health/substance use services rendered at the RTC level of care are more restrictive or impose greater limitations than the guidelines for SNF or inpatient rehabilitation facilities. *James C. v. Anthem Blue Cross and Blue Shield*, 2021 WL 2532905, *20 (D. Utah June 21, 2021) (slip op.) ("The fact that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity; it is a logical consequence of the undeniable reality that every illness is inherently different and requires different treatment. This is why the Parity Act only requires comparability, not equality, between limitations for Residential Treatment Centers and Skilled Nursing Facilities.") Indeed, it is well accepted that the unsubstantiated, conclusory statements as alleged in Plaintiffs' Amended Complaint are wholly insufficient to defeat summary judgment. *See, e.g., Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 481 (10th Cir. 2011) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings") (internal citation and quotation marks omitted). Because Plaintiffs' claim that Defendants violated the Parity Act is unsupported, and indeed contradicted by the Record evidence and extra-record documents Defendants produced in discovery, summary judgment is appropriate for Defendants here.

Nearly identical allegations were raised (and dismissed) in *Michael P.*, where plaintiffs argued that Aetna's denial of their claim for residential treatment coverage violated the Parity Act, but they "provide[d] no case authority for their position" and "point[ed] to no evidence of record which persuad[ed] the Court that the Plan is noncompliant with the Parity Act." *Michael P.*, 2017 WL 4011153, *7.[5] The court in

---

[5] Plaintiffs' counsel in *Michael P.* was the same as Plaintiffs' counsel in this case.

*Michael P.* denied plaintiffs' motion for summary judgment on their Parity Act claim, and it is respectfully submitted that this Court should grant summary judgment to the Defendants here for substantially similar reasons. *See also, e.g., Julie L. v. Excellus Health Plan, Inc.*, 447 F.Supp.3d 38, 58 (W.D.N.Y. 2020) (denying plaintiffs' motion for summary judgment on their Parity Act claim and noting that "[c]ourts have recognized that conclusory allegations are insufficient to sustain a Parity Act claim on a motion to dismiss" and that "[t]hat principle is even more applicable on a motion for summary judgment").[6]

Indeed, any differences in coverage requirements between residential treatment facilities and SNFs are "not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment at those facilities." *Michael P.*, 2017 WL 4011153, *7; *see also Julie L.,* 447 F. Supp. 3d at 57 (noting that "the regulations demonstrate that there is no ERISA violation simply because the application of the same evidentiary standards results in different benefits or coverage between mental health, substance abuse, medical, or surgical conditions").

It is important to note that the *sole basis* for Plaintiffs' Parity Act claim is the factually incorrect allegation that UBH impermissibly required that G.K. exhibit acute symptoms at admission and thereafter demonstrating that she presented an immediate danger to herself and/or others (which are actually criteria for admission to an acute in-patient hospital program) for her admission and continued care at Sunrise, a sub-acute RTC facility, and that no such acuity requirement applies to allegedly analogous SNF or INR care on the medical/surgical side. (Compl., ¶48; *see also* Compl., ¶¶47 and 49.) Plaintiffs' allegation is contrary to the evidence and case law and must be rejected.

As an initial matter, since the final adverse appeal determination was rendered by MCMC, an external review agent, which did not consult or refer to the UBH RTC LOCG, Plaintiffs' claim that Defendants

---

[6] Plaintiffs' counsel in *Julie L.* was the same as Plaintiffs' counsel in this case.

violated the Parity Act by erroneously applying UBH's acute in-patient hospitalization level of care criteria is unavailing. (AR 2386-92.) Indeed, this fact alone sufficiently demonstrates that the Defendants could not – and did not – violate the Parity Act and ERISA §502(a)(3) in the manner alleged. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (noting that a "statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute"); *Huntsinger v. Shaw Grp., Inc.*, 268 F. App'x 518, 520 (9th Cir. 2008) (ERISA "require[s] proof that the alleged ERISA violation caused harm"); *Hein v. FDIC*, 88 F.3d 210, 224 (3d Cir. 1996).

