IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| S.K. and R.K., individually and on behalf of G.K, a minor,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH, and the EMC CORPORATION HEALTH PLAN,<br><br>     Defendants. | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-880-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Plaintiffs S.K. and R.K. are the parents of G.K.  S.K. was a participant in and G.K. was a beneficiary under Defendant EMC Corporation Health Plan (the Plan), governed by the Employee Retirement Income Security Act (ERISA).[1]  Defendant United Behavioral Health (UBH) was the Plan's designated behavioral health claims administrator.

In 2016, G.K. was treated at a Utah residential treatment center (RTC), Sunrise Solacium (Sunrise) after years of serious mental health issues, a suicide attempt, and extended hospitalization.  Defendants repeatedly issued denials for Plan coverage for the entire term of treatment at Sunrise.  Plaintiffs then initiated this action individually and on G.K.'s behalf,[2] claiming: 1) Defendants breached fiduciary duties under ERISA, 29 U.S.C. § 1132(a)(B) in denying benefits, and 2) the denial violated the Mental Health Parity and Addiction Equity Act (Parity Act), 29 U.S.C. § 1132(a)(3).[3]

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] S.K. maintains individual claims, while R.K.'s were dismissed.  *See* Dkt. 43, *Order Following Oral Ruling*.  Both parents pursue claims on their child's behalf.

[3] Dkt. 2, *Complaint*, at 11-13 (using court's ECF pagination).  All citations herein to the parties' filings will refer to the page numbers on the court's ECF pagination.

Now before the court are each side's cross-motions for summary judgment.[4]  For the reasons discussed below, Plaintiffs' Motion is GRANTED and Defendants' Motion is DENIED.

## I.      FACTUAL BACKGROUND

The facts in both sides' Motions are mostly undisputed.  Indeed, Plaintiffs state they have no specific objection to any fact in Defendants' Motion for Summary Judgment.[5]

Defendants purport to dispute a handful of specific facts in Plaintiffs' Motion and lodge an "omnibus" objection to "nearly every fact" in Plaintiffs' Motion on the grounds they are "replete with argumentative statements, legal conclusions, selective and/or misleading quotes . . . [and] without any citation."[6]  Thus, before summarizing the facts, the court discusses Defendants' omnibus objection and factual disputes.

### A.      Defendants' Omnibus Objection to and Specific Disputes of Plaintiffs' Facts

As Plaintiffs note in their Reply, Defendants' omnibus objection is unspecific and wholly deficient under Federal Rule of Civil Procedure 56,[7] which requires a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by:"

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[4] Dkt. 71, *Plaintiffs' Motion for Summary Judgment* [SEALED] (*Plaintiffs' MSJ*); Dkt. 73, *Defendants' Motion for Summary Judgment* [SEALED] (*Defendants' MSJ*).

[5] Dkt. 84, *Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* [SEALED] (*Plaintiffs' Opp.*), at 4.

[6] Dkt. 83, *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* [SEALED] (*Defendants' Opp.*) at 13 n.3.

[7] Dkt. 89, *Plaintiffs' Reply in Support of Motion for Summary Judgment* [SEALED] (*Plaintiffs' Reply*) at 2-3.

And as discussed below, multiple purported factual disputes by Defendants similarly fall short.  As Plaintiffs note, "on the balance,"[8] Defendants do not actually dispute the substance of Plaintiffs' factual assertions.

1.      Defendants purport to dispute Plaintiffs' Fact No. 4, which provides "The prelitigation appeal record contains very little information about G.K.'s medical condition until her seventh-grade year."  Citing "generally" to the entire Administrative Record (A.R.), comprised of thousands of pages, Defendants state that they dispute the fact "to the extent that Plaintiffs characterize the documents, including G.K.'s clinical records, submitted in support of Plaintiffs' administrative appeals and contained in the A.R."[9]  But this is not a specific dispute, and does approach compliance with Rule 56.  It neither shows Plaintiffs' cited fact is inaccurate nor identifies any part of the A.R. with information about G.K. before her seventh-grade year.

2.      Defendants purport to dispute Plaintiffs' Fact No. 34, which states "Accordingly, G.K. was admitted into Solacium Sunrise ("Sunrise"), a residential treatment center on April 7, 2016."  Citing their own letters denying coverage for this treatment, Defendants state they dispute this fact "to the extent that Plaintiffs state a conclusion of law as fact that G.K.'s admission to Sunrise was appropriate or Medically Necessary as defined by the Plan."  This response does not specifically dispute any part of Plaintiffs' stated fact.

3.      Defendants purport to dispute Plaintiffs' Fact No. 41, which states "In an Explanation of Benefits statement dated July 19, 2016, UBH denied payment for all of G.K.'s treatment at Sunrise 'due to No Authorization.'"  Defendants contend the fact is disputed because "Plaintiffs cite to arguments contained in their internal administrative appeal, not the

---

[8] Dkt. 89, *Plaintiffs' Reply*, at 3.

[9] Dkt. 83, *Defendants' Opp*., at 13.

[EOBs].  The A.R. reflects that by EOBs dated July 19, 2016, G.K.'s treatment at Sunrise from April 7, 2016 through June 30, 2016 was denied for lack of authorization. The A.R. also reflects that subsequent EOBs dated from September 2016, October 2016, November 2016, December 2016, and March 2017 denied G.K.'s treatment at Sunrise from July 2016 through December 2016 for lack of authorization."[10]  Defendants are not actually disputing a fact. To the extent they simply wished to cite to the actual EOB rather than Plaintiffs' appeal to support the fact, those EOBs dated July 19, 2016[11] state what Plaintiffs did: that payment for care at Sunrise was denied "due to No Authorization."  That "No Authorization" denial is not contested in this litigation.

   4.  Defendants dispute Plaintiffs' Fact 51, in which Plaintiffs state "Defendants arranged for an external review organization to evaluate their denial of G.K.'s claims." Defendants label this fact "inaccurate," and state that "[a]ccording to the terms of the Plan, MCMC is an external and independent review agent that was specifically designated by the Plan to conduct final and binding second level appeal reviews, did not consider the Optum [UBH].[12] RTC guidelines in upholding the adverse appeal determination of G.K.'s claim for coverage at Sunrise from April 4, [sic] 2016 through December 20, 2016 on the basis of lack of medical necessity."[13]  Defendants do not actually dispute any part of Plaintiffs' fact.  Stating that the Plan terms designated an external review doesn't contradict that Defendants arranged for such an external review, and Defendants done explain who else could have.  But for purposes of resolving the pending motions, and because Plaintiffs do not dispute them, the court accepts

---

[10] *Id.* at 13-14.

[11] Administrative Record [SEALED] (A.R.) 186-197

[12] UBH also uses the brand name Optum.  *See* A.R. 140, 148, and 151 (Level of Care Guidelines, noting "Optum is a brand used by United Behavioral Health and its affiliates.").  EOBs sent to Plaintiffs state on the bottom of some pages, "United Behavioral Health, operating under the brand name Optum."  *See* A.R. 186, 190, 194, 198, 202, 206-07, 211-12, 216-17, 221-22, 226-32.

[13] Dkt. 83, *Defendants' Opp.*, at 14 (citing A.R.2384-92).

Defendants' added facts concerning MCMC, including that it did not consider the Optum RTC guidelines in upholding the adverse coverage determination.

5.      Defendants similarly dispute Plaintiffs' Fact 53, which states, "To evaluate whether mental health treatment received at a residential treatment facility (such as Sunrise) was medically necessary, Defendants utilized the Optum by United Behavioral Health Level of Care Guidelines for 2016 ('Optum Guidelines.')"  Defendants contend that the fact is "misleading and inaccurate" because "MCMC, an external and independent review agent, which was specifically designated by the Plan to conduct final and binding second level reviews, did not consider Optum RTC guidelines in upholding the adverse appeal determination of G.K.'s claim for coverage at Sunrise from April 4, 2016 through December 20, 2016 on the basis of lack of medical necessity."[14]  For purposes of resolving the pending motions, and because Plaintiffs do not dispute them, the court accepts Defendants' added facts concerning MCMC,  including that MCMC did not consider the Optum RTC guidelines in upholding the adverse coverage determination.  Defendants do not dispute UBH used its guidelines in its own denials.

## B.      The Factual Record for Summary Judgment

Plaintiffs S.K. and R. K. are Plaintiff G.K.'s parents.  Defendant EMC Corporation established and maintained a group medical plan for its employees, the EMC Corporation Health Plan (the Plan).[15]  The Plan is a self-funded employee welfare benefits plan under ERISA, 29 U.S.C. §1001 et. seq.[16]  S.K. was a member/participant in the Plan, and G.K. was a beneficiary under the Plan as a dependent of S.K.[17]  Defendant EMC was the named Plan Administrator and

---

[14] Dkt. 83, *Defendants' Opp.*, at 14.

[15] Dkt. 73, *Defendants' MSJ*, at 5 ¶ 1 (citing A.R. 1-139, 1393-2519).

[16] *Id.* at 6 ¶¶ 2-4 (citing A.R.10, 110, 114-15, 2410, 2415, 2422, 2503-05); Dkt. 71, *Plaintiffs' MSJ*, at 3 ¶ 1.

[17] Dkt. 73, *Defendants' MSJ* at 6 ¶¶ 2-3 (citing A.R. 10, 2422, 2504-05).

Defendant United Behavioral Health (UBH) was the Plan's claims administrator for mental health benefits.[18]  UBH also uses the brand name Optum.[19]

### 1.  G.K.'s History

While in seventh grade, in about 2013, G.K. began distancing herself from friends and school activities.[20]  She later reported she began suffering from depression and anxiety about this time.[21]  In the fall of 2014, it was discovered that she was visiting "anorexia websites and posting comments about wanting to disappear."[22] At some point between 2013 and 2016, G.K. began cutting herself and binging and purging food, but was able to conceal both activities—indeed, she believed she was "able to keep her symptoms pretty much hidden" from her parents and therapists.[23]  In about 2014, G.K. also began having suicidal thoughts.  Those thoughts persisted for the next two years.[24]

Starting in March 2015, G.K. began seeing a therapist every week, and by the fall, with her depression and anxiety worsening,[25] she told her therapist she was anxious about going to high school and had been avoiding going out to socialize.[26]  Around that time, she came out as a lesbian and joined her school's gay-straight alliance, but "did not connect with anyone in this

---

[18] Dkt. 71, *Plaintiffs' MSJ*, at 3 ¶ 10; Dkt. 73, *Defendants' MSJ*, at 6 ¶ 10 (citing A.R. 122-39, 2503).

[19] *See supra* footnote 12.

[20] Dkt. 2, *Complaint*, at ¶ 9; Dkt. 71, *Plaintiffs' MSJ*, at 3 ¶ 5 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[21] Dkt. 71, *Plaintiffs' MSJ*, at 3 ¶ 6 (citing A.R.2333, part of a psychiatric evaluation performed at Sunrise).

[22] *Id.* at 4 ¶ 7 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[23] *Id.* at 4 ¶¶ 8-9, 15 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination, and A.R.2333, part of a psychiatric evaluation done at Sunrise).

[24] *Id.* at 5 ¶ 17 (citing A.R.2331, part of an assessment done at Sunrise).

[25] *Id.* at 5 ¶ 18 (citing A.R.2333, part of a psychiatric evaluation done at Sunrise).

[26] *Id.* at 4 ¶¶ 10-11 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

group."[27]  By December 2015, G.K. "began to show signs of anxiety, including being unable to answer her Spanish teacher, walking out of class crying, and not being able to order in a fast food restaurant."[28]

By December 2015 and January 2016, G.K. was having suicidal thoughts daily, and later reported she felt she had no reason to live and that no one really cared about her.[29]  In mid-January 2016, she attempted suicide by waiting until everyone else in her home went to bed, then taking sixteen Tylenol and sixteen Advil and severely cutting her arm.[30]  After she texted 911, G.K. was hospitalized for ten days.[31] During that hospitalization, G.K. told staff she was suicidal, left suicide notes in her room and on her phone, and used razor blades to cut herself.[32]

After this, G.K. was transferred to Centennial Peaks Psychiatric Hospital (Centennial). While a typical stay at Centennial is usually three to five days, G.K. was there for a month due to her suicidal ideation—from January 28 to February 29, 2016.[33]  During that time, she stated that she wanted to jump off a local bridge, and that she had hidden Advil, Tylenol, and Nyquil in her room to use in ending her life.[34]

Centennial referred G.K. to a facility called Northwest Passage for a thirty-day assessment program. She was there from February 29 to April 5, 2016, for assessment and to

---

[27] *Id.* at 4 ¶ 13 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[28] *Id.* at 4 ¶ 14 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[29] *Id.* at 5 ¶¶ 19-20 (citing A.R.2331, part of an assessment done at Sunrise).

[30] *Id.* at 5 ¶ 21 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination, and 1238, letter from Northwest Passage Case Manager Briana Bielmeier).

[31] *Id.* at 5 ¶ 22 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[32]*Id.* at 6 ¶¶ 23-24 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[33] *Id.* at 6 ¶¶ 25-26 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

[34] *Id.* at 6 ¶ 27 (citing A.R.2387, part of MCMC's Notification of Second Level Appeal Determination).

receive medication to stabilize her depression and anxiety.[35]  But at Northwest Passage, G.K.'s anxiety not only continued, but "appeared to be exacerbated by the other patients."[36]  After her assessment, the Northwest Passage recommended G.K. receive further residential treatment:[37]

> At the completion of her assessment, the team recommended that she receive a higher level of care to monitor her and maintain her safety.  She continued to present a high level of risk, including that it was necessary for her to be restricted from various means to harm herself. She was recommended to be discharged to a residential program to manage her suicidal ideation, self-harm behaviors and emotional dysregulation. . . The team recommended intensive treatment to manage [G.K.'s] emotions and behaviors, and to help her learn and generalize therapeutic skills. Ample support services are needed both academically and therapeutically. There is significant concern that without interventions her patterns of emotional distress will continue.[38]

Thus, G.K. was admitted to Sunrise on April 7, 2016.  The State of Utah has licensed Sunrise as a "residential treatment" program under its laws, including Utah Code Annotated § 62A-2-101.[39]  On admission, G.K. was diagnosed with:

    A.    Major Depressive Disorder, recurrent severe;

    B.    Generalized Anxiety Disorder;

    C.    Social Anxiety Disorder; and

    D.    Emerging Avoidant Personality Traits.[40]

G.K. remained at Sunrise for just over eight months, until her discharge on December 20, 2016.  While there, G.K. received daily group therapy, weekly individual and family therapy,

---

[35] *Id.* at 6 ¶¶ 29, 30 (citing A.R.2387-88, part of MCMC's Notification of Second Level Appeal Determination).

[35] *Id.* at 7 ¶ 31 (citing A.R.2388, part of MCMC's Notification of Second Level Appeal Determination).

[36] *Id.* at 7 ¶ 32 (citing A.R.2388, part of MCMC's Notification of Second Level Appeal Determination).

[37] *Id.* at 7 ¶ 33 (citing A.R.2388, part of MCMC's Notification of Second Level Appeal Determination).

[38] A.R. 2388 (part of MCMC's Notification of Second Level Appeal Determination).

[39] Dkt. 84, *Plaintiffs' Opp.*, at 4-5 ¶¶ 1-6.