Nor can Plaintiffs show they possess the requisite Article III standing demonstrating an actual case in controversy that permits judicial review of their Parity Act claim. Article III of the United States Constitution states that courts may only hear actual cases and controversies. U.S. Const. Art. III, §2, cl.1. A plaintiff's standing is essential to determining whether there is an actual case to be resolved by a court. *See Warth* v. *Seldin*, 422 U.S. 737, 750 (1984); *see also Lujan* v. *Defenders Of Wildlife*, 504 U.S. 555, 560 (1992). There are three components to the Constitutional standing requirement: (1) a personal injury; (2) that is fairly traceable to the defendant's wrongful conduct; and (3) the injury is likely to be redressed by the relief sought. *See Fulani* v. *League of Women's Voters Educ. Fund*, 882 F.2d 621, 624 (2d Cir. 1989) (relying on *Allen* v. *Wright*, 468 U.S. 737, 751 (1984)); *see also Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 1670, 180-81 (2000). Where, as here, however, Plaintiffs cannot demonstrate that they have suffered *any* injury from the alleged violation, they are not entitled to relief and cannot overcome this jurisdictional defect. *M.S. v. Premera Blue Cross, et. al.,* Case no. 2:19-cv-00199-RJS-CMR, 2022 WL 2208927 at *3 (D. Utah June 21, 2022) (Slip Op.) (Shelby, C.D.J.)

Notwithstanding the foregoing, even considering the text of the UBH LOCG, there is no Parity Act violation as Plaintiffs allege, because it is well-established that a plan may reasonably impose requirements

to stabilize a patient in residential treatment to permit the patient's treatment to be subsequently stepped-down to a less intensive level of care. *See Mary D.*, 778 F. App'x 580, 592-93 (10th Cir. July 15, 2019) (upholding denial of plaintiffs' claim for residential treatment benefits where the plan provided that "the individual must reasonably be expected to both stabilize and improve from short-term residential treatment and then return to outpatient treatment"); *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 848 (10th Cir. 2020) (upholding denial of plaintiffs' claim for residential treatment benefits where the plan provided that "[t]here should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the Covered Individual will be able to return to outpatient treatment").

Plaintiffs' allegation of a Parity Act violation is also based on their incorrect semantic distinctions in the usage of the word "acute" in UBH's RTC LOCG, by confusing the use of the word to require symptoms that are severe enough to require treatment at an acute in-patient level of care, as opposed to being of sudden onset, for the evaluation of symptomology presented by a patient at the time of admission and/or evaluation of continuing care needs. For example, in her request for appeal review by MCMC, Plaintiff Sue K. argues that the admission criteria for RTC "makes it clear that *acute* symptoms, such as imminent risk of harm to self or others, are inappropriate for admission to an RTC." (AR 1170 (emphasis added).) However, this argument is based on an erroneous reading of these guidelines. UBH's Common Care and RTC level of care guidelines define the RTC as a "facility-based program which delivers 24-hour/7-day assessment and diagnostic services." (AR 1199.) Moreover, the admissions criteria from the Common Care and RTC level of care guidelines all include the following requirements: (1) that services be clinically appropriate to treat the condition, *i.e.*, co-occurring behavioral health and medical conditions

can be safely managed at the level of care (AR 1203-1204); (2) that services cannot be safely, efficiently, or effectively managed at a less intensive level of care because of *acute* (*i.e.*, sudden and temporary) impairments that would threaten the member or others (AR 1203-1204); (3) that services <u>can</u> be safely, efficiently, or effectively managed at the proposed level of care – RTC is <u>not</u> the appropriate setting to address a situation where the patient is in "imminent or current risk of harm to self, others, and/or property" (AR 1203-1204 (emphasis added). Finally, treatment at the RTC level of care is not medically necessary where (1) there is no reasonable expectation of improvement within a reasonable period of time, or (2) the services are custodial (geared toward maintenance of a condition as opposed to seeking a cure or improving function), or (3) do not require administration by trained medical/clinical personnel. (AR 1203-1204.) Indeed, review of the presence of acute (*i.e.*, not chronic) symptomology, and evaluation of the severity of these sudden onset symptoms to determine the appropriate (*i.e.*, least intensive) level of care to safely and effectively G.K.'s condition is, as the external review agent noted, part of the "general standard of care." (AR 2386.)