[40] Dkt. 71, *Plaintiffs' MSJ*, at 7 ¶ 35 (citing A.R. 2332, part of a Sunrise Treatment Plan dated April 9, 2016).

and milieu therapy interventions as needed.[41]  In addition to these regular therapies, she also received Dialectical Behavioral Therapy, process therapy, shame resiliency therapy, and participated in distress tolerance and emotion regulation skills practices.[42]

At Sunrise, G.K. initially struck her treatment team and staff as pleasant, calm, and kind, denying suicidal ideation.[43]  However, staff would record observations that G.K. "seemed to be shy when asking for her basic needs to be met" and "[G.K.] seemed to overall have a positive day because she kept her emotions at face value."[44]

Shortly after her admission into Sunrise, G.K.'s treatment team noted that G.K. "struggle[d] with anxiety and depression[,]" but that she would "need to be challenged to be genuine and honest with where she's at emotionally" because "[s]he puts on a front of being very sweet and calm."[45] Her treatment team warned staff:

> [B]e very aware of her relationships to make sure they are safe and appropriate. Point out inconsistencies between her behavior and her mood (if she is saying she's depressed but isn't showing it). Staff can model how to share emotions and show her it's ok to let these things out.[46]

These concerns, along with her treatment team's extra call for staff to be particularly observant when interacting with G.K., were reflected in the following staff and treatment team notes indicating G.K. was manifesting symptoms of ongoing depression, avoidance, and anxiety:

> May 1, 2016 – "G.K. seems to be depressed and withdrawn from her community. Writer has observed her [sic] that she seems to observe others and tends to shy

---

[41] Dkt. 84, *Plaintiffs' Opp.*, at 5 ¶ 7 (citing A.R. 1045, part of a Sunrise Treatment Plan dated April 9, 2016 (appearing to be identical to A.R. 2332)).

[42] *Id.* at 5 ¶ 8 (citing A.R. 946-49, G.K.'s Master Treatment Plan at Sunrise).

[43] Dkt. 71, *Plaintiffs' MSJ*, at 7 ¶ 36 (citing A.R. 980-1041, Sunrise treatment notes).

[44] *Id.* at 7-8 ¶ 36 (citing A.R. 1041, 1014 Sunrise treatment notes).

[45] *Id.* at 8 ¶ 37 (citing A.R. 2334, part of a psychiatric evaluation).

[46] *Id.*

away when reaching out. [G.K.] seems to isolate to herself most of the time. She was respectful towards staff as well as peers with very little interaction."[47]

May 2, 2016 – "[G.K.] seemed to have a high level of stress and anxiety today. She appears to have tried multiple tactics to get her one team to be mutually respectful, with no solid results. [G.K.] expressed to staff that she doesn't feel like she is able to grow in her current situation. . . . Staff tried to reach out to [G.K.] to make her feel safe and supported. Staff encouraged her to reach out when she felt like she was struggling with her peers or her feelings."[48]

May 4, 2016 – "[G.K.] seemed to struggle a lot emotionally today. After getting her feedback from treatment team she seemed upset and talked with writer about not understanding what they were asking her. [G.K.] said she feels like she's being herself and that she doesn't feel the need to work on relationships with her peers. [G.K.] said she's never had a lot of relationships and that thats [sic] fine with her. [G.K.] seemed to get very emotional while talking with writer about this and even teared up a little. Throughout the night [G.K.] was respectful and did what was expected of her but she seemed to be upset and depressed."[49]

May 5, 2016 – "[G.K.] appeared to be very closed off. She was compliant with the one team and was respectful to writer. She seemed to keep her conversations surface level and seemed to keep the relationship with writer at arms [sic] length. [G.K.] appeared to be willing and positive towards the community and staff. Writer observed [G.K.] to become deep in her feelings when she felt no one was looking…"[50]

May 6, 2016 – "[G.K.] seemed aloof, introspective, and quiet today. She seemed to isolate and read a lot throughout the shift and seemed to shift and not respond when asked to check in emotionally. She seemed a bit more frustrated at her peers on the one team today and seemed more agitated than usual . . . ."[51]

May 7, 2016 – "[G.K.] struggles with self-advocacy. She has a hard time asking for help from teachers. She struggles in social settings."[52]

May 7, 2016 – "[G.K.] is really good at disguising her anxiety and emotions … [G.K.] has opportunities to open up to her peers and staff, but doesn't seem to be taking the chance to do so. [G.K.] has high social anxiety, so what she needs and wants (to be heard, etc), is also the scariest thing for her. Staff will work on

---

[47] *Id.* at 8 ¶ 38 (citing A.R. 2336, a residential progress note).

[48] *Id.* at 8 ¶ 38 (citing A.R. 2337, a residential progress note).

[49] *Id.* at 9 ¶ 38 (citing A.R. 2338, a residential progress note).

[50] *Id.* at 9 ¶ 38 (citing A.R. 2339, a residential progress note).

[51] *Id.*, at 9 ¶ 38 (citing A.R. 2340, a residential progress note).

[52] *Id.* at 9 ¶ 38 (citing A.R. 2341, part of a Master Treatment Plan).

challenging [G.K.] to explore her emotions . . . . [G.K.] still hasn't opened up in class, and continues to remain quiet."[53]

May 20, 2016 – "[G.K.] did not seem to open up to peers or staff today. She was agreeable to the point that it was suspicious. She seemed to lay in her bed and isolate after she was done with her morning responsibilities. Overall she seemed to have a less than average day on the AM shift today."[54]

May 23, 2016 – "[G.K.] is reporting that her depression has not improved and that she thinks it may be worse and the anxiety is still a problem. She still finds little joy in her life. . . .[G.K.'s] mood is quite depressed, seems quite sad, nothing to look forward to, feels safe here at Sunrise but would not be safe at home. She is feeling somewhat hopeless and helpless . . . ."[55]

May 25, 2016 – "… [G.K.] struggles to assert her needs assertively and seems to give up easily. When asked why she doesn't push for her needs, she expresses that she feels it doesn't matter. [G.K.] seems to be struggling to find the value in boundaries as well as her personal needs."[56]

June 4, 2016 – "[G.K.] seems to avoid talking about anything beneath the surface level with staff and peers but continues to do well following basic house expectations."[57]

July 9, 2016 – "[G.K.] told staff she was feeling very anxious today. She said she feels anxious all the time, and if she wasn't anxious, she would be bored all the time. … [G.K.] seemed very isolated today. She appeared to try to smooth things over with her roommates and staff today, rather than find a solution to the conflict. [G.K.] seemed very anxious, and was exercising to cope with the anxiety. At lunch she told staff that she feels anxious all the time. She said it is her normal feeling, and if she didn't feel constantly anxious, that she would be bored, as if [nothing] exists about her personality outside her anxiety. Staff asked her what she thought she could accomplish if she was not anxious all the time. She said she didn't know."[58]

---

[53] *Id.* at 9 ¶ 38 (citing A.R. 2343, a treatment team update).

[54] *Id.* at 10 ¶ 38 (citing A.R. 2344, a residential progress note).

[55] *Id.* at 10 ¶ 38 (citing A.R. 2347, psychiatric notes).

[56] *Id.* at 10 ¶ 38 (citing A.R. 2348, a residential progress note).

[57] *Id.* at 10 ¶ 38 (citing A.R. 2349, a residential progress note).

[58] *Id.* at 10-11 ¶ 38 (citing A.R. 2350, a residential progress note).

As her stay at Sunrise progressed, G.K. began confronting her anxiety, avoidant behaviors, and depression, and Sunrise staff and treatment team started expressing hope in her outlook, as reflected in some treatment notes:

> September 16, 2016—[G.K.] indicated that her anxiety was higher than normal, and she had a hard time in family therapy and started crying out of frustration.[59]
>
> September 19, 2016 – "[G.K.] indicates that she is doing quite well and feels good about her progress. She does appear to fewer [sic] complaints than she has had in the past, attitude does appear to be more positive. . . . She looks good today, engages well in the conversation, mood seems to be quite stable, affect is bright, denies self-harm thoughts, much less critical of others and herself, less blaming, appetite is better and her weight is stable."[60]
>
> September 28, 2016 – "[G.K.] did not appear to be anxious tonight. She seemed to be calm and content. [G.K.] seemed to start conversations throughout the night with staff as well as peers. She did not appear to hesitate to start any. [G.K.] did appear to be anxious when getting behind in the house schedule and seemed to manage her anxiety well. … [G.K.] did not appear depressed. She seemed happy and excited that her parents sent her origami stuff. She appeared to do that most of the night when not doing what was expected of her at that time."[61]
>
> October 17, 2016 - "[G.K.] is doing quite well, happy with her present combination of meds. She indicates that she had a good visit with parents over parent weekend. She would like to continue the present medications. She looks super today, pleasant, engages well in the conversation, mood is stable, much less of the depression, affect is bright, denies self-harm thoughts, appears to have no side effects to the present medications. She is expecting to be on level four shortly."[62]
>
> December 5, 2016 – "[G.K.] is doing very well, had a super home visit and visited some schools where she plans to enroll after finishing at Sunrise later this month. She is excited about the new changes for her. She would like to stay on her present medications when discharged. … [G.K.] looks super today, engages well in the conversation, seems to enjoy my dog and excited told me about the two new puppies they have at home. Her mood is stable, affect is bright and [attitude] is quite positive. We discussed her meds and plan to stay with the present regimen. I left a message for mom that we will have prescriptions for [G.K.] at

---

[59] A.R. 2352 (residential progress note).

[60] *Id.* at 11 ¶ 39 (citing A.R. 2353, psychiatric notes).

[61] *Id.* at 11 ¶ 39 (citing A.R. 2354, a residential progress note).

[62] *Id.* at 11-12 ¶ 39 (citing A.R. 2355, psychiatric notes).

discharge with refill. [G.K.] did indicate that she has a therapist and a psychiatrist for follow-up when she returns home."[63]

On December 20, 2016, G.K. was successfully discharged from Sunrise.[64]

### 2. The EMC Plan Claim Administration and Appeal Terms

EMC is the Plan Administrator, and UBH administers mental health claim services under the Plan.[65]  The Plan gives the EMC as Administrator "complete discretionary authority with regard to the operation, administration and interpretation of the Plan, and any determination by the Plan Administrator relating to the Plan shall be final, binding and conclusive in the absence of clear and convincing evidence that the Plan Administrator acted arbitrarily and capriciously."[66]  But EMC as Administrator "may also delegate any of its responsibilities under the Plan to any other person or entity."[67]  And it delegated behavioral health claims administration to UBH.

The Plan charges UBH with reviewing and approving (or denying) pre-service, concurrent, post-service, and urgent claims for Behavioral Health Services.[68]  If UBH denies benefits, it must provide notice to "explain the reason for denial, refer to the part of the Plan on which the denial is based, and provide the claim appeal procedures."  The Plan also states UBH will conduct first level pre-service and post-service claim appeals, as well as urgent appeals.[69]

---

[63] *Id.* at 12 ¶ 39 (citing A.R. 2356, psychiatric notes).

[64] *Id.* at 12 ¶ 40 (citing A.R. 2381-82, letter dated June 13, 2107, from Sunrise treating therapist Ke'ala Cabulagan).

[65] Plan claims for medical/surgical benefits are administered by Blue Cross Blue Shield of Massachusetts. *See* Dkt. 73, *Defendants' MSJ*, at 6 ¶ 9 (citing A.R. 2393-2500, 2503).

[66] *Id.* at 6 ¶ 5 (citing A.R. 2502, 2508, 2510).

[67] *Id.* at 6 ¶ 6 (citing A.R. 2502).

[68] *Id.* at 8 ¶ 16 (citing A.R. 137-138).

[69] *Id.* at 8 ¶ 18 (citing A.R. 138).

For urgent appeals, UBH's decision is "final and binding."[70]  But for non-urgent appeals beyond the first level, claimants who have been denied benefits may seek a "second level appeal" by providing materials to MCMC, a third-party independent review organization hired by EMC.[71]

### 3. Plan Coverage Terms

The Plan covers only "medically necessary" mental health services at both inpatient and outpatient levels of care, including residential treatment.[72]  All care "is subject to review based upon plan's relevant clinical criteria (available upon request), and all providers and facilities must meet Optum [UBH] Behavioral Solutions' credentialing and licensing criteria."[73]

Further, any mental/behavioral health service must also be a "Covered Service," meaning: 1) "provided for the purpose of preventing, diagnosing or treating a behavioral disorder, psychological injury or substance abuse addiction," 2) "described in the section titled 'What This Plan Pays,'" and 3) not listed in the section entitled 'Not Covered-Exclusions.'[74] These listed exclusions include "Services or supplies for MHSA [mental health/substance abuse] Treatment that, in the reasonable judgment of Optum are any of the following:"

- not consistent with the symptoms and signs of diagnosis and treatment of the behavioral disorder, psychological injury or substance abuse;

- not consistent with prevailing national standards of clinical practice for the treatment of such conditions;

---

[70] A.R. 138.

[71] Dkt. 73, *Defendants' MSJ*, at 9 ¶ 19 (citing A.R. 138).

[72] *Id.* at 6 ¶ 11 (citing A.R. 127).  The Plan terms Defendants recite in their Motion for Summary Judgment here, that both parties cite in other briefing often appear to come from Summary Plan Descriptions.  For instance, this cited reference to "medically necessary" comes from a part of the A.R. stating "Summary Plan Description: This summary together with the Health and Welfare Plan Summary Plan Description constitute the complete Behavioral Health Plan Summary Plan Description. The Health and Welfare Plan Summary Plan Description can be accessed at www.peoplelinkbenefits.com/spd/health_welfare.pdf."  A.R. 122.  The parties do not dispute the recitations of Plan terms derives from the Summaries, and the court applies them.

[73] A.R. 127.

[74] Dkt. 73, *Defendants' MSJ*, at 7 ¶ 12 (citing A.R. 128).

- not consistent with prevailing professional research demonstrating that the service or supplies will have a measurable and beneficial health outcome;

- typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective; or

- not consistent with Optum's Level of Care Guidelines or best practice as modified from time to time (available upon request).

Optum may consult with professional clinical consultants, peer review committees or other appropriate sources for recommendations and information.[75]

The Plan also excludes "[c]ustodial care" coverage, except for "the acute stabilization and return back to your baseline level of individual functioning."  Care is "custodial" when:

- it provides a protected, controlled environment for the primary purpose of protective detention and/or providing services necessary to assure competent functioning in activities of daily living; or

- it is not expected that the care provided or psychiatric treatment alone will reduce this disorder, injury or impairment to the extent necessary to function outside a structured environment. [76]

The Plan states these exclusions apply "regardless of whether the services, supplies or treatment described in this section are recommended or prescribed by your provider and/or are the only available treatment options for your condition."[77]

### 4.  Optum (UBH) Level of Care Guidelines

In 2016, UBH/Optum in its benefits determinations applied Level of Care Guidelines defining a "Residential Treatment Center for Mental Health Conditions" as:

A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient.

---

[75] *Id.* at 7-8 ¶ 14 (citing A.R. 132).

[76] *Id.* at 8 ¶ 14 (citing A.R. 132).

[77] *Id.* at 8 ¶ 15 (citing A.R. 132).

The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.[78]

The Guidelines provide admissions criteria for "Residential Treatment Center for Mental Health Conditions." These criteria require a showing of the following:

- Common Criteria for all Levels of Care are satisfied; AND

- The member "is not in imminent or current risk of harm to self, others, and/or property" AND;

- "The 'why now' factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include:

> o Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

> o Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[79]

To meet the "Common Criteria" required for residential treatment, a claimant must show the following, in relevant part:

> The Plan "member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the 'why now' factors leading to admission)."[80]
>    "Failure of treatment in a less intensive level of care is not a prerequisite for authorizing coverage."[81]

---

[78] *Id.* at 9 ¶ 21 (citing A.R. 1199).

[79] *Id.* at 9-10 ¶ 22 (citing A.R. 1200), *see also* A.R. 1199.

[80] *Id.* at 10 ¶ 24 (citing A.R. 1203).

[81] *Id.* at 10 ¶ 24 (citing A.R. 1203).

And:

"[t]he member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and treatment of acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the 'why now' factors leading to admission)[82]

"Co-occurring behavioral health and medical conditions can be safely managed."[83]

"Services are the following:
 o Consistent with generally accepted standard of clinical practice;
 o Consistent with services backed by credible research soundly demonstrating that the services will have a measurable and beneficial health outcome, and are therefore not considered experimental;
 o Consistent with Optum's best practice guidelines;
 o Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks."[84]

"There is a reasonable expectation that service will improve the member's presenting problems within a reasonable period of time."