Plaintiffs' Parity Act violation claim fares no better when undertaking the required comparison of the medical necessity guidelines for the mental health treatment at issue (RTC) and Plaintiffs' alleged medical/surgical analogues (SNF and Subacute in-patient rehabilitation (INR)). The Subacute INR and SNF guidelines produced in this case (*see* Sue K. 2616-2882) demonstrate that both the medical/surgical and behavioral health guidelines are consistent and similar in determining the medically necessary therapeutic interventions for treatment of acute (*i.e.*, sudden, new, temporary) symptoms with a goal toward improvement. The Subacute INR and SNF guidelines also generally provide that where the treatment is maintenance care or provided solely for treatment of a stable condition without a reasonable expectation of improvement, such treatment is not Medically Necessary. ██████████████

As the court

in *James C.* noted, there is no disparity between mental health/substance abuse guidelines and medical/surgical guidelines where the requirements share a common purpose (*i.e.*, to cover treatment at the appropriate level of care until the patient can be safely and effectively treated at a less intensive level of care). *James C.*, 2021 WL 2532905 at *20 ("The fact that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity; it is a logical consequence of the undeniable reality that every illness is inherently different and requires different treatment. This is why the Parity Act only requires comparability, not equality, between limitations for Residential Treatment Centers and Skilled Nursing Facilities.").

Plaintiffs' allegation that "UBH and the Plan" improperly required Plaintiff G.K. "satisfy acute care medical necessity criteria" to receive Plan benefits for sub-acute care (*see* Compl., ¶48), is similarly flawed and contrary to case law on point. Indeed, most courts that have considered the same or similar allegations in similar cases have rejected the argument that acute care criteria were used to evaluate the

appropriateness of treatment at a sub-acute setting merely because reviewers referred to the absence of acute symptomology in finding that residential treatment was not medically necessary. *See Mary D.*, 778 F. App'x at 590-91 (in which the 10th Circuit rejected plaintiffs' argument that "the reviewers' findings on A.D.'s risk for suicide and homicide" indicate that the claim administrator "erroneously used the medical-necessity criteria for acute inpatient care rather than the criteria for residential treatment" where the reviewers "all specified the residential-treatment criteria, not the acute-inpatient-care criteria, as the basis for their determination", "none of the reviewers even mentioned the acute-inpatient-care criteria", and noting that in-patient hospitalization and residential treatment criteria partially overlap); *Brian C. v. ValueOptions*, 2017 WL 4564737, *4 (D. Utah Oct. 11, 2017) (finding that RTC criteria were properly applied and noting that "[j]ust because the denial correspondence addressed whether A.C. was a harm to herself or others" did not mean that acute inpatient criteria was applied); *Amy G. v. United Healthcare*, 2018 WL 2303156, *3 (D. Utah May 21, 2018) (finding that UBH correctly applied the UBH Guidelines for Residential Treatment Center when it found that RTC level of care was not medically necessary because claimant was not "at risk of harm to self or others"); *Mark. M. v. United Behavioral Health*, Case No. 2:18-CV-00018-BSJ, 2020 WL 5259345, *12 (D. Utah, Sept. 3, 2018) (noting that acute and sub-acute care criteria "partially overlap" and that UBH properly concluded that plaintiff "was not exhibiting acute changes in her signs or symptoms such that treatment at the residential treatment level was medically necessary"). Notwithstanding the foregoing, one court recently reached a contrary conclusion, making a factual finding that a health benefit plan administrator violated the Parity Act by requiring the patient to show acute in-patient hospital care needs in order to qualify for residential treatment. *Jonathan Z. v. Oxford Health Plans*, 2022 WL 2528362, *20-*21 (D. Utah July 7, 2022) (slip op.). The *Jonathan Z.* decision is an outlier, and notably, the court in that case did not acknowledge, discuss, or attempt to distinguish why

it reached a different conclusion on this issue than the courts in the cases cited above.