* * *

And, "[t]reatment is not primarily for the purpose of providing social, custodial, recreational, or respite care."[85]

In addition to these admissions criteria, UBH applies Level of Care Guidelines Criteria

for "continued service" at residential treatment centers, including:

"Treatment is not primarily for the purpose of providing custodial care," meaning:

- "Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating)."

- "Health-related services that are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to

---

[82] *Id.* at 10 ¶ 24 (citing A.R. 1203).

[83] *Id* at 10 ¶ 24 (citing A.R. 1204).

[84] *Id.* at 10-11 ¶ 24 (citing A.R. 1204).

[85] *Id.* at 11 ¶ 24 (citing A.R. 1204).

improving that function to an extent that might allow for a more independent existence," or

- "Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively."[86]

### 5. Plaintiffs' Claim for Plan Benefits

There is little in the parties' briefing about how the claim for G.K.'s treatment was initiated.[87]  But UBH case notes indicate one of their employees spoke to S.K. on April 7, 2016 and learned the Plaintiffs were trying to have G.K. transferred to Sunrise, a long-term residential care facility in Utah.  When another UBH employee contacted (apparently) S.K., she was not willing to accept alternative treatment facilities.  G.K. was apparently admitted to Sunrise on April 7, 2016, before authorization had been obtained.[88]

#### a. Initial Denial for Lack of Authorization

In multiple EOBs Optum/UBH issued dated July 19, 2016, G.K.'s treatment at Sunrise from April 7, 2016 through June 30, 2016 was denied by UBH for lack of authorization.[89]  In later EOBs dated from September 2016, October 2016, November 2016, December 2016, and March 2017, Optum/UBH denied G.K.'s treatment at Sunrise from July 2016 through December 2016, again, for lack of authorization."[90]  Plaintiffs do not appear to take issue with these denials.

---

[86] *Id.* at 10 ¶ 23 (citing A.R. 1200).

[87] Plaintiffs offer almost no explanation in their Motion for Summary Judgment, and Defendants primarily cite to UBH case notes.  Dkt. 73, *Defendants' MSJ*, at 11 ¶ 25-28.  Plaintiffs do not take issue with their citation, so the court summarizes them above.

[88] Dkt. 73, *Defendants' MSJ*, at 10-11 ¶¶ 25-30 (citing A.R. 233-47).

[89] A.R. 186-197.

[90] A.R. 198-225.

### b. Retrospective Review

By letter dated October 13, 2016, S.K. asked UBH to conduct a retrospective review of the claim for coverage for G.K.'s treatment at Sunrise from April 7, 2016 on and to provide authorization for G.K.'s continued treatment on the basis it was medically necessary with this letter.[91]  S.K. provided hundreds of pages of G.K.'s Sunrise medical records to UBH, dated from April 7-October 14, 2016.[92]

UBH apparently received the letter and records on October 20, 2016.  Just over a week later, on October 28, 2016, UBH Associate Medical Director Dr. Gary Rosenberg, M.D., responded to S.K., stating he had conducted a retrospective review applying Optum Level of Care Guidelines for Mental Health Residential Rehabilitation, and denying coverage for all the claimed Sunrise residential treatment care—beginning from day one, April 7, 2016[93]  Dr. Rosenberg explained his review "included an examination of the following: UBH case notes, and medical records."  And though Defendants contend internal UBH case notes indicate he also called one of G.K.'s treating providers  to conduct an interview,[94] Dr. Rosenberg does not refer to or state that he relied on any part of that phone call in his denial letter.

---

[91] Dkt. 71, *Plaintiffs' MSJ*, at 12-13 ¶ 43 (citing A.R. 269-70). A.R. 268-1101. Defendants' Fact on this point states that the letter is dated October 20, 2016, but it is dated October 13, 2016.  *See* Dkt. 73, *Defendants' MSJ*, at ¶ 32. A receipt appears to show the letter was received by UBH on October 20, 2016. *See* A.R. 268.  This discrepancy in dates is immaterial.

[92] A.R. 271-1101.

[93] Dkt. 73, *Defendants' MSJ*, at 13 ¶ 35 (citing A.R. 1102-1105).

[94] *Id.* at 13 ¶ 36 (citing A.R. 1102).  Defendants contend in their Motion that UBH case notes "document[s] Dr. Rosenberg conducted a live telephone interview with one of [G.K.'s] treating providers at Sunrise concerning G.K.'s treatment . . . ." The cited records, A.R. 248-49, document the substance of the retrospective review decision.  The "Note-Type" is "Non-Urgent Appeal" and it is noted that the "Materials Used in Review" are "case and medical records."  There is a reference to a telephone interview "with AP's designee" at 10:00 a.m.—about an hour and a half before the decision issued.  (A.R. 248).  There is no explanation who the AP Designee is.  Below that notation is a "CA Summary" recounting G.K.'s medical history.  The record is not clear that that is a summary of a phone call.  But Plaintiffs do not offer a different interpretation, and the court takes as true that Dr. Rosenberg called an unidentified treatment provider at Sunrise and obtained the information in the CA summary, in addition to the medical records he expressly states he reviewed.

Dr. Rosenberg provided his rationale for UBH's denial in the following paragraphs:

> Your child was admitted for treatment of depression and anxiety. After reviewing the medical records, your child had made good progress and no longer needed the type of care provided in this setting. While your child continued to face challenges as she worked on his [sic] issues, your child had progressed to the point that she was not in immediate danger of hurting herself. Your child may have required support staff for these issues, however, she did not require this kind of structure, monitoring and clinical support found in this setting.

> This does not mean that your child could not have received further treatment. Instead, your child could have continued care in a mental health partial hospitalization.[95]

### c. Level One Appeal

In a December 22, 2016 letter, S.K. submitted to UBH a Level One appeal (mistakenly labeled "Level Two Member Appeal" due to a misstatement by UBH) of the retrospective review denial of coverage for G.K.'s care at Sunrise.[96]

In a responsive letter to Plaintiffs dated January 4, 2017, UBH Associate Medical Director Dr. Melinda Privette, M.D., upheld the coverage denial for all of G.K.'s residential treatment at Sunrise again from day one.[97] Dr. Privette based her decision on "case notes and medical records," and denied coverage citing the following rationale:

> Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24-hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety, mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be

---

[95] Dkt. 73, *Defendants' MSJ*, at 13 ¶¶ 36-38 (citing A.R. 1102).

[96] *Id.* at 14 ¶ 41 (citing A.R. 1111-15).

[97] *Id.* at 14 ¶¶ 42-43 (citing A.R. 1116-19).

paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered.[98]

### d.  External Level Two Appeal

Plaintiffs then sought an external second level appeal in a twenty-page letter to UBH dated June 28, 2017.[99]  Responding to UBH's prior appeal denial, Plaintiffs argued Sunrise was a licensed and accredited residential treatment center rather than a "boarding school" as Dr. Privette had stated; that G.K.'s treatment there did not amount to uncovered "custodial care;" and that G.K.'s initial admission and continued care were medically necessary and covered under Optum Guidelines in view of G.K.'s personal history and treatment.[100]

S.K. also attached letters from multiple treating providers from Northwest Passage (Brianna Bielmeier, case manager, and Dr. Robert T. Law, pediatric neuropsychologist) and Sunrise (Ke'ala Cabulagan, therapist).[101]  Each opined that G.K.'s admission and treatment at Sunrise was medically necessary.[102]

First, Bielmeier noted that at Northwest, G.K. was eventually "willing to engage," but "continued to struggle with social interactions."  And "[w]hile this, in and of itself, was not

---

[98] *Id.* at 14 ¶ 43 (citing A.R. 1116).

[99] *Id.* at 14 ¶ 44 (citing A.R. 1125-49).

[100] *Id.*

[101] Dkt. 71, *Plaintiffs' MSJ*, at 14-16 ¶¶ 46-49 (citing A.R. 1237-42, 2380-83

[102] There is some confusion in the briefing as to when these letters were provided to Defendants.  Plaintiffs in their Motion for Summary Judgment included in their Statement of Facts that "45.  [S.K.] appealed a second time [after the October 28, 2016 denial] . . . enclosing [G.K.'s] medical records and letters from various professional who had treated G.K. supporting the contention that her treatment was medically necessary.  46. [S.K.] attached several letters from professionals who had treated G.K. to her second level appeal, all opining that G.K.'s admission into Sunrise was medically necessary."  Dkt. 71, *Plaintiffs' MSJ*, at 15-16.  Defendants do not dispute this fact in their "Response to Plaintiffs' Statement of Undisputed Material Facts."  Dkt. 83, *Defendants' Opp.*, at 13-15.  But they do argue in the body of their Opposition that Plaintiffs did not submit the letters until the second level review to MCMC.  *Id.* at 34.  It is clear that the letter from Ms. Cabulagan, dated June 13, 2017, could not have been submitted to UBH preceding the October 28, 2016 and January 4, 2017 decisions from UBH.  And because Plaintiffs don't further contest the issue, the court accepts for purposes of summary judgment Defendants' assertion that none of the letters were provided before MCMC considered them in conjunction with the external review.

problematic, the pattern of social anxiety and challenges with peer interactions has contributed to

[her] depression and suicidal ideation."  Continuing, Bielmeier noted:

> [G.K.] also had a difficult time expressing her emotions and relied on others to
> notice the symptoms and initiate the conversations. As a result [her] ability to
> maintain in the community or in lower levels of care continue to put her at risk of
> suicidal ideation and further isolative/avoidant behaviors.
>
> [G.K.'s] clinical team recommended that [she] continue to receive a high level of
> care to monitor her affect and maintain her safety. [G.K.] continues to present a
> high level of risk given her struggles to utilize skills.  At the time of her discharge,
> it was still important for [her] to be restricted from various means of harm to
> herself.  It was recommended and medically necessary that [G.K.] receive
> intensive therapeutic services in a residential treatment facility to address her
> mental health needs.  It was recommended that the residential environment be
> structured and supportive while [G.K.] learns more appropriate skills to manage
> her suicidal ideation, self-harming behaviors[,] and emotion dysregulation.  This
> pattern appeared to be surrounded by anxiety, depression, and emotion
> dysregulation.[103]

Second, pediatric neuropsychologist Dr. Robert T. Law noted that the Northwest Passage

clinical team had recommended for G.K.: 1) medical management by a psychiatrist and 2)

"support and guidance in a residential treatment center to learn and generalize therapeutic

skills."[104]  Dr. Law stated that G.K.'s "continued struggles with anxiety and depression have

severely impacted her safety and functioning in her daily life."[105]  The clinical team therefore

had "significant concern" that without the recommended interventions, "[G.K.'s] patterns of

emotional distress will continue."[106]

Third, Sunrise therapist Ke'ala Cabulagan opined that G.K. needed residential care from

April through December 2016 because, given her suicidal history, her continued anxiety and lack

---

[103] Dkt. 71, *Plaintiffs' MSJ*, at 15 ¶ 47 (citing A.R. 1238-39).

[104] *Id.* at 15 ¶ 48 (citing A.R. 1241-42).

[105] *Id.* at 15 ¶ 48 (citing A.R. 1241-42).

[106] *Id.*

of desire to form relationships would have prevented "any success in returning to home or receiving lower levels of care during the time period of treatment with Sunrise."[107]

UBH responded to the letter on July 19, 2017, notifying Plaintiffs that "UBH is not delegated to process your second level appeal."[108]  Rather, "MCMC has been designated by EMC to conduct non-urgent Second Level appeal[s]."[109]

So, on October 4, 2017, Plaintiffs sent the twenty-page second level appeal letter directly to MCMC, along with hundreds of pages of exhibits. These exhibits included: 1) documents showing Sunrise's licensure as a residential treatment center, 2) Optum Level of Care Guidelines and other coverage criteria, 3) American Academy of Child & Adolescent Psychiatry Principles of Care applicable in residential treatment, 4) letters from G.K.'s treatment providers at Northwest and Sunrise, and 5) all G.K.'s medical records from Sunrise—hundreds of pages.[110]

In a letter dated March 22, 2018, MCMC upheld UBH's coverage denial for G.K.'s entire term of treatment at Sunrise, from April 7, 2016 to December 20, 2016.[111]  MCMC explained that this conclusion was reached "[a]fter a review by an independent Board Certified physician of the Plan Language and clinical records" in which the physician "determined that the dates of serviced [sic] being appealed are not medically necessary . . ."[112]  The lone citation to Plan Language in the letter is in the following passage: "The Plan states that 'only medically

---

[107] *Id.* at 15 ¶ 49 (citing A.R. 2381-82).

[108] Dkt. 73, *Defendants' MSJ*, at 24 ¶ 43 (citing A.R. 1153-54).

[109] *Id.*

[110] *Id.* at 24 ¶ 46 (citing A.R. 1160-2283).

[111] *Id.* at 15 ¶¶ 50-51 (citing A.R. 2384, 2386).

[112] *Id.* at 15 ¶¶ 51 (citing A.R. 2386).

necessary care will be approved and paid under the plan. All care is subject to review based on [sic] plan's relevant care criteria . . . ."[113]

The letter then sets forth the reviewing physician's rationale for denial embedded in a single, albeit lengthy, paragraph:

> In this case, the patient is hospitalized after a suicide attempt in January 2016. She has three psychiatric hospital placements from that hospitalization, prior to her entering the Residential Treatment Center during the dates in question. At the time of placement, she is not suicidal. She has improved significantly from the time of her initial hospitalization, though she remains requiring intensive treatment and is vulnerable to relapse. It is her vulnerability to relapse that is stressed as the basis of her requiring RTC level of care, along with her need for continuous in the moment counseling during this time period. However, she goes on several day trips and extended home passes with the family during this time period as well as a camping trip, which is not continuous for her need for continuous in the moment counseling. There is a time that she regresses in May 2016 and has an increase in depression and worry that were she home she would experience suicidal ideation. There are multiple alternative placements in which her need for continued intensive treatment and monitoring could be achieved, less intensive than the RTC. It is general standard of care to treat an individual at the least restrictive setting in which RTC environment. She goes on passes and trips, so the treatment that she receives in reality is more consistent with a group home treatment, with access to family and to community. A group home environment, through state department of mental health services (which the records do not indicated were sought in this case) would provide significant structure, continuous and in the moment counseling and support and a safe environment in which to build around additional services. A therapeutic school, for instance, along with outpatient individual group, medication management and family treatment services. The lack of actual 24/7 care and the lack of accessing community educational and therapeutic services including group living services indicates she was not being treated in the least intensive environment in which safe and appropriate treatment could be provided, which is a requirement for medical necessity determination.[114]

Following this rationale, the letter sets forth a clinical summary of records submitted in conjunction with the second level appeal: 1) S.K.'s appeal letters dated October 13, 2016, December 22, 2016, and June 28, 2017; 2) letters from G.K.'s treatment providers Briana

---

[113] A.R. 2386 (ellipses in original MCMC letter).

[114] A.R. 2386-87.

Bielmeier, Dr. Robert Law, and Ke'ala Cabulagan; and 3) treatment records from Sunrise.  It also lists nine "References"—academic articles and other publications concerning adolescent psychology and treatment—though there is no citation to or discussion of them in the denial rationale itself[115]  Defendants point out in their moving papers that "notably, the UBH[/Optum] medical necessity guidelines are not listed as materials relied on by the MCMC external appeal reviewer."[116]

### 6. This Litigation

After exhausting their appeals as required under the Plan and ERISA, Plaintiffs filed this action on November 8, 2018, asserting individually and on behalf of G.K. two causes of action.[117]  First, Plaintiffs seek recovery of Plan benefits under 29 U.S.C. § 1132(a)(1)(B), arguing UBH and the Plan breached fiduciary duties in denying benefits for G.K.'s medically necessary treatment at Sunrise.[118]  Second, Plaintiffs seek unspecified, "[a]ppropriate equitable relief" under the Parity Act, 29 U.S.C. § 1132(a)(3).[119]  Here, Plaintiffs first recite generally the Parity Act requirement that ERISA plans offer no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders, and its prohibition on ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than treatment limitations.[120]

---

[115] A.R. 2387-92.