Courts have also found that the claim administrator has properly considered sub-acute care criteria where, as here, the physician reviewers recommended care less intensive than residential treatment. *Mike G.*, 2019 WL 2357380 at *13 (rejecting plaintiffs' argument that "Blue Cross used improper [acute care] criteria when considering A.G.'s need for residential treatment" and noting that "the reviewers did recommend sub-acute levels of care, including partial hospitalization," which "demonstrates that Blue Cross did consider whether sub-acute care was appropriate"); *Carlo B. ex rel. C.B. v. Blue Cross Blue Shield of Mass.*, 2010 WL 1257755, *1 (D. Utah Mar. 26, 2010) (rejecting plaintiffs' argument that defendants used improper acute care criteria where defendants' denial was based on the finding that C.B. "did not meet criteria for admission to acute residential treatment" and instead "met criteria for outpatient therapy"). That is exactly what happened here, where each medical reviewer, and the external appeal reviewer, concluded that treatment at less intensive levels of care would have been appropriate. (AR 1562, 3120, 3159.)

In the end, Plaintiffs' conclusory allegations of a violation of the Parity Act are wholly unsupported by any evidence showing that there is any *disparity* between treatment guidelines or limitations for mental health residential treatment care and those applicable to allegedly analogous care on the medical surgical side. Without such a showing, Plaintiffs' Parity Act claim is fatally flawed.

At bottom, the Record shows that UBH's final adverse appeal determination was reasonably based on substantial evidence in the Record and not arbitrary and capricious. The determination that Plaintiff G.K.'s treatment was not medically necessary at the RTC level of care was reached by three separate physicians, including an independent external appeals reviewer. Against the overwhelming weight of evidence supporting the determination that no coverage was available for G.K.'s treatment at Sunrise as it was not

medically necessary, Plaintiffs' bald and unsupported Parity Act claim, which fails to show how their claim for coverage of Plaintiff G.K.'s residential treatment was subjected to more rigorous review *in comparison* to a claim for allegedly analogous medical/surgical care, such as SNF services, is a weak attempt to distract the Court's attention from the operative facts. Consequently, this Court should grant the Defendants' motion for summary judgment dismissing the Plaintiffs' Parity Act claim.

### C. Summary Judgment Should be Granted to UBH on the Additional Ground that it Did Not Act as an ERISA Fiduciary in this Case and is Therefore, Not a Proper Party Defendant.

In addition to the foregoing, this Court should grant summary judgment to UBH because it is not a proper party defendant in this action alleging violation of ERISA. Plaintiffs' Complaint alleges that Defendants (including UBH) (1) "breached their fiduciary duties" in "failing to provide coverage for [G.K.'s] medically necessary treatment" (Compl., ¶¶41-42) and (2) violated the Parity Act by requiring G.K. to "satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment" (Compl., ¶48). However, UBH is not, and did not, act as an ERISA fiduciary to the Plan in this case. Therefore, as a matter of law, it could not have breached any ERISA fiduciary duty to the Plaintiffs.

ERISA defines a fiduciary as follows:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . .

ERISA §3(21); 29 U.S.C. §1002(21). As discussed in detail *infra*, and below, UBH did not act as a fiduciary under the Plaintiffs' Plan because it did not have, nor did it exercise, final discretionary authority over disposition of assets of the Plan (*i.e.*, payment of Plan benefits). UBH did not make the final claim determination and has no authority over the disposition of Plan assets as to this benefit claim.