[116] Dkt. 73, *Defendants' MSJ*, at 17 at ¶ 57 (citing A.R. 2391-92).

[117] Dkt. 2, *Complaint*.

[118] *Id.* at ¶¶ 39-42.

[119] *Id.* at 13, *Claim for Relief*.

[120] *Id.* at ¶¶ 44-45.

In April 2019, Defendants filed a Motion to Dismiss Plaintiffs' Parity Act claim in its entirety, and Plaintiffs' individual claims on the grounds that they lack standing to bring them.[121] The motion was granted only to the extent that R. K.'s individual claims were dismissed.  The remainder of the motion was denied.[122]

After engaging in discovery, the parties filed cross-motions for summary judgment in July 2022.[123]  After briefing was complete, the court heard oral argument on May 9, 2023.

In their Motion, Plaintiffs first ask the court to find Defendants' denial of Plan benefits for G.K.'s residential treatment was incorrect, under either a de novo or arbitrary and capricious standard of review.  Second, Plaintiffs ask the court to find the Defendants committed "as-applied" Parity Act violations in three ways: 1) requiring G.K. to have acute symptoms to qualify for residential treatment when sub-acute issues are sufficient for coverage for the Plan's analogous medical/surgical care, skilled nursing centers and  inpatient rehabilitation; 2) because Defendants apply a criteria to mental health coverage beyond the Plan terms (the Optum guidelines) where they don't apply criteria beyond Plan terms in determining medical/surgical coverage; and 3) because a specific Optum guideline requiring "acute changes in the member's signs and symptoms" before admission but require a stable condition for analogous medical/surgical care.  Finally, Plaintiffs ask the court to reverse the Defendants' coverage denials, award G.K. benefits, and permit them to file an additional brief concerning their entitlement to attorneys' fees, costs, and prejudgment interest.

Defendants argue in their own Motion that Plaintiffs' claims for benefits and under the Parity Act fail as a matter of law.  In large part, their arguments rests on the theory that because

---

[121] Dkt. 20.

[122] Dkt. 43, *Order Following Oral Ruling*.

[123] Dkts. 71 and 73.

the Plan charged external reviewer MCMC with handling the second level appeal, UBH is simply not a proper Defendant in this ERISA matter because it did not exercise "final" discretionary authority over the benefits determination for G.K.[124]  Thus, Defendants argue, they are neither a fiduciary under ERISA nor a proper Defendant at all.  And, continuing with this theme, because MCMC was the last to review coverage, the explanations and conclusions in UBH's preceding retrospective review and first level appeal denials are immaterial, because they could not be the proximate cause of any harm from a wrongful benefits denial or Parity Act violation.  UBH also argues MCMC's benefits denial should be affirmed under the arbitrary and capricious standard of review (and that UBH's should too, if they are reviewed), and that Plaintiffs' Parity Act claim fails for lack of evidence and because MCMC did not rely on the allegedly problematic Optum guidelines in its second level review.[125]

On May 15, 2023, Plaintiffs provided the court with supplemental authority[126]—a case from the Tenth Circuit decided that day, *D.K. et al., v. United Behavioral Health, et al.*[127]  In *D.K.,* as here, UBH was the claims administrator for mental health benefits that were denied to the plan's minor beneficiary for residential treatment—both by UBH on repeated review and appeals, and finally by an external reviewer.[128]  UBH had paid for only a short period of residential care, but denied coverage for continued care.  The external reviewer upheld the denials on the basis "it was not medically necessary for [the minor beneficiary] to remain in residential treatment."[129]  Reviewing all denials under an arbitrary and capricious standard of

---

[124] Dkt. 73, *Defendants' MSJ*, at 4-5.

[125] *Id.* at 3-5.

[126] Dkt. 95.

[127] 67 F.4th 1224 (10th Cir. 2023).

[128] *Id.* at 1234-35.

[129] *Id.* at 1235.

review, the court of appeals affirmed the district court's rulings that: 1) "[UBH] acted arbitrarily and capriciously"[130] in the denials, and 2) the Plaintiffs should be awarded benefits outright rather than remanding for further administrative review.[131]

## II.    LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "there is no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law."[132]  On the Plaintiffs' Plan benefits claim, where both sides have moved for summary judgment, they have effectively "stipulated that no trial is necessary and that "summary judgment is merely a vehicle for deciding the case."[133]  And in resolving this claim, "the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[134]  In contrast, the Parity Act claim involves the legal question of statutory interpretation.  In resolving it, the court views the evidence and makes reasonable inferences in the light more favorable to the nonmoving party.[135]

## III.    ANALYSIS

Below, the court evaluates the two causes of actions at issue the parties' cross-motions for summary judgment: 1) Plaintiffs' claim for wrongful denial of plan benefits under ERISA for G.K.'s residential treatment at Sunrise, and 2) a claim for violation of the Parity Act.  But first,

---

[130] *Id.* at  1237.

[131] *Id.* at 1228 (finding no abuse of discretion in in declining to remand in view of the "administrator's clear and repeated procedural errors in denying this claim," where "provid[ing] an additional 'bite at the apple' would "be contrary to ERISA fiduciary principles . . . .").

[132] FED. R. CIV. P. 56(a).

[133] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted).

[134] *Id.* (citation omitted).

[135] *Theo M. v. Beacon Health Options,*  631 F.Supp.3d 1087, 1100 (D.Utah 2022) (citations omitted).

the court addresses issues underlying some of Defendants' arguments: 1) whether UBH owes fiduciary duties under ERISA and is thus a proper Defendant, and 2) whether MCMC's second level appeal determination renders an evaluation of UBH's preceding denials immaterial.

As discussed below, UBH is an ERISA fiduciary under the Tenth Circuit's 'functional fiduciary' standard, and Defendants' arguments to the contrary are meritless.  Second, MCMC's final appeal determination does not render immaterial an evaluation of UBH's own denials in relation to both the claims for benefits and under the Parity Act.  Third, the Defendants' blanket denials of coverage for G.K.'s care are arbitrary and capricious and are reversed.  Fourth, Defendants committed an 'as-applied' violation of the Parity Act when they required G.K. to have an acute condition—be dangerously suicidal—as a prerequisite to receive sub-acute residential treatment care under the Plan.  Finally, Plaintiffs are invited to submit briefing on Parity Act remedies, attorneys' fees, and costs.

### A.  UBH is an ERISA Fiduciary and a Proper Defendant

UBH argues it is entitled to summary judgment on all claims because it did not act as an ERISA fiduciary regarding Plaintiffs' benefits claim and is therefore not a proper Defendant.  As discussed below, the court disagrees.

"There are two types of ERISA fiduciaries: named fiduciaries and functional fiduciaries."[136]  Though EMC was expressly named the Plan's Administrator, Plaintiffs allege UBH was a functional fiduciary under the terms of 29 U.S.C. § 1002(21)(A), which provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority

---

[136] *Lebahn v. National Farmers Union Unform Pension Plan,* 828 F.3d 1180, 1184 (10th Cir. 2016) (citing 29 U.S.C. § 1102(a) (named fiduciaries) and 29 U.S.C. § 1002(21)(A) (functional fiduciaries)).

or control respecting management or disposition of its assets, . . .  or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  Applying this provision, the Tenth Circuit has explained that "regardless of status or title, parties are only plan fiduciaries to the extent they are performing functions identified in the definition."[137]

Plaintiffs argue UBH functioned as a fiduciary regarding their coverage claim because UBH handled and had the discretion and authority to review and determine behavioral health coverage claims under the Plan, and any decision it made to grant coverage would have been final and resulted in payment.[138]  And, though not explicitly engaged in a functional fiduciary analysis as the parties didn't seem to dispute that United was the plan administrator, the Tenth Circuit in *D.K. v. United Behavioral Health* noted the fiduciary duties inherent in claim determinations:

> Administrators, like United, are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts. That is, in determining benefit eligibility, "the administrator owes a special duty of loyalty to the plan beneficiaries."[139]

The court also observes that in the many ERISA mental health benefits cases it has surveyed, there is no case evaluating, let alone concluding, that a designated claims administrator in UBH's position is not a functional fiduciary.

And Defendants do not dispute that benefit determinations involve discretionary, fiduciary actions.  But they argue UBH was not an ERISA fiduciary and thus not a proper Defendant for two reasons.  First, they suggest it is dispositive that UBH lacked "final

---

[137] *David P. Coldesina, D.D.S. v. Estate of Simper,* 407 F.3d 1126, 1132 (10th Cir. 2005) (citations omitted).

[138] Dkt. 84, *Plaintiffs' Opp.,* at 8.

[139] *D.K.,* 67 F.4th at 1236 (quoting *Metropolitan Life Ins. Co.  v. Glenn*, 554 U.S. 105, 111 (2008)).

discretionary authority over disposition of assets of the Plan (*i.e.*, payment of Plan benefits),"[140] where the Plan hired an external reviewer (MCMC) to conduct the final, second level appeal. Second, Defendants argue UBH's role with regard to the Plan "is merely administrative" where one part of the Plan states "'medical vendors' (such as UBH) 'provide administrative services to the self-insured portion of the plan, and 'while these vendors provide claims payment and other administrative services. . . they do not assume any financial risk or obligation with respect to claims or the plan.'"[141]  Thus, they argue UBH "is not a proper party defendant in this action alleging violation of ERISA."[142]  Taking up the arguments in reverse order, the court disagrees.

Under the Tenth Circuit's functional analysis for determining ERISA fiduciaries, the record establishes UBH's fiduciary role in administering and deciding Plaintiffs' entitlement to Plan benefits for G.K.'s care.  First, though EMC was the named 'Plan Administrator,' Plan documents expressly charged UBH with administrative and discretionary functions regarding behavioral health claims like Plaintiffs'.  And, as noted above, the Plan charged UBH with behavioral health claims administration, including conducting initial coverage determinations, first level, and final urgent appeals under the Plan.  UBH performed these functions as a claims administrator, engaging in discretionary decisions regarding the Plaintiffs' claim for coverage, including by its own employed physicians and medical directors.  It is the handling of these discretionary functions—the investigation, evaluation, and communicated rationales in UBH's coverage denials—that underlies Plaintiffs' causes of action against UBH in this matter.

Still, UBH argues it was "merely" engaged in *ministerial* administrative acts by pointing to another part of the Plan identifying UBH in a list of nearly a dozen self-insured medical

---

[140] Dkt. 73, *Defendants' MSJ*, at 39.

[141] *Id.* at 40 (quoting A.R. 2503).

[142] *Id.* at 39.

vendors "who provide claims payment and other administrative services under an administrative services contract with EMC, but they do not assume any financial risk or obligation with respect to claims or the plan."[143]  It is true that an ERISA actor may avoid fiduciary liability for acts that it can establish are simply ministerial—"such as clerical services."[144]  But UBH has not even attempted to establish that the complained-of actions regarding Plaintiffs' claims determinations were merely ministerial, and they cite no case supporting that proposition—nor could they.

It is almost certainly true that in addition to discretionary coverage claims investigated and determined by UBH, UBH employees also engaged in ministerial acts for which they may not be an ERISA fiduciary.  But the fact that UBH may "wear two hats"—engage in fiduciary claims determinations and also handle ministerial clerical-type work (though not specifically established in the briefing)—does not alter the fact that it is a fiduciary "to the extent" it acts in a fiduciary role.[145]  "ERISA does require, however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary  decisions."[146]  Here, whatever ministerial role it may have additionally played, UBH functioned as the Plan's designated mental health claims administrator, and made discretionary coverage decisions at multiple levels.  Those are the fiduciary decisions about which Plaintiffs complain.

---

[143] A.R. at 2503.

[144] *David P. Coldesina,* 407 F.3d at 1132.

[145] *In re Luna*, 406 F.3d 1192, 1207 (10th Cir. 2005) (citations omitted).  In *Luna*, the Tenth Circuit found employers who failed to make regular employee contributions to ERISA-covered benefit plan were not ERISA fiduciaries.  The court found the employers did not exercise authority or control concerning management or disposition of assets, including because the act of failing to make a contribution in a time of economic hardship: 1) did not concern the real asset in question, the trustees' right to collect unpaid contributions, and 2) even if the asset were the unpaid contributions themselves, failure to pay them does not amount to a commonly understood management decision such as "'selecting investments, exchanging one instrument or asset for another, and so on.'" 406 F.3d at 1204 (quoting *Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Company,* 302 F.3d 18, 28 (2d Cir. 2002) (other citations omitted)).  In contrast, a claims evaluation involves evaluation and decision-making at a fiduciary level, as the Tenth Circuit recognized in *D K. v. United Behavioral Health*, cited above.

[146] *Pegram v. Hedrich,* 406 F.3d 211, 225 (citations omitted).

UBH also argues it cannot be a fiduciary under ERISA because it did not issue the final, second level appeal decision, stating "[t]he functional fiduciary act at issue here is the final second-level determination which left Plaintiffs without any further recourse under the Plan."[147] UBH suggests that because it did not exercise "final discretionary authority over disposition" of Plan assets—"*i.e.*, payment of Plan benefits"—it cannot be a fiduciary.  The court disagrees.

First, under § 1002(21)(A), UBH is a fiduciary "to the extent" it exercised "any" discretionary authority or control respecting Plan management, exercised "any" authority or control respecting management or disposition of Plan assets, or had "any" discretionary authority or responsibility Plan administration.  Though UBH would rewrite the statute to require the exercise of any fiduciary authority or control be "any *final*" exercise of authority or control—this is not what § 1002 expressly requires.

And UBH's reliance on the Tenth Circuit cases of *Geddes v. United Staffing Alliance Employee Medical Plan*[148] is misplaced.  UBH cites *Geddes* for the proposition that it is not a fiduciary, contending that the court of appeals "affirmed that the third-party claims entity that denied plaintiffs' claims for benefits *was not a fiduciary of the plan*, but rather, it acted as an agent to the fiduciary. . . ."[149]  That is a misleading summary.

In *Geddes*, the Tenth Circuit considered the issue of whether a de novo or arbitrary and capricious standard of review applied to a coverage denial when a Plan names an "administrator and fiduciary" but also provides that the fiduciary will engage "an independent third party" to review claims and administer benefits.[150]  As discussed in more detail below in determining the

---

[147] Dkt. 88, *Defendants' Reply*, at 10 (emphasis in Defendants' briefing).

[148] 469 F.3d 919 (10th Cir. 2006).

[149] Dkt. 88, *Defendants' Reply*, at 10 (emphasis in Defendants' briefing).

[150] 469 F.3d at 922.

applicable standard of review,  ERISA denials are evaluated de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan."[151] Though the plan gave the administrator and fiduciary authority to hire independent third parties, it also "[i]mportantly, . . explicitly reserve[d] . . . the right to make all final decisions about benefits paid under its terms, as well as the authority to interpret disputed Plan provisions."[152]

The district court had concluded the independent third party who reviewed the Plaintiffs' claim was not a fiduciary, and that in delegating claims review to a non-fiduciary, the plan administrator "effectively did nothing" to exercise discretion, "thereby forfeiting its claim to deferential review."[153]  The court of appeals reversed, holding "a fiduciary's decision to delegate part of its . . . authority to an independent claims administrator" does not trigger de novo review[154] where such partial delegation is permitted under analogous trust law, and the for purposes of liability, the decisions of the independent third parties, acting "only as agents of the fiduciary," amount to decisions made by the administrator.[155]

But in reversing the district court, the *Geddes* Court expressly stated it was not evaluating whether the third-party reviewer was, or was not, a fiduciary, because the parties on appeal simply did not dispute the district court's finding that it was not.  Where the parties did not contest the finding, there was "no reason to revisit that conclusion," because finding the third-party claims administrator to be a fiduciary would not change—but would only buttress—its conclusion that the more deferential standard of review applied.[156]

---

[151] *Id.* at 923 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[152] *Id.* at 922.

[153] *Id.* at 924.