The Record shows that the Plan is self-funded, and the Plan expressly provides that "medical vendors" (such as UBH) "provide administrative services to the self-insured portion of the plan," and while these vendors "provide claims payment and other administrative services under an administrative services contract with EMC, [ ] they *do not assume any financial risk or obligation with respect to claims or the plan*." (AR 2503 (emphasis added).) The Plan also expressly provides that in the event a member is dissatisfied with UBH's initial adverse benefit determination or level one appeal determination on their benefit claim, any final Level Two appeal "*must* be submitted to MCMC, a third-party appeals organization retained by [the Plan]." (AR 138 (emphasis added).) Based on the foregoing, it is clear that under this Plan, UBH's role is merely administrative, that it has not been vested by the Plan Administrator (EMC), with discretionary authority to render final determinations on non-urgent benefit claims such as the claims at issue here. *See Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919 (10th Cir. 2006); *In re Luna*, 406 F.3d 1192, 1205-1206 (10th Cir. 2005) (finding that employer's obligation to pay debts owed to an employee benefit plan is insufficient to confer ERISA fiduciary status, but rather is more akin to persons "who have 'no power to make any decisions as to plan policy, interpretations, practices or procedures,' but instead who perform only 'administrative' or 'ministerial functions' related to the plan, are not fiduciaries under ERISA §3(21)(A)") (internal citations omitted). Accordingly, UBH is not a Plan fiduciary as a matter of law. It follows then that UBH could not have breached any ERISA fiduciary duties as alleged by Plaintiff because it had no authority under the Plan to (and in fact, did not) render any final determination on the Plaintiffs' benefit claims.

This case presents a similar issue to the one addressed by the Tenth Circuit in *Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919 (10th Cir. 2006). In *Geddes*, the Tenth Circuit reversed a district court's award of money damages awarded by a district court against a third-party administrator,

13446389.1

notwithstanding the district court's finding that the administrator was an independent, non-fiduciary that was not delegated fiduciary responsibilities under the plan and was not the entity responsible for making final benefit determinations. *Geddes*, 469 F.3d at 931-32. The Tenth Circuit reasoned that ERISA "requires that plan administration be vested in a fiduciary and permits the fiduciary plan administrator to employ an agent to carry out plan responsibilities." *Id.* at 931. The Tenth Circuit then noted that while the "fiduciary owes a duty of care to the beneficiaries and is legally responsible both for its own decisions and also for decisions made by its agent," the agent, "assuming it is not a fiduciary, owes duties to the administrator and not to the beneficiaries." *Id.* at 931-32.

The Tenth Circuit in *Geddes* held unequivocally that "[t]he ERISA statute is clear: ERISA beneficiaries may bring claims against the plan as an entity and plan administrators. Everest is neither. We reverse the district court." The result here should be no different. Because MCMC, and not UBH, was delegated with final discretionary authority to determine Plaintiffs' claims for coverage of G.K.'s RTC level of care treatment at Sunrise, and because MCMC issued the final determination that no coverage was available for G.K.'s claim for benefits, UBH did not act as Plan fiduciary with respect to this claim for benefits. UBH also has no authority over the disposition of Plan assets as to this claim for benefits. Quite simply, UBH had no authority to issue a final adverse appeal determination, and the Record evidence amply demonstrates that MCMC was vested with, and exercised, that authority pursuant to the Plan.

## IV.    CONCLUSION

Accordingly, this Court should grant summary judgment to Defendants and dismiss Plaintiffs' Complaint in its entirety and with prejudice.

DATED this 28th day of July, 2022.

/s/ Clint R. Hansen
Scott M. Petersen

40

Clint R. Hansen
*Attorneys for Defendants*

/s/ Michael H. Bernstein
Michael H. Bernstein
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of July, 2022, I caused a true and correct copy of the

foregoing to be filed via the Court's ECF filing system, which made service electronically upon the

following counsel of record:

Brian S. King, brian@briansking.com
Brent J. Newton, brent@briansking.com
BRIAN S. KING, P.C.
*Attorneys for Plaintiffs*

*/s/ Clint R. Hansen*

13446389.1