[154] *Id.* at 921.

[155] *Id.* at 927.

[156] 469 F.3d at 937 n.1.

Thus, the *Geddes* Court did not evaluate when functional ERISA fiduciary status attaches to entities other than the named administrator, including where, as here, the Plan terms expressly give UBH as claims administrator discretion to interpret the Plan terms, render initial and appeal determinations, apply its own guidelines, and administer claims.

Indeed, in an even more recent case where UBH was, as here, not the named Plan Administrator but the designated claims administrator for mental health claims, the Tenth Circuit affirmed the district court's finding that subsequent external reviews of various coverage determinations could not "correct the deficiencies in UBH's claims processing."[157]  In *David P. v. United Healthcare Insurance Company,* the Plan Administrator delegated "discretion to decide benefits to designated claims administrators, including Defendant United Healthcare Insurance Company," who "administered the Plan's mental health/substance abuse benefits through its affiliate, United Behavioral Health (UBH)."[158]  UBH denied coverage for nearly all of a beneficiary's stays at two residential treatment centers, and those denials were upheld on external review.  The district court reversed UBH's denials and awarded benefits, finding UBH's claims determinations deficient under an arbitrary and capricious standard of review.[159]  In so doing, the district court declined to consider the external reviewers' evaluations that the RTC care was not medically necessary.[160]

Before the district court, Defendants had argued the external review "constitutes substantial evidence showing that UBH's  final adverse benefit determinations were not arbitrary

---

[157] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309 (10th Cir. 2023).

[158] *Id*. at 1301.

[159] *Id.* at 1303.

[160] *Id.* at 1314.

and capricious."[161]   Surveying decisions from sister courts referencing external reviewer reports, the district court found no clear basis to do so, noting "[w]hile it is true that an external reviewer's approval of the plan administrator's benefits determination can provide some indicia that the administrator's determination was reasonable, the administrator's determination must stand on its own."[162]   Thus, as here, "[r]ationales and factual evidence later cited by internal reviewers cannot salvage deficient rationales or findings of fact provides by UBH."[163]   Thus, while the district court considered the entire record, it "prioritized the rationales laid out in UBH's five denial letters in ruling that UBH's determination was arbitrary and capricious."[164]

The court of appeals found no fault in this course of action, noting that the district court focused on and reversed UBH's denials, and found that the external reviewers could not "cure UBH's deficient claims processing."[165]   Thus, though UBH argued the court should consider the external reviewers' medical necessity reasoning to buttress the rationales for its prior denials, the court of appeals declined, finding "UBH's argument fails in light of the deficiencies in its claims processing, which we have already identified.  The external reviews here, then do not preclude reversing UBH's denial of benefits."[166]

For these reasons, UBH's argument that MCMC's external review entirely absolves it of potential ERISA liability for its claims determinations and Parity Act violations fails.  Rather, the

---

[161] *David P. v. United Healthcare Ins. Co.*, 564 F.Supp.3d 1100, 1121 (D.Utah 2021), *aff'd in part, vacated in part, rev'd in part*, 77 F.4th 1293.

[162] *Id.* at 1122.

[163] *Id.*

[164] *Id.*

[165] *David P.*, 77 F.4th at 1314.

[166] *Id.* The court of appeals went on, however, to reverse the district court's decision awarding benefits outright.  The court of appeals found that under the facts of the case, remand was more appropriate, especially where the court could not "say that the 'record clearly shows'" the plaintiffs were, or were not, entitled to benefits.  *Id.* at 1315.

court agrees with Plaintiffs that UBH is a functional fiduciary "to the extent" it engaged in the coverage determination as a designated claims administrator under the Plan, and it does not matter that the second level appeal was submitted to an independent third party hired by the Plan. If UBH had approved G.K.s benefits claims, "either upon initial review . . . or after the first-level appeal, its decision would have been final and Plaintiffs would have been paid."[167]  Likewise, if UBH violated the Parity Act and the violation led to a claim denial which might otherwise have been paid if in compliance, G.K.'s claims "would never have made it to MCMC in the first place."[168]  The court concludes UBH is clearly an ERISA fiduciary, and is a proper party with regard to both of Plaintiffs' claims.

## B.  The Plan Benefits Denials were Arbitrary and Capricious

ERISA allows plan participants and beneficiaries, like Plaintiffs, to seek judicial review of an administrative denial of health benefits under 29 U.S.C. § 1132(a)(1)(B).  This analysis typically requires first identifying the proper standard of review.

### 1.  Standard of Review

ERISA "does not specify the standard of review that courts should apply" in reviewing a benefits denial.[169]  But the Supreme Court instructs that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

---

[167] Dkt. 84, *Plaintiffs' Opp.*, at 8.

[168] *Id.* at 24.  At page 33 of their Motion for Summary Judgment (Dkt. 73), Defendants contend Plaintiffs' Parity Act claim fails where UBH's denials allegedly violating that Act were not "final."  Defendants  argue "Plaintiffs are not entitled to any equitable relief . . . because they have not alleged and cannot show that the alleged Parity Act violation proximately caused them any injury – particularly where, as here, the final adverse appeal determination on their benefit claim was made by MCMC, not UBH, and MCMC did not refer to or rely on the allegedly improper UBH guidelines in rendering that final appeal determination."

[169] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F. 3d 1311, 1315 (10th Cir. 2009).

construe the terms of the plan."[170]  Where such discretion is granted, the court applies a more

deferential standard of review, "asking only whether the denial of benefits was arbitrary and

capricious."[171]  This "judicial deference to ERISA plan administrators is premised on their

fiduciary roles,"[172] as "ERISA requires fiduciaries to 'discharge [their] duties with respect to a

plan solely in the interest of the participants and beneficiaries.'"[173]

The party arguing for the more deferential standard of review bears the burden of

establishing its applicability.[174]  Here, that is UBH.  And the court is persuaded that this standard

seems at least initially appropriate, where the Plan has delegated to UBH the role of claims

administrator for behavioral health benefits,[175] including the direct determination of first level

pre-service and post-service appeals for these benefits.[176]

But Plaintiffs contend Defendants are nonetheless not entitled to the more deferential

standard of review, because the denial letters in this case show they have breached ERISA

regulations.  Where there are "serious procedural irregularities" in contravention of ERISA

regulations, the court applies "de novo review where deferential review would otherwise be

required."[177]  Plaintiffs claim the denial letters breach ERISA regulations because they lacked

meaningful engagement with the opinions of G.K's treating professionals;[178] were "conclusory,

---

[170] *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

[171] *LaAsmar*, 605 F.3d at 796.

[172] *D.K.*, 67 F.4th at 1243 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)).

[173] *Id.* (quoting 29 U.S.C. § 1104).

[174] *LaAsmar*, 605 F.3d at 796.

[175] A.R. 2503 (identifying UBH as the only entity providing claims administration for the Plan's behavioral health benefits)

[176] A.R. 137-38.

[177] *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[178] Dkt. 71, *Plaintiffs' MSJ*, at 25.

threadbare, and [failed to] . . . engage" with G.K.'s own representations as to "her own mental health status;" and did not "reflect a reasoned application of the Plan's language to the information [they] had about G.K.'s medical history."[179]

Indeed, certain ERISA regulations provide that a Plan administrator improperly exercises its discretion if it denies benefits without complying with statutory procedural requirements.[180] These regulations require the administrator to provide notice to claimants of "any adverse benefit determination," and such notice must "set forth, in a manner calculated to be understood by the claimant—"

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

***

(v) In the case of an adverse benefit determination by a group health plan. . .

(B) If the adverse benefit determination is based on a medical necessity. . . either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.[181]

Further, ERISA regulations afford claimants a "full and fair review" when they appeal adverse benefit determinations.[182]  A full and fair review "takes into account all comments, documents, records and other information submitted by the claimant relating to the claim."[183]

If the breaches Plaintiffs identify are "serious procedural irregularities" then de novo review would apply.  But de minimis violations in the claims process occurring "in the context of

---

[179] *Id.* at 26.

[180] *See* 29 C.F.R. § 2590.715-2719(b)(2)(F)(1).

[181] 29 C.F.R. § 2560.503-1(g).

[182] 29 C.F.R. § 2560.503-1(h)(2).

[183] *Id.* § 2560.503-1(h)(2)(iv).

an ongoing, good faith exchange of information between the plan and the claimant" will not trigger de novo review.[184]  What constitutes a de minimis procedural violation under present ERISA regulations is an open question within the Tenth Circuit.[185]  Under a prior version of ERISA, the court of appeal held de novo review applied only if the administrator did not "substantially comply with ERISA regulations" in the benefit-determination process.[186]  That court has yet to decide whether the substantial compliance rule still applies under the amended ERISA regulations, allowing only de minimis procedural violations.[187]

This issue remains unresolved following recent Tenth Circuit rulings.  In *D.K. v. United Behavioral Health*, the court of appeals stated it would apply the more deferential arbitrary and capricious standard of review "[b]ecause [UBH] had 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . '"[188]  It did not decide if UBH's alleged breaches would affect the standard of review—the plaintiffs seemingly did not argue for application of a de novo standard of review on appeal.  Thus, although the court of appeals recognized UBH's breaches in that case (failures to sufficiently engage in a "meaningful dialogue" with the opinions of claimant's treating professionals and to apply plan terms to the claimant's medical records) also amounted to breaches of ERISA regulations,[189] it did not discuss how those breaches affect the standard of review.

---

[184] 29 C.F.R. § 2590.715-2719(b)(2)(F)(2).

[185] *LaAsmar*, 605 F.3d at 800 n.7 ("[W]e left open the question of whether the 'substantial compliance' rule remains applicable under the revised 2002 ERISA regulations.").

[186] *See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 (10th Cir. 2009).

[187] *See id.* at 1152 n.3 ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 827–28 (10th Cir. 2008); *see also LaAsmar*, 605 F.3d at 800.

[188] *D.K.*, 67 F.4th at 1235 (quoting *Firestone Tire & Rubber*, 489 U.S. at 115).

[189] *D.K.,* 67 F.4th at 1239 (citing 29 C.F.R. § 2560.503-1(h)(3), (4) and *13 29 C.F.R. § 2650.503-1(h)(2)(iv)), and 1243 (noting we hold [UBH] acted arbitrarily and capriciously in not engaging with the medical opinions of . . . treating professionals. . . .").

Likewise, in *Easter v. Hartford Life and Accident Insurance Company*, the Tenth Circuit noted that it had not yet "extended the procedural-irregularity exception beyond two limited scenarios—*viz.*, where a claim administrator either did not issue a decision or issued a substantially late appeal," but determined the case before it did not require deciding "whether the exception could extend to other scenarios."[190]  No procedural irregularities in the claims process warranted any exception—indeed, the court of appeals affirmed the denial of coverage under the arbitrary and capricious standard of review.[191]

Plaintiffs here allege violations akin to those in *D.K.*  But where the Tenth Circuit has not had occasion to rule on the issue, and because the Defendants' denials were improper even under the more deferential arbitrary and capricious standard of review, it is unnecessary to determine if the alleged breaches might amount to procedural irregularities warranting de novo review.[192]

### 2.  The Plan Benefits Denials were Arbitrary and Capricious

"ERISA sets minimum standards for employer-sponsored health plans, which may be administered by a separate entity."[193]  "Under arbitrary and capricious review, the actions of ERISA administrators are upheld if reasonable and supported by substantial evidence."[194]

---

[190] 2023 WL 3994383 (10th Cir. June 14, 2023) at *5.

[191] *Id.* at *4.

[192] *See also James C. v. Aetna Health and Life Ins. Co.*, 499 F.Supp.3d 1105, 1117 (finding de novo review unwarranted though Plaintiffs alleged Defendants breached ERISA regulations by failing to engage with medical records or "provide the particular provision on which it based its denials.")  In *James C.*, Judge Barlow explained:

> Under Tenth Circuit precedent, de novo review is appropriate despite a plan's conferral of discretion on a plan administrator if: the administrator fails to exercise discretion within the required timeframe; the administrator fails to apply its expertise to a particular decision; the case involves serious procedural irregularities; the case involves procedural irregularities in the administrative review process; or where the plan members lack notice of the conferral of administrator discretion over the plan.

499 F.Supp.3d at 116-17 (quotation marks and citations omitted).

[193] *D.K.*, 67 F.4th at 1236 (citing 29 U.S.C. § 1001).

[194] *Id.* at 1235 (citing *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).

Substantial evidence "mean[s] more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion."[195]  The court reviews the record as a whole to determine whether substantial evidence exists to support the rationale for denial, accounting for all record facts, including those detracting from the administrator's decision.[196]

A plan administrator "has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim."[197]  As noted above,"[a]dministrators, like [UBH], are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts."[198]  In making benefits determinations, an "administrator owes a special duty of loyalty to the plan beneficiaries," and must interpret the plan reasonably and in good faith.[199]

Administrators must also "follow specific procedures for denials."[200]  Denials must be in writing and "set forth the specific reasons for such denial," and "afford a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[201]  Recall that ERISA regulations require denials to refer to "the specific plan provisions on which the determination is based," and if the denial is based on a lack of medical necessity, "either an explanation of the scientific or clinical judgment for the determination, applying the

---

[195] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and quotation marks omitted).

[196] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

[197] *Rasenack,*585 F.3d at 1324 (citations omitted).

[198] *D.K.*, 67 F.4th at 1236 (citations omitted).

[199] *David P.*, 77 F.4th at 1299, 1308 (citations omitted).

[200] *D.K.*, 67 F.4th at 1236 (citations omitted).

[201] *Id.* (citing 29 U.S.C.§ 1133).

terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request."[202]

Review of a denial under the arbitrary and capricious standard "considers if it '(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'"[203]  An administrator arbitrarily and capriciously fails to be "consistent with the purposes of the plan" if it does not "'consistently apply'" plan terms or "provides an interpretation inconsistent with" plan's plain language.[204]

For a "full and fair" review, claimants must know "what evidence the decision-maker relied upon," have "an opportunity to address the accuracy and reliability of the evidence, [and] hav[e] the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[205]  As the Tenth Circuit has explained, "[i]n referring to a claimant's medical records, administrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[206]  And while there is no general requirement that a claims administrator *defer* to the opinions of the claimant's treating physicians, they may not "arbitrarily refuse to credit such opinions if they constitute reliable

---

[202] 29 C.F.R. § 2560.503-1(g).

[203] *D.K.*, 67 F.4th at 1236 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007)).

[204] *Id.* (quoting  *Tracy O. v. Anthem Blue Cross Life*, 807 F. App'x 845, 854 (10th Cir. 2020)).

[205] *D.K.*, 67 F.4th at 1236 (citations omitted).

[206] *Id.* at 1242 (citing *McMillan v. AT&T UmbrellaBenefit Plan No. 1*, 746 F. App'x 697, 705-06 (10th Cir. 2018)).

evidence from the claimant."[207]  Put another way, "reviewers 'cannot shut their eyes to readily available information ... [that may] confirm the beneficiary's theory of entitlement.'"[208]

Under these standards, Plaintiffs argue Defendants' coverage denials on retrospective review and the first and second level appeals were arbitrary and capricious because they 1) rest on "conclusory statements without factual support;"[209] and 2) credit evidence supporting the denials—primarily G.K.'s own initial representations in April 2016 at Sunrise that she was doing better—while ignoring or failing to meaningfully grapple with substantial contrary evidence showing that G.K.'s care was "medically necessary' as defined in the Plan, including the opinions of treating providers at both Sunrise and Northwest Passage, G.K.'s own statements beginning in May 2016, and G.K.'s history of depression, suicidal thoughts and actions, and masking her serious mental health issues.[210]

Defendants respond that UBH's denials were all based on substantial evidence, and thus not arbitrary and capricious.[211]  Defendants argue the fact that UBH reviewers and the external reviewer (MCMC) all agreed the treatment was not medically necessary amounts to substantial evidence supporting UBH's denials.[212] And, Defendants contend,  MCMC's final review "reasonably determined" G.K.'s residential treatment level of care was not "medically

---

[207] *Id.* at 1237 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003)).

[208] *Id.* (quoting *Gaither v. Aetna Life Ins. Co*., 394 F.3d 792, 807 (10th Cir. 2004)).

[209] Dkt. 71, *Plaintiffs' MSJ*, at 33 (quoting *Raymond M. v. Beacon Health Options, Inc.*, 436 F.Supp. 3d 1250, 1266 (D.Utah 2020)).

[210] *Id.* at 27-34.

[211] Dkt. 83, *Defendants' Opp.*, at 29.

[212] *Id.* at 29-30 (noting "where, as here, multiple internal reviewers and the external review agent that rendered the final review of Plaintiffs' second-level appeal each determined that the treatment at issue was not medically necessary . . .those determinations constitute substantial evidence that the adverse benefit determination is correct under either a *de novo* or arbitrary and capricious standard of review.") (citations omitted).

necessary" as the Plan defines that term,[213] and (2) regardless, the care at Sunrise was not really "24/7" RTC level of care, but was more akin to a "group home."[214]

For the reasons discussed below, the court agrees with Plaintiffs that even under the more deferential standard of review, the Defendants' blanket denials of Plan benefits for G.K.'s residential treatment at Sunrise—from day one—were arbitrary and capricious.

### a. Dr. Rosenberg's Retrospective Review

Dr. Rosenberg, a UBH reviewer, provided the following rationale for his retrospective review denial of the entirety of G.K.'s treatment at Sunrise—from day one on April 7, 2016, to her discharge in December:

> Your child was admitted for treatment of depression and anxiety. After reviewing the medical records, your child had made good progress and no longer needed the type of care provided in this setting. While your child continued to face challenges as she worked on his [sic] issues, your child had progressed to the point that she was not in immediate danger of hurting herself. Your child may have required support staff for these issues, however, she did not require this kind of structure, monitoring and clinical support found in this setting.
>
> This does not mean that your child could not have received further treatment. Instead, your child could have continued care in a mental health partial hospitalization.[215]

This entirely unspecific denial rationale lacks a basis in substantial evidence and is therefore arbitrary and capricious.

---

[213] *Id.* at 28.

[214] *Id.* at 33.

[215] Dkt. 73, *Defendants' MSJ*, at 13 ¶¶ 36-38 (citing A.R. 1102). Defendants also cite an internal UBH case note they claim "documents that Dr. Rosenberg conducted a live telephone interview" with a treating provider in conjunction with his review which revealed G.K. had been "guarded, depressed, and anxious" upon admission to Sunrise, but improved over time, and had not "self-harmed" or endorsed suicidal ideation. *Id.* at 13-14 ¶ 40. Dr. Rosenberg does not indicate in his note with whom he spoke, and neither references nor appears to rely on this information in his retrospective review actually provided to the Plaintiffs. The case note is therefore immaterial. *See David P.*, 77 F.4th at 1313 (noting "a court reviewing an administrator's benefits decisions cannot consider reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the claimant."). But the case note's substance does not change the court's analysis.

First, it lacks any citation to Plan terms upon which it is based and reference to any specific records—aside from the entire "medical records."  There is no clinical evaluation of G.K. at the time of admission in April following a suicide attempt and unusually lengthy stabilization period.  Nor is there clinical discussion of her "good progress:" what this was, when it was achieved over the eight month at Sunrise, and why it meant she "no longer needed the type of care provided in this setting" and "partial hospitalization" would have addressed her issues.

If the cited "good progress" was, as it seems to be, that G.K. that "not in immediate danger of hurting herself," as is discussed in the next sentence, this does not appear to be a valid reason under the Plan for denying residential treatment coverage on admission or as continued care.  To the contrary, it is a *requirement* under the Optum Guidelines for residential care that the member "is not in imminent or current risk of harm to self, others, and/or property."  This is the only rationale that comes close to a specific description of G.K., and it is not a valid basis to deny coverage.

Confronting a similar issue in *David P*., the Tenth Circuit recently affirmed a finding that UBH denials were arbitrary and capricious in part because they "seemingly contradicted UBH's own guidelines for when coverage was warranted.  For instance, UBH denied coverage at [an RTC] because L.P. did not want to hurt herself or others, but according to UBH's guidelines, treatment in an RTC can be warranted when the insured is not in imminent or current risk of harm to self or others."[216]

The non-specific mention of "good progress" also fails to account for G.K.'s well-understood history of masking her serious conditions—things plainly noted in the Sunrise records—and the records from nearly two months into G.K.'s stay noting she had reported her

---

[216] 77 F.4th at 1308.

depression may have worsened, her anxiety persisted, she found little joy in life, and was feeling "hopeless."[217]  To ignore these records in light of G.K.'s specific history, including a relatively suicide attempt, followed by an unusually long but eventually stabilizing hospital stay, is an arbitrary and capricious failure.

Dr. Rosenberg's rationale is so generalized and non-specific to G.K. and her history it approaches a "rubber stamp;" indeed, he mistakenly states that "she worked on *his* issues."  This is insufficient.  As the *David P.* Court recently stated in finding UBH's denial letters did not meet minimal ERISA requirements for explaining why residential treatment was unnecessary: "None of UBH's denial letters cited to any of L.P.'s records. Nor were many of the statements UBH included in the denial letters 'backed up with any reasoning.'"[218]  The same is true here.

### b.  Dr. Privette's First Level Review

Next, UBH Associate Medical Director Dr. Melinda Privette upheld Dr. Rosenberg's denial.[219]  Citing unspecified "case notes and medical records," she provided this rationale:

> Your child was admitted for boarding school, and for treatment of depression and anxiety. After reviewing the medical records, your child did not need to be in a 24-hour mental health residential rehabilitation setting. Your child was not suffering from an acute behavioral health condition at this point. She was in control of her emotions and not acting on any negative feelings. She did well in school, was cooperative with chores and activities, went on extended hiking trips and off grounds passes and worked on anxiety, mood and relationships. Your child could have received individual, group and family therapy by outpatient providers. Your health plan provides coverage for acute behavioral care, not for long term custodial care. Your health plan does not allow individual services, such as therapy, provided in an overall uncovered service, residential care, to be paid for separately. If the residential service is not covered, as it is not covered in this case, then no parts of it are covered.[220]

---

[217] Dkt. 71, *Plaintiffs' MSJ*, at 10 ¶ 38 (citing A.R. 2347, psychiatric notes (emphasis in original)).

[218] 77 F.4th at 1312 at 1312 (citing *D.K.*, 67 F.4th at 1242).

[219] Dkt. 73, *Defendants' MSJ*, at 14 ¶¶42-43 (citing A.R. 1116-19).

[220] *Id.* at 14 ¶ 43 (citing A.R. 1116).

Dr. Privette's highly generalized reasoning applied to the entirety of G.K.'s progressive treatment at Sunrise fails for the same reasons Dr. Rosenberg's does, as does her similar requirement that G.K. be "suffering from an acute behavioral health requirement" to warrant coverage. Her denial is not saved by the few statements that come closer to specificity, that: 1) G.K. had been admitted for "boarding school," 2) G.K. had gone on hiking trips and received "off grounds passes," 3) the Plan covers "acute behavioral care," not "long-term custodial care."

The statement G.K. was "admitted for boarding school" is specious. As Plaintiffs have established, Sunrise is a residential treatment center licensed by the State of Utah—a licensure distinct from "boarding school."[221] G.K. was admitted to Sunrise for residential treatment following a suicide attempt and a month of hospitalization where she continued to express suicidal ideation. That Sunrise offered educational services to G.K., then a minor, is both understandable and likely mandated under Utah law.

Judge Jenkins very recently rejected a similar rationale in denials for a minor's residential treatment center wherein the reviewers ignored evidence that the center was licensed by the State of Utah, and repeatedly based denials "on the premise that [the center] was not a licensed residential treatment center, but a boarding school that was not licensed under the plan."[222] Citing Utah statutes and regulations requiring educational services at licensed residential treatment centers serving children or adolescents," he concluded the center's "provision of legally mandated educational programs does not convert otherwise covered residential treatment services into excluded services."[223]  But he noted that even without those express requirements,

---

[221] Dkt. 84, *Plaintiffs' Opp.*, at 4.

[222] *C.P. v. United Healthcare Ins. Co.*, 2023 WL 4108368 (D.Utah June 21, 2023).

[223] *Id.* at *6.

"it would make little sense to deny benefits for residential treatment care solely because some educational services are also available at a residential treatment facility:"

> As a threshold matter, it seems beyond challenge that a residential treatment facility for adolescents would also have to include some educational component. These are young people ages 12-18 years old—middle and high school students—who have sought out help to address their mental health and/or substance abuse afflictions. How could it ever be appropriate for a facility like that to ignore the young person's educational development? And, if so, for how long? Some residents stay for a matter of days, others for months, some for more than a year. Should the residential treatment facility simply avoid providing educational services altogether, limit the services it provides, or attempt to mimic a "normal" educational curriculum as best it can? These are interesting questions. These young people—dealing as they are with serious mental health issues—should not be expected to fall further behind in their academic and intellectual development while seeking the medical help they need.[224]

Dr. Privette also recites in her denial that G.K. went on hiking trips and enjoyed off-grounds passes.  She does not offer any citation in the records for these trips, including when they occurred or how long they lasted.  More important, there is no clinical explanation why going hiking or enjoying a pass to visit family is contradictory to residential care rather than part of a normal progression to an eventual return to life at home.  Indeed, as Plaintiffs note, part of G.K.'s May 7, 2016, Sunrise Master Plan for treatment of anxiety included participation in recreation activities with "authoritative guidance" from staff;[225] and that her parents' work on unhealthy patterns and G.K.'s reactions would involve the parents' participation in "social calls," weekend visits, and weekly therapy.[226]  And it defies logic to think that residential care would not include off grounds activities and passes at appropriate times as part of care, both as a therapy but also to introduce a patient back to the environment to which they will eventually return.  If it does, there is no clinical explanation of this other than conclusory statements.

---

[224] *Id.* at *7.

[225] Dkt. 84, *Plaintiffs' Opp.*, at 11 (citing A.R. 946-49).

[226] *Id.* at 12 (citing A.R. 949).

Dr. Privette notes as a final point in her denial that the Plan does not cover "long-term custodial care." But aside from this factual statement about coverage, there is not a single reason provided to support the notion G.K.'s care at Sunrise was "custodial" under the Plan or the Optum guidelines, which are not specifically cited. Indeed, this point is internally contradictory to her other unsupported contentions that G.K. had been admitted to boarding school, or that off-site passes somehow transformed G.K.'s care into something less intensive than residential care.

### c. MCMC's External Second Level Appeal

Following Dr. Privette's denial, Plaintiffs appealed to external reviewer MCMC. As noted above, Defendants are incorrect in arguing MCMC's is the only review the court should consider and that it absolves UBH of its own missteps. At the same time, it is unclear whether the court should review the MCMC rationales at all, and if so, what weight to give them. Indeed, while the Tenth Circuit in *David P.*, affirmed the district court's decision to focus only on UBH's earlier denials in finding the Defendants acted arbitrarily and capriciously in processing and denying Plaintiffs' plan benefits claim, the court does not make clear that the court must ignore MCMC's review. And neither side urges that course. For these reasons, and because reviewing MCMC's denial does change any outcome, where it too fails as arbitrary and capricious, the court discusses MCMC's denial.

In conjunction with the appeal to MCMC, S.K. again provided all Sunrise medical records as UBH had, but also provided three letters from G.K.'s treating providers: Northwest Passage case manager Brianna Bielmeier, Northwest pediatric neuropsychologist Dr. Robert T. Law, and Sunrise therapist Ke'ala Cabulagan.[227] It bears noting that Defendants incorrectly suggest in their briefing that "it is unclear whether therapist Cabulagan ever met or treated

---

[227] Dkt. 71, *Plaintiffs' MSJ*, at 14-16 ¶¶ 46-49 (citing A.R. 1237-42, 2380-83).

G.K."[228]  The Sunrise records Plaintiffs provided to UBH and MCMC at every stage of the retrospective review and appeal process make clear that Cabulagan met with G.K. at the very start of her admission on April 8, 2016 and provided an initial report about G.K. to other staff.[229] At that time, she also prepared an "Interim Treatment Plan" for G.K., noting that she comes to Sunrise suffering from "severe depression" and anxiety following a "suicide attempt" and treatment at Northwest Passage and a hospital.[230]  She notes a projected length of stay to be "7 to 9 months,"  during which time G.K. will receive daily group therapy, weekly individual and family therapy, and milieu interventions.[231]  Without mining the entire administrative record, these records make clear Cabulagan was involved from day one with G.K's treatment at Sunrise.

All of the treating providers opined that the Sunrise residential treatment was medically necessary.  First, Bielmeier noted that G.K.'s "pattern of social anxiety and challenges with peer interactions has contributed to [her] depression and suicidal ideation."  In view of her history and symptoms at the time of discharge, Bielmeier opined G.K. could not "maintain in the community or in lower levels of care" without putting her "at risk of suicidal ideation and further isolative/avoidant behaviors."  G.K.'s clinical team recommended residential treatment at the time she left Northwest for Sunrise, "to monitor her affect and maintain her safety," "be restricted from various means of harm to herself," and "receive intensive therapeutic services in a residential treatment facility" with a structured environment to "learn more appropriate skills to

---

[228] Dkt. 83, *Defendants' Opp.*, at 33 n.6.

[229] A.R. 1062.

[230] A.R. 1045.

[231] *Id.*

manage her suicidal ideation, self-harming behaviors[,] and emotion dysregulation"—a  pattern "surrounded by anxiety, depression, and emotion dysregulation."[232]

Second, Dr. Law noted that the Northwest Passage clinical team had recommended for G.K.: 1) medical management by a psychiatrist and 2) "support and guidance in a residential treatment center to learn and generalize therapeutic skills."[233]  Dr. Law stated that G.K.'s "continued struggles with anxiety and depression have severely impacted her safety and functioning in her daily life."[234]  The team had "significant concern" that without these interventions, "[G.K.'s] patterns of emotional distress will continue."[235]

Third, Sunrise therapist Cabulagan opined that G.K. needed residential care from April through December 2016 because, given her suicidal history, her continued anxiety and lack of desire to form relationships would have prevented "any success in returning to home or receiving lower levels of care during the time period of treatment with Sunrise."[236]

MCMC upheld UBH's coverage denials for G.K.'s entire term of treatment at Sunrise, from April 7, 2016 to December 20, 2016.[237]  MCMC explained that this conclusion was reached "[a]fter a review by an independent Board Certified physician of the Plan Language and clinical records" in which the physician "determined that the dates of serviced [sic] being appealed are not medically necessary . . ."[238]  The lone citation to Plan in the letter is in the following passage: "The Plan states that 'only medically necessary care will be approved and paid under the plan.

---

[232] Dkt. 71, *Plaintiffs' MSJ*, at 15 ¶ 47 (citing A.R. 1238-39).

[233] *Id.* at 15 ¶ 48 (citing A.R. 1241-42).

[234] *Id.* at 15 ¶ 48 (citing A.R. 1241-42).

[235] *Id.*

[236] *Id.* at 15 ¶ 49 (citing A.R. 2381-82).

[237] Dkt. 73, *Defendants' MSJ*, at 15 ¶¶ 50-51 (citing A.R. 2384, 2386).

[238] *Id.* ¶¶ 51 (citing A.R. 2386).

All care is subject to review based on [sic] plan's relevant care criteria . . . ."[239]  The letter then

sets forth the reviewer's rationale for denial:

> In this case, the patient is hospitalized after a suicide attempt in January 2016. She
> has three psychiatric hospital placements from that hospitalization, prior to her
> entering the Residential Treatment Center during the dates in question. At the
> time of placement, she is not suicidal. She has improved significantly from the
> time of her initial hospitalization, though she remains requiring intensive
> treatment and is vulnerable to relapse. It is her vulnerability to relapse that is
> stressed as the basis of her requiring RTC level of care, along with her need for
> continuous in the moment counseling during this time period. However, she goes
> on several day trips and extended home passes with the family during this time
> period as well as a camping trip, which is not continuous for her need for
> continuous in the moment counseling. There is a time that she regresses in May
> 2016 and has an increase in depression and worry that were she home she would
> experience suicidal ideation. There are multiple alternative placements in which
> her need for continued intensive treatment and monitoring could be achieved, less
> intensive than the RTC. It is general standard of care to treat an individual at the
> least restrictive setting in which RTC environment. She goes on passes and trips,
> so the treatment that she receives in reality is more consistent with a group home
> treatment, with access to family and to community. A group home environment,
> through state department of mental health services (which the records do not
> indicated were sought in this case) would provide significant structure, continuous
> and in the moment counseling and support and a safe environment in which to
> build around additional services. A therapeutic school, for instance, along with
> outpatient individual group, medication management and family treatment
> services. The lack of actual 24/7 care and the lack of accessing community
> educational and therapeutic services including group living services indicates she
> was not being treated in the least intensive environment in which safe and
> appropriate treatment could be provided, which is a requirement for medical
> necessity determination.[240]

The MCMC letter also sets forth a clinical summary of records submitted in conjunction with the

second level appeal: 1) S.K.'s appeal letters dated October 13, 2016, December 22, 2016, and

June 28, 2017; 2) the letters from G.K.'s treating providers; and 3) Sunrise records.  At the end

---

[239] A.R. 2386 (ellipses in original MCMC letter).

[240] A.R. 2386-87.

of the denial, MCMC cites without any elaboration nine "References"—academic articles and other publications concerning adolescent psychology and treatment.[241]

Plaintiffs contend MCMC arbitrarily and capriciously fails to articulate a principled basis for denial, recites conclusory statements not based in fact, and fails to meaningfully grapple with the medical records and opinions of three treating providers.  The court agrees.

It is true the MCMC denial is lengthier, sets forth in its summary more facts from the medical records than the UBH denials, acknowledges G.K.'s suicide attempt and stabilizing hospital stays, and at least makes oblique reference to a recommendations for residential care for G.K., "It is her vulnerability to relapse that is stressed as the basis of her requiring RTC level of care, along with her need for continuous in the moment counseling during this time period."

But the actual rationale for denial fares no better than UBH's.  And the court finds unpersuasive Defendants' arguments to the contrary, that: 1) MCMC correctly determined G.K. could have received a less intensive level of care than residential treatment, which "she was not even receiving in any event,"[242] 2) the reviewer "cites nine (9) References" in its decision,[243] and 3) that multiple internal reviews had "independently determined that a claim for benefits is not medically necessary."[244]

First, like the other denials, the MCMC letter fails to sufficiently cite any Plan provision upon which it is based.  It is true that recites that only "medically necessary" care is covered under the Plan, and refers to unidentified "care criteria" under which care is reviewed.  But MCMC does not identify the "criteria" it relies on to determine what is medically necessary.

---

[241] A.R. 2387-92.

[242] Dkt. 73, *Defendants' Opp.*, at 25; *see also* Dkt. 88, *Defendants' Reply*, at 6 (contending the record "does not establish that G.K. was actually receiving RTC services.").

[243] Dkt. 73, *Defendants' Opp.*, at 26.

[244] Dkt. 73, *Defendants' Opp.*, at 20-21.

Defendants emphasize in their briefing and at oral argument that MCMC did *not* rely on the Optum guidelines.[245]   Thus, it appears MCMC's denial based on a finding G.K.'s care is not "medically necessary," is untethered to any Plan definition or criteria that might define it and is arbitrary and capricious.

And like the other denials, MCMC's appears to rest in large part on the fact that G.K. was not suicidal, particularly on admission: "At the time of placement, she is not suicidal."  But recall this is precisely what the Plan requires—G.K. needed to "not" be "in imminent or current risk of harm to self, others, and/or property"—to meet Optum guidelines for residential care.

The Defendants' consistent reliance in *every* denial on G.K.'s recent stabilization following extensive care at Northwest—that she "had progressed to the point that she was not in immediate danger of hurting herself," "was not suffering from an acute behavioral health condition," and was "not suicidal" is thus arbitrary and capricious.  Indeed, at oral argument, the undersigned had the following exchange with Defendants' counsel:

*Q. What's the basis for the denial of the admission?*

*A. The patient wasn't suicidal and didn't require that level of supervision.*

Later, when the court raised the issue again, asking if the applicable criteria made G.K. *ineligible* for residential care if she was suicidal, counsel agreed: "That's right. That's one of the criteria. . . . that did not *disqualify* her from residential treatment."  Counsel then argued that the real question was if could G.K. have stepped down even further.

It is true that a lack of imminent danger to self is both a requirement for residential care and could be a characteristic of someone who does not require residential care.  But the court reads the UBH and MCMC letters to cite lack of "acute" or "suicidal" condition to *warrant*

---

[245] Dkt. 83, *Defendants' Opp.*, at 14.

residential care.  The letters are short on analysis, especially UBH's, and they are meant to

convey the grounds for denial.  That rationale is included in every letter.  And notably this was

the same understanding the court of appeals seemed to have in *David P.* when it found UBH

denials arbitrary and capricious in part because they "seemingly contradicted UBH's own

guidelines for when coverage was warranted.  For instance, UBH denied coverage at [an RTC]

because L.P. did not want to hurt herself or others, but according to UBH's guidelines, treatment

in an RTC can be warranted when the insured is not in imminent or current risk of harm to self or

others."[246]

Next, the MCMC reviewer acknowledges G.K.'s vulnerability to relapse that might serve

as a basis for residential care, but then rejects that rationale because they find G.K isn't truly

receiving residential treatment level care.  This is because she goes on "several day trips and

extended home passes with the family during this time period as well as a camping trip, which is

not continuous [sic] for her need for continuous in the moment counseling.'"  The reviewer thus

suggests Sunrise is in fact not really offering residential care but is more akin to a group home,

stating the "lack of actual 24/7 care and the lack of accessing community educational and

therapeutic services including group living services indicates she was not being treated in the

least intensive environment in which safe and appropriate treatment could be provided, which is

a requirement for medical necessity determination."  This reasoning bakes in unsupported,

conclusory statements upon the other and is thus arbitrary and capricious.

First, as noted above, there is no rationale offered for the conclusion that going on passes

contradicts a residential level of care, or why going on passes beginning nearly two months into

her stay at Sunrise rendered G.K.'s treatment not covered from the date of admission.  The

---

[246] 77 F.4th at 1308.

passes are the only discernable fact in the denial to support the statement that there is a "lack of actual 24/7 care."  Sunrise is a state-licensed residential treatment center.  While there, G.K. engaged in the daily and weekly therapy recommended to her.  G.K. was seen daily by staff and was checked twice nightly for sleep.  Part of G.K.'s Sunrise Master Plan for treatment of anxiety included participation in recreation activities with "authoritative guidance" from staff;[247] and that her parents' work on unhealthy patterns and G.K.'s reactions would involve the parents' participation in "social calls," weekend visits, and weekly therapy.[248]  From MCMC's own clinical summary of records, MCMC understood G.K. went on her first three-day home visit at the end of May, after she had been at Sunrise for nearly two months.[249]  She then had two- to three-day home visits in June and July, and went on a two-day leadership camp at the end of July.[250]  There is no indication the camp did not include Sunrise staff.  There is no mention of any off-site visits of any kind in the entire month of August.  G.K. then goes on a five-day home visit in September, a nearly two-week home pass in October, and a two-day off-campus pass the same month.[251] Other than these notations, it appears vast majority of G.K.'s treatment at Sunrise was spent residing in their facilities.  Passes are an activity contemplated in G.K.'s initial plan at Sunrise and at least would seem a logical part of residential care.

And MCMC cites no criteria to the contrary.  Nor do they cite any criteria to illuminate the comparison between residential treatment and "group home" level care.  A conclusion that intermittent passes meant G.K. was receiving—and thus necessarily only needed—group home

---

[247] Dkt. 84, *Plaintiffs' Opp*., at 11 (citing A.R. 946-49).

[248] *Id.* at 12 (citing A.R. 949).

[249] A.R. 2390.

[250] A.R. 2390-91.

[251] A.R. at 2391.

level care, is unsupported.  And nowhere is there any discussion why G.K.'s severe depression, anxiety, stabilized suicidal ideations would improve in a group home or therapeutic school setting as opposed to the structured environment G.K.'s treating providers believed she needed, and residential care offered.  This denial is not based on substantial evidence in the record.

Finally, MCMC fails to engage meaningfully with G.K.'s records and the clear recommendations of G.K.'s three treating providers' evaluation that G.K. needed residential care in April 2016 following her suicide attempt and lengthy stabilization.  Both the Sunrise records and provider opinions are consistent, detailed, and compelling, and are referenced in MCMC's clinical summary.  Yet while MCMC summarizes the facts of the recommendation, the reviewer offering the denial rational does not meaningfully grapple with them in a way that is not arbitrary and capricious.  At most, MCMC notes G.K.'s vulnerability to relapse as the basis for residential treatment, and acknowledges G.K. had "regresse[d]" in May 2016, having an "increase in depression and worry that were she home she would experience suicidal ideation."[252]  This brief acknowledgement is followed not by any further discussion of G.K. or her provider recommendations, but by the general statement that it "is [sic] standard of care to treat an individual at the least restrictive setting in which she/he can be safely and effectively treated," and the unsupported rationale concerning a lack of residential care at Sunrise.

As Plaintiffs correctly argue, quoting *Gaither v. Aetna Life Ins. Co.,*[253] Defendants were required to engage with the treating providers, and were not entitled to "shut their eyes to readily available information . . .that might confirm" an entitlement to benefits."[254]  Defendants' argument to the contrary—based on the Tenth Circuit declining in *Mary D. v. Anthem Blue*

---

[252] A.R. 2386.

[253] 394 F.3d 792, 807 (10th Cir. 2004).

[254] Dkt. 71, *Plaintiffs' MSJ,* at 32.

*Cross Blue Shield*[255] to apply this reasoning from *Gaither*—a case involving disability benefits—in the health benefits context—is misplaced under the recent cases of *David P.*[256] and *D.K.*[257]  As the court of appeals stated in *David P.*, "UBH relies on an unpublished decision, *Mary D. v. Anthem Blue Cross Blue Shield*, . . . to support UBH's assertion that it was not required to explain why it disagreed with L.P.'s treating care givers' opinions that she required treatment in an RTC. This reliance is misplaced in light of this court's more recent published *D.K.* decision."[258]

And this denial is not helped, as Defendants urge, by MCMC's citation without discussion to titles of nine professional articles or books, or the mere fact that other reviewers denied coverage before the external reviewer affirmed that decision (which will always be the case if a decision gets to an external review).  First, the fact that an MCMC denial includes a list of nine references means little if the denial itself fails to adequately support its conclusion.  And there is no citation to or discussion of any of the references in the denial at all.

Second, Defendants argue where the fact that internal reviewers and an external agent all found the treatment at issue was not medically necessary, those determinations constitute substantial evidence that they are is correct under either a *de novo* or arbitrary and capricious standard of review.  Defendants cite two cases for this proposition.  Neither expressly supports the notion that the fact alone that multiple reviewers all reached the conclusion coverage should be denied amounts to substantial evidence supporting the denials.  Indeed, such as rule would

---

[255] 778 F. App'x 580 (10th Cir. 2019).

[256] 77 F.4th 1293.

[257] 67 F.4th 1224.

[258] *David P.*, 77 F.4th at 1312.

mean so long as deferential review is applied in cases where Plaintiffs previously exhausted their internal appeals, the denials must be upheld in ensuing litigation.

First, Defendants refer to *Amy G. v. United Healthcare*,[259] in which this court, Judge Jenkins, upheld the defendants' denial of benefits for a teen's lengthy (sixteen-month) stay at a residential treatment center under the arbitrary and capricious standard where multiple health care professionals had reviewed the plaintiffs' request and "found no authorization could be provided."[260]  The court did not find the denials appropriate based solely on the fact that "[s]everal health care professionals" agreed on the outcome.[261]  The court reviewed the substance of UBH's denials and the external review denial, finding they were not arbitrary and capricious under the facts of that case, and where Defendants "cited to sufficient evidence in the record to support these determinations."[262]  There, the residential treatment referral was for depression, mood instability, and family conflict, but the teen in question had no history of hallucinations, or aggressive, violent, or self-injurious acts, nor suicidal/homicidal ideation or attempts.[263]  Thus, not only was the teen not in imminent harm (a requirement for residential treatment), the reviewers appropriately considered that there was an "absence of *any* risk of harm" in determining whether other UBH guideline criteria are met.[264]

Defendants also cite *Alexandra H. v Oxford Health Insurance*, an unpublished case from the Eleventh Circuit.[265]  In it, the court reviewed summary judgment granted in favor of the

---

[259] 2018 WL 2303156 (D.Utah May 21, 2018).

[260] Dkt. 83, *Defendants' Opp.*, at 30 (citing *Amy G.*, 2018 WL 2303156, *5).

[261] 2018 WL 2303156 at *5.

[262] *Id.*

[263] *Id.* at *1-2.

[264] *Id.*

[265] 763 F.App'x 865 (11th Cir. 2019).

Defendants' denial of continued coverage for the adult plaintiff's "partial hospitalization" treatment for anorexia following a period of what her own providers called "marked progress."[266] By the time coverage was discontinued after multiple weeks of permitted coverage, the records were silent as to any suicidal ideation—something that had been repeatedly noted in prior records.[267]  Under these facts, the court affirmed summary judgment under either a deferential or de novo standard.  Nowhere does the court state that the fact that reviewers agreed on a coverage denial in and of itself is substantial evidence.

In this case, UBH's  denials on retrospective review and first level appeal, and MCMC's second level appeal determination are each deficient to the point they are arbitrary and capricious.  Having three deficient denials considered together does not amount to substantial evidence to save any one of them.

Based on the foregoing, the court concludes the UBH and MCMC denials do not "reside[] 'on the continuum of reasonableness'" or rest on substantial evidence.[268]  Each sets forth general rationales not backed up by citations to the Plan language and applicable criteria or specific records and fails to meaningfully engage with G.K.'s specific medical history of recent suicidal behavior, long stabilization period, anxiety triggers, and masking.  And the MCMC denial additionally fails to meaningfully discuss the compelling opinions of the treating providers.  Instead, each denial seemed to rely in large part on the fact that G.K. was not suicidal on admission to Sunrise, when the Plan and UBH guidelines appears to require precisely that stabilized condition as a requirement for residential care.  And the more specific rationales for

---

[266] *Id.* at 869.

[267] *Id.*

[268] *Adamson*, 455 F.3d at 1212 (quoting *Kimber v. Thiokol Corp.* at 1098 196 F.3d 1092, 1098 (10th Cir. 1999)).

provided in Dr. Privette and MCMC's denials: that G.K. was attending "boarding school" or receiving group home rather than residential care, are factually and clinically unsupported.  The denials were arbitrary and capricious.

## C.  Plaintiffs are Entitled to an Award of Benefits

The court must determine whether to award Plaintiffs coverage for G.K.'s benefits outright, or to remand for further administrative review.  Remand may be warranted if "the administrator's flawed handling could be cured by a renewed evaluation to address, for example, a 'failure to make adequate findings or to explain adequately the grounds for decision.'"[269]

But a court may award benefits outright in certain circumstance, including includes "when the record shows that benefits should clearly have been awarded by the administrator."[270] And the Tenth Circuit recently explained "[t]hat is not the only instance in which a court may award benefits."[271]  Benefits may also be awarded if an administrator's actions "were clearly arbitrary and capricious,"[272] or if remand would simply be an "'opportunity to retool a defective system,'"[273] or give "an additional 'bite at the apple' to ERISA administrators acting unjustly."[274]  This determination is informed by the Defendants' fiduciary role, which permits deference, but not "unlimited freedom to act improperly towards claimants."[275]

Thus, the court of appeals in *D.K.* affirmed the district court's decision to award benefits outright after finding the underlying denials were arbitrary and capricious.  "Considering the

---

[269] *D.K.*, 67 F.4th at 1243 (quoting  *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002)) (other citations omitted).

[270] *Id.* (citations omitted).

[271] *Id.*

[272] *Id.* (citing *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F3d 1161, 1175-76 (10th Cir. 2006)).

[273] *Id.* (quoting *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002)).

[274] *Id.* (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001)).

[275] *Id.* at 1244 (citations omitted).

administrator's clear and repeated procedural errors in denying this claim, it would be contrary to ERISA fiduciary principles to mandate a remand and provide an additional 'bite at the apple.'"[276] In contrast, in *D.P.*, the court of appeals reversed the district court decision to award benefits where the record did not clearly show whether Plaintiffs were, or were not, entitled to benefits.[277]

Under these principles, and the specific facts of this case, the proper remedy for Defendants' wrongful denial of Plan benefits is to award Plaintiffs benefits outright for G.K.'s care. First, as discussed above, the denials beginning with retrospective review and through the second level appeal were arbitrary and capricious, citing unsupported facts and rationales, seemingly requiring G.K. to be currently suicidal to obtain coverage, failing to cite Plan terms or specific medical records (though MCMC's does contain a clinical summary), and failing to grapple with the recommendations of treating providers.

Second, for the reasons carefully cited in Plaintiffs' papers,[278] the court finds the record clearly establishes G.K.'s residential treatment was medically necessary and should have been covered under the Plan when G.K. was admitted to Sunrise in April 2016, and this necessity remained at least until the fall of 2016, when G.K. began showing consistent signs of improvement for a few weeks. In April 2016, G.K.'s serious, suicidal behaviors had just stabilized to the point she could leave the hospital setting at Northwest. Two Northwest treating providers opined that G.K. needed structured, therapeutic residential level care, and that any lower level of care would put her at risk of suicidal ideation and other distressing outcomes. And Sunrise therapist Cabulagan corroborated G.K.'s need for this level of care, noting G.K.'s continued struggles and symptoms even at Sunrise, but also that the residential care setting

---

[276] *Id.*

[277] 77 F.4th at 1315.

[278] Dkt. 71, *Plaintiffs' MSJ*, at 27-30.

allowed G.K. to make gains and improvements and to maintain them.  As Plaintiffs highlight in their papers, those improvements became consistent and notable in later summer and fall of 2016, as evidenced, for example, in Sunrise notes from October 17, 2016, reflecting that G.K. is doing well, happy with present medications, and had a good family visit.

The court concludes that sometime between October 2016, and continuing through her discharge two months later, in December 2016, G.K.'s condition seemed clearly to have consistently improved to the point she might have been discharged.  And the court might have, under different circumstances, remanded this action for further determination as to when the coverage appropriately ended in that time frame.

But in view of their fiduciary role, the court declines to give Defendants another 'bite at the apple' in this case in view of the denials discussed above, the evidence clearly supporting coverage at least through the fall of 2016, and the positions Defendants have taken.  Most notably, Defendants have taken the unsupported position that UBH is simply not a fiduciary at all, one the court finds clearly at odds with its role as claims administrator and under the applicable law.  This gives the court serious concern about authorizing remand to Defendants who have argued UBH is not governed by fiduciary duties.

Under these specific circumstances, the court declines to delay Plaintiffs' relief any longer with a remand and awards them their benefits outright.

### D.  Plaintiffs have Established Defendants Violated the Parity Act

In addition to seeking Plan benefits, Plaintiffs also assert a Parity Act claim.  The Act applies to group health plans providing  medical/surgical benefits and mental health or substance use disorder benefits.[279]  Under it, treatment limitations applicable to mental health benefits may

---

[279] 29 U.S.C. § 1185a(a)(3)(A).

not be more "more restrictive than the predominant treatment limitations applied to substantially all" medical/surgical benefits.[280]  To establish a Parity Act violation, Plaintiffs must show:

> (1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.[281]

The parties do not dispute that the Plan is subject to the Parity Act and provides both mental health and medical/surgical benefits.  And the parties do not dispute that Plaintiffs identified skilled nursing and inpatient rehabilitation facilities as appropriate medical/surgical analogues to the sub-acute residential mental health treatment at issue in this case, as they are all "intermediate services."[282]  The third element is disputed: whether Defendants limited coverage for residential care in a way more restrictive than the medical/surgical analogues.  In doing so, the court "affords no deference" to the benefits administrator and instead examines "'the plan documents as a whole' to determine whether" there is a violation.[283]

Treatment limitations evaluated for parity may be quantitative or nonquantitative.[284]  Nonquantitative limitations include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness."[285]  A challenge to a limitation

---

[280] *Id.* § 1185a(a)(3)(A)(ii).

[281] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1028 (D.Utah 2021) (quotation simplified).

[282] Dkt. 71, *Plaintiffs' MSJ*, at 35; Dkt. 73, *Defendants' MSJ*, at 32; Dkt. 83, *Defendants' Opp.*, at 41 (citing 78 Fed. Reg. 68240-01, 68246-68247 (Nov. 13, 2013)).  Defendants dispute the propriety of a third proposed analogue, hospice care.  That dispute is immaterial to the issues the court resolves, as it relates to Plaintiffs' overall challenge of the Optum guidelines.  The court does not address that challenge.

[283] *M.Z.*, 2023 WL 2634240, at *17 (D.Utah March 24, 2023) (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008)).

[284] 29 C.F.R. § 2590.712(a).

[285] *Id.* § 2590.712(c)(ii)(F).

may take one of two forms, either a facial challenge brought based on express Plan terms, or an as-applied challenge based on the administrator's application of the plan.[286]

Plaintiffs assert Defendants committed as-applied violations.  Thus, Plaintiffs can succeed on its Parity Act claim only by showing "the mental health or substance abuse services at issue meet the criteria imposed by [the plan] . . . and that the insurer imposed some additional criteria to deny coverage of the services at issue."[287]

In their opening brief, Plaintiffs assert Defendants committed as-applied violations by applying nonquantitative limitations to the determination of medical necessity for residential mental health that they do not similarly apply to the determination of medical necessity for medical/surgical analogues.  Plaintiffs contend Defendants 1) denied coverage because G.K. did not present with "acute" symptoms, but do not require acute symptoms as a prerequisite for coverage in the analogous medical/surgical settings of skilled nursing and inpatient rehabilitation facilities,[288] 2) apply criteria beyond the Plan terms—the Optum guidelines—when no extra-Plan guidelines at all are used in determining coverage for at least one analogous category of medical/surgical treatment, inpatient hospice facilities,[289] and 3) in specific Optum guidelines require "acute changes" in symptoms for residential coverage, while there is no evidence acute changes are required for coverage for analogous medical/surgical care.[290]

Plaintiffs do not clearly develop in their papers how Defendants committed two of the "as-applied' violations they assert, leading to a G.K.'s coverage: application of the Optum

---

[286] *J.L. v. Anthem Blue Cross*, No. 2:18-cv-00671, 2019 WL 4393318, at *2 (D. Utah Sept. 13, 2019).

[287] *Anne M. v. United Behavioral Health,* 2022 WL 3576275 at *2 (D. Utah Aug. 19, 2022).

[288] Dkt. 71, *Plaintiffs' MSJ,* at 36-37.

[289] *Id.* at 38.

[290] *Id.* at 37.

guidelines generally or the specific guideline language requiring "acute changes in the member's signs and symptoms" to deny coverage.  The court thus focuses on Plaintiffs' argument that Defendants violated the Parity Act by denying coverage for G.K. because she lacked an acute condition—being suicidal.  Plaintiffs do not appear directly tie violation—requiring an acute condition to obtain residential care coverage—to Defendants' application of the UBH guidelines.

Defendants respond that 1) Plaintiffs cannot establish Article III standing to assert such as claim against UBH where MCMC, not UBH made the final benefits determination and did not apply Optum guidelines to do so and Plaintiffs have not established any injury resulting from the alleged violation,[291] 2) they are allowed to refer to "acute" criteria in evaluating residential treatment coverage, and that such discussion is appropriate under cases where reviewers were found to permissibly refer to "the absence of acute symptomology in finding that residential treatment was not medically necessary."[292]  The court disagrees.

### 1.  Standing

An ERISA plaintiff "must have standing pursuant to Article III of the United States Constitution," demonstrating that 1) they have suffered of an actual or threatened injury in fact, 2) "the injury is causally connected" to the complained-of conduct , and 3) it is likely the injury "will be redressed by a favorable decision."[293]  Defendants argue Plaintiffs cannot establish standing because they cannot show any Parity Act injury from the violations alleged arising from the application of Optum guidelines.  Defendants argue where MCMC conducted the final

---

[291] Dkt. 73, *Defendants' MSJ*, at 32-33; Dkt. 83, *Defendants' Opp.*, at 45; Dkt. 88, *Defendants' Reply*, at 14-15.

[292] *Id.* at 37 (citations omitted).

[293] *Jonathan Z. v. Oxford Health Plans*, 2022 WL 3227909 at *1 (D.Utah Aug. 9, 2022) (citing *Thole v. U.S. Bank N.A.*, 140 S.Ct, 1615, 1622 (2020) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

external review, and purportedly did not apply the Optum guidelines, this shields UBH's determinations from Parity Act scrutiny.[294]

The court finds Defendants are incorrect, at least at this stage.[295]  As noted above, UBH's denials as the claims administrator are the court's central focus and must stand on their own. They result in liability if they show Parity Act violations that resulted in harm to Plaintiffs—for example, an impermissibly stringent standard applied—whether derived from the guidelines or not—resulting in a denial of benefits where they would otherwise be granted.  MCMC's own violations might cement, but are unnecessary, to reach such a result.  And, in any event, the alleged as-applied Parity Act violation the court focuses on—the apparent requirement in the denial letters that G.K. be suffering from an acute condition to qualify for residential care coverage—does not depend on the guidelines.  Indeed, it arguably contradicts them.

### 2.  Violation

Plaintiffs argue "Defendant violated [the Parity Act] when [UBH] denied G.K.'s claims because she was 'not in immediate danger of hurting herself' and 'was not suffering from an *acute* behavioral condition.'"[296]  Plaintiffs cite for comparison the Plan's internal medical/surgical InterQual guidelines for 'Rehabilitation' and 'Sub-Acute SNF [Skilled Nursing Facility]' levels of care to contend there is no evidence in the record that Defendants require acute symptoms to obtain coverage.[297]  For this violation (unlike the others the court does not

---

[294] Dkt. 73, *Defendants' MSJ*, at 32-33.

[295] As discussed herein, the court finds Defendants violated the Parity Act, and will permit the Plaintiffs to submit further briefing on the remedy they believe is warranted for any Parity Act.  Plaintiffs will still be required to show they have an existing or likely injury that has not been remedied and is capable of being redressed.

[296] Dkt. 89, *Plaintiffs' Reply*, at 15.

[297] Dkt. 71, *Plaintiffs' MSJ*, at 36-37 (citing Parity Act Discovery, Sue K. 2616-41).

consider regarding application of the Optum guidelines)  Plaintiffs to not seem to directly rely on citation to the Optum guidelines.

To this alleged violation, Defendants respond it was permissible for them to refer in denial letters to "the absence of acute symptomology in finding that residential treatment was not medically necessary."[298]  Thus, the references to "acute" in the denials was part of an evaluation of "acuity" –not a requirement G.K. have acute symptoms for residential coverage.[299]

As already discussed above in considering the claim for benefits, that is not how the court reads the discussion of acuity or being suicidal in the denial letters.  Rather, the letters to convey to the reader that an acute condition—being presently suicidal—would have supported, and was required, for residential treatment care coverage under the Plan.

Judge Parrish in this District recently reached the same conclusion *Jonathan Z. v. Oxford Health Plans* in considering whether rationales in residential treatment care denials amounted to a Parity Act violation.[300]  There, one denial stated:

> You were admitted for treatment of Depression. It is reported that you made progress and no longer need the type of care and services provided in this setting you are not a danger to self or others.  You have no medical issues.[301]

Another denial stated "[y]ou were not thinking about hurting yourself or others," and "[y]ou were not hearing or seeing things that others do not." [302]

In that case, as here, the administrator used the Optum guidelines, including the common criteria for residential care—that the "member is not in imminent or current risk of harm to self,

---

[298] Dkt. 73, *Defendants' MSJ*, at 37 (citations omitted).

[299] *Dkt.* 83, *Defendants' Reply*, at 51.

[300] 2002WL 2528362.

[301] *Id.*

[302] *Id.*

others, and/or property." [303]  And for the relevant medical/surgical analogue, skilled nursing

facilities, the Plan required that there should be "no acute hospital needs," but there are "intense

and complex care needs."[304]

While the court concluded found no discernable *facial* Parity Act violation, the substance

of the denial letters amounted to an as-applied violation:

> [i]n practice, however, Oxford [the administrator] applied a more stringent burden
> to Plaintiffs claims for [residential] care . . . than outline in the Plan.  Indeed, the
> Plan requires that the member present no imminent risk of serious harm to self or
> others in order to provide coverage at an RTC facility.  But Oxford *denied*
> coverage based upon the rationale that [a teenage beneficiary] was not a danger to
> self or others and did not display suicidal or homicidal ideation.  ("You were not
> thinking about hurting yourself or others).  Suicidal ideation, homicidal ideation,
> and hallucinations are acute symptoms.  Indeed, Oxford's rational for denying . . .
> coverage at RTC-level facilities more closely mirrors the requirements outline for
> inpatient mental health care treatment: that '[t]he member is at imminent risk of
> harm to self or others as evidenced by . . . current suicidal ideation . . . .[305]

As the undersigned concludes, Judge Parrish found the denial letters were not merely mentioning

the lack of acute symptoms as a starting point to evaluate whether care could be stepped down—

they were a basis to contend residential care was entirely unavailable.  This amounts to an as-

applied Parity Act violation.  And it does not depend on application of the UBH guidelines.

Rather, as Judge Parrish suggested, it actually seems incongruent with them.

Thus, the court concludes that the UBH retrospective review and first level appeal

denial letters, and MCMC's second level denial violated the Parity Act by requiring G.K. to be

presenting suffering from an acute condition—being suicidal—when such an acute condition is

not required to receive analogous medical/surgical care at a skilled nursing facility.

---

[303] *Id.*at 3.

[304] *Id.* at 20.

[305] *Id.*

    **3.   Further Briefing on Parity Act Remedies, Fees, Costs, and Prejudgment Interest**

Having found an as-applied violation of the Parity Act, Plaintiffs are invited to submit supplemental briefing on the issue of the availability and propriety of a remedy. Additionally, Plaintiffs in their opening brief requested the opportunity to brief the propriety of an award of prejudgment interest, attorneys' fees, and costs under 29 U.S.C. § 1132(g), should they prevail on their Motion for Summary Judgment.[306]  Thus, within fourteen (14) days, Plaintiffs shall submit a combined brief no longer than fifteen (15) pages within fourteen (14) days on these issues.  After Plaintiffs file their brief, Defendants shall have fourteen (14) days to respond with a brief also limited to fifteen (15) pages.

## IV.    CONCLUSION

Based on the foregoing, the court GRANTS Plaintiffs' Motion for Summary Judgment[307] and DENIES Defendants' Motion for Summary Judgment.[308]  The court awards Plaintiffs G.K.'s benefits for her entire residential treatment at Sunrise on Plaintiffs' first cause of action, for Plan benefits.  On Plaintiffs' second cause of action, the court concludes Defendants committed an as-applied Parity Act violation.  Further briefing is invited on Parity Act remedies, attorney fees, costs, and prejudgment interest.

So ordered this 29th day of September 2023.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[306] Dkt. 71, *Plaintiffs' MSJ*, at 40-41.

[307] *Id.*

[308] Dkt. 73, *Defendants' MSJ*